## IN THE DISTRICT COURT
## SEWARD COUNTY, KANSAS

MARVIN D. CHANCE, JR., )
on behalf of himself and )
all others similarly situated, )
                            )
        Plaintiff, )
                            )
v. )
                            )
INTEL CORPORATION, a Delaware )
corporation, and INTEL KABUSHIKI )
KAISHA, a Japanese corporation, )
                            )
        Defendants. )
_____)

FILED
CLERK OF DIST. COURT
SEWARD COUNTY

2005 JUL 7 PM 2 57

Case No. _05 CV 97_

(Pursuant to Chapter 60)

### CLASS ACTION PETITION

Marvin D. Chance, Jr. ("Plaintiff"), by and through his undersigned attorneys, allege against INTEL CORPORATION and its worldwide family of dominated subsidiaries, including INTEL KABUSHIKI KAISHA, (hereafter collectively, "Intel") an antitrust violation and on information and belief would show the Court and jury as follows:

### NATURE OF THE ACTION

1.     Intel manufactures x86 microprocessors, the central processing unit (CPU) of most computer systems. The microprocessor processes system data and controls other devices in the system, acting as the "brains" of the computer. Intel's microprocessors run the popular Microsoft Windows and Linux families of operating systems.

2.    In 2004, Intel's revenue from sales of microprocessors was $24.5 billion, approximately 72% of its consolidated net revenue of $34.2 billion. *See* Intel Corporation's 2004 Form 10-K, attached as Exhibit A, at 2, 30.

3.    As Intel proudly declares in the opening sentences of its Form 10-K for the year ended December 25, 2004, it is "the world's largest semiconductor chipmaker. . . [It's] goal is to be the preeminent building block supplier to the worldwide digital economy." *See* Exhibit A, Intel Corporation's 2004 Form 10-K at 1.

4.    To achieve its goal of being "the preeminent building block supplier to the worldwide digital economy," Intel engaged in numerous anticompetitive strategies, including threats, intimidation, kickbacks, and retaliation.  Intel designed these strategies to quash product-based competition on price and performance in the microprocessor industry.  The specific strategies are more completely detailed in the Complaint filed in *Advanced Micro Devices, Inc. and AMD International Sales & Service, Ltd. v. Intel Corporation and Intel Kabushiki Kaisha,* Case No. 1:05-cv-00441, (USDC DE, June 27, 2005), attached hereto as Exhibit B ("the AMD Complaint").

5.    By its own admission, Advanced Micro Devices, Inc. (AMD) is Intel's primary microprocessor competitor. *See* Exhibit A, Intel Corporation's 2004 Form 10-K at p. 13.

6.    In addition to direct competitors like AMD, Intel's anticompetitive strategies impact consumers of computers operating with Intel microprocessors. The inability of AMD and other microprocessor manufacturers to compete fairly and openly in the worldwide digital economy deprives consumers of the right to

2

buy the best product to suit their needs at the lowest price.  *See* Reuters article, "AMD files antitrust suit against Intel," June 28, 2005, attached as Exhibit C.  As detailed in the AMD Complaint, "[c]onsumers ultimately foot this bill, in the form of inflated PC prices and the loss of freedom to purchase computer products that best fit their needs.  Society is worse off for lack of innovation that only a truly competitive market can drive."  Exhibit B, AMD Complaint, at 3, ¶ 6.

7.     Plaintiff Marvin D. Chance, Jr., is a consumer of computers using Intel microprocessors.  As such, he and the Class he seeks to represent are indirect purchasers of Intel's x86 microprocessors who have been damaged by Intel's anticompetitive, monopolistic conduct in violation of Kansas' antitrust statutes. Consequently, Plaintiff and the Class (plaintiffs) seek overcharge and full consideration damages, statutory penalties, attorneys' fees, and costs.

### JURISDICTION AND VENUE

8.     Jurisdiction is proper in this Court under the Kansas antitrust statutes, K.S.A. 50-101, et seq., pursuant to the Kansas long arm statute K.S.A. 60-308(b)(1), (2), and/or (7), and general jurisdiction.  Intel's monopolistic conduct in the sale and distribution of its microprocessors adversely affects and has affected the Kansas market for computers installed with Intel microprocessors and has directly damaged plaintiffs.

9.     Venue is proper in this Court because Intel transacted business, committed an illegal or tortious act, substantially affected the Kansas trade and commerce in the computer microprocessor market, and injured plaintiffs in Seward County, Kansas where Plaintiff bought computers with Intel microprocessors.

10.     Plaintiff and each member of the class has incurred damages under Kansas law in an amount less than $75,000, even if trebled, and neither plaintiffs nor any other member of the class seeks damages exceeding $75,000, nor do their damages individually exceed $75,000 inclusive of interest and attorneys' fees and all relief of any nature sought hereunder.  Further plaintiffs assert no federal question or statute and plaintiffs' state law causes of action are not federally preempted.  Plaintiffs allege a cause of action solely under the laws of Kansas and specifically deny any attempt to state a cause of action under the laws of the United States of America including without limitation the Sherman Antitrust Act.

11.     More than 2/3rds of the members of the proposed plaintiff class are residents of Kansas.  All class members were principally harmed in Kansas.  No injunctive relief is sought. The class-wide claim is **less than** $5 million. No other class claims have been filed by anyone in the prior three years asserting the same or similar factual allegations against any of the defendants.

## THE PARTIES

12.     Plaintiff Marvin D. Chance, Jr. is a resident of Seward County, Kansas, who purchased a personal computer with an Intel microprocessor during the Class Period.

13.     Defendant INTEL CORPORATION is a Delaware corporation with its principal executive offices at Santa Clara, California, and it conducts business both directly and through wholly-owned and dominated subsidiaries worldwide. Intel and its subsidiaries design, produce, and sell a variety of microprocessors, flash memory devices, and silicon-based products for use in the computer and

4

communications industries worldwide. *See* Intel Corporation's 2004 Form 10-K, List of Subsidiaries, attached as Exhibit D.

14. Intel is a foreign corporation registered with the Kansas Secretary of State. It is currently active and in good standing.

15. Defendant INTEL KABUSHIKI KAISHA ("Intel KK"), a Japanese corporation, is Intel's wholly owned and dominated subsidiary through which Intel sells its microprocessors in Japan. *See* Exhibit D, Intel Corporation's 2004 Form 10-K, List of Subsidiaries.

## THE MICROPROCESSOR MARKET

16. For many years, Intel's x86 microprocessors have garnered 90% of the revenue and 80% of the units sold in the world's microprocessor market.

17. As reported in Intel's 2004 10-K (Exhibit A at 31), Intel had net consolidated revenue from the sales of microprocessors of almost $ 24.5 billion, an increase of $3.0 billion from the prior year.

18. With $24.5 billion in worldwide revenue from sales of Intel microprocessors, such sales in Kansas account for many millions of dollars per year.

19. Published reports identify Intel as the market leader with over 90% of the market share as measured by revenue. AMD is second with 9%. Other manufacturers make up the remaining 1%.

20. With over 90% of the market, Intel's monopoly enables it to control pricing for the microprocessors, achieving gross margin percentages approaching 60%. *See* Exhibit A, Intel's 2004 Form 10-K at 30. *See* Intel Business Outlook,

attached as Exhibit E (reporting expected gross margin percentage for 2005 is 59%).

21.     Despite attempted entries into the computing market by other microprocessor manufacturers, Intel has captured the Windows and Linux operating systems that dominate the consumer and business worlds. Other microprocessors cannot be substituted, giving Intel a captive market.

22.     Moreover, computer manufacturers will not invest in developing alternative computer architectures because it is impractical.   First, the cost of switching consumers to computers using other microprocessors is too great given the need to replace hardware and software when compared with upgrading. Second, the market of new first time users is too small to create competition in a generally already entrenched market.  Third, competitors cannot meet the huge barriers to entry, such as construction of fabrication facilities and funding of research and development costs.  Fourth, with the exception of AMD, the two remaining competitors in the microprocessor market, Transmeta Corporation and Via Technologies, Inc., are struggling with around 1% of the market.

23.     Hence, the computer microprocessor market is essentially homogenous.  It is the same from country to country, state to state, city to city.  Further, the ease of shipping microprocessors worldwide maintains price consistency which, in turn, deters arbitrage.

24.     To combat Intel's monopoly, AMD compelled arbitration under the 1982 AMD-Intel Technology Exchange Agreement and prevailed after seven years of litigation and appeals.  After confirmation of the arbitration award by the California Supreme Court in 1994, the arbitrator expressed hope that "the

competition sure to follow will be beneficial to the parties through an expanded market with appropriate profit margins and to the consumer worldwide through lower prices." *See* Exhibit B, AMD Complaint at 7, ¶16.

25.     However, even after losing the arbitration battle, Intel still intended, at that time, and to this day, to become the "preeminent building block supplier to the worldwide digital economy" and recommitted to its anticompetitive strategies in order to achieve its monopolistic goal.   *See* Exhibit B, AMD Complaint at 6, ¶15.

26.     These strategies include:

a.      Forcing major customers into exclusive or near-exclusive deals;

b.      Conditioning rebates, allowances and market development funding on customers' agreements to minimize or eliminate its purchases of microprocessors from competitors, particularly AMD;

c.      Establishing a tiered system of retroactive, first-dollar rebates to serve as an incentive for the customers' purchase of microprocessors at high volumes that effectively locked in Intel as the supplier and locked out other microprocessor manufacturers;

d.      Threatening retaliation against customers introducing other manufacturers' computer platforms, particularly in strategic market segments;

e.      Enforcing quotas among key retailers and requiring them to stock overwhelmingly, if not exclusively, Intel-powered computers thereby limiting consumers' choice;

f.    Providing financial rewards through the "Intel Inside" and "Centrino" programs to OEM customers for branding their personal computers with "Intel" indicators;

g.    Forcing PC makers and technology partners to boycott other manufacturers' product launches and promotions;

h.    Forcing technical standards and products on the industry to secure for itself and to prevent competitors from altering the microprocessor market.

27.    Intel particularly targeted its "primary competitor" AMD by the use of these abusive, exclusionary tactics. *See* Exhibit B, the AMD Complaint at 15-41.

28.    Further, these tactics are unlawfully exclusionary, have no pro-competitive justification, and are intended to maintain Intel's monopoly of the x86 microprocessor market.

29.    They are anticompetitive tactics in that they prevented distribution of competing products, stifled innovation, wrongfully induced retailers and distributors to stop carrying the competitors' products, and reduced or eliminated competitors' meaningful access to computer manufacturers, trade shows, and ultimately consumers, all of which had the combined intent and effect of preserving Intel's monopoly.

30.    In Kansas, these abusive monopolistic practices effectively eliminated the consumers' right to purchase the best computing product to suit their needs at the most competitive price.

31.    The above mentioned abusive monopolistic practices by Intel have had the following effects on Kansas consumers:

i. Restraint or elimination of competition in the sale of computers in Kansas;

ii. Injury to actual and potential competitors in the Kansas market; and

iii. Higher prices to Kansas consumers who were deprived of the benefits of free, competitive, innovative, and unrestrained markets.

32. As a result of Intel's monopolistic practices, Plaintiff and the Class have paid higher prices for computers than they would have paid in a competitive market and have been injured thereby.

## CLASS ALLEGATIONS

33. Plaintiff brings this action under KSA 60-223(a), and (b) (3) on behalf of himself and a "Class" defined as:

> Individuals or entities who have purchased for end use and not for resale, computers with Intel microprocessors at any time from January 1, 2000 to the present (the "Class Period") who reside in or have their purchasing entity in the Kansas counties of Seward, Greeley, Hamilton, Stanton, Morton, Wichita, Kearney, Grant, Stevens, Scott, Finney, Haskell, Gray, Meade, Ford, Clark, Kiowa, and Comanche.

34. Numerosity. Plaintiff does not know the exact number of class members, but reasonably believes that the class members number at least in the thousands and are geographically dispersed throughout the aforementioned Kansas counties such that joinder of all class members is impracticable.

35. Commonality. There are questions of law and/or fact, common to the class, including but not limited to:

a. Whether the Kansas computing market is the relevant market for determining whether a monopoly exists;

b. Whether Intel, individually or in consort with its subsidiaries and affiliates, collectively, have monopoly power in the Kansas computing market;

c.     Whether Intel willfully maintained monopoly power or restrained competition in the computing market;

d.     Whether Intel engaged in anticompetitive behavior unilaterally or in combination with others in order to maintain its monopoly in the microprocessor market;

e.     Whether Intel's monopolistic conduct caused artificial and non-competitive pricing for computers sold in Kansas;

f.     Whether Plaintiffs and class members were injured by Intel's conduct and, if so, the appropriate class-wide measure of damages.

36.    <u>Typicality and Adequacy</u>. Plaintiff's claims are typical of the claims of the Class who bought computers with Intel x86 microprocessors in the aforementioned Kansas counties, including Seward County, and who seek effectively the same relief of monetary damages. Plaintiff will fairly and adequately represent the interests of the Class and has no conflicts with any member of the Class. Furthermore Plaintiff has retained competent legal counsel experienced in Kansas antitrust and class action litigation.

37.    <u>Common questions of law and/or fact predominate and class actions are superior under K.S.A. 60-223(b)(3)</u>. A class action to resolve these issues is far superior for the fair and efficient adjudication of the controversy so as to concentrate the litigation in a single proceeding to eliminate the burden on the courts and the parties. Thousands of lawsuits throughout the state of Kansas would be undesirable, unmanageable, and cost prohibitive. Whatever difficulties may exist in the management of the class action will be greatly outweighed by the class action procedure.

## TOLLING OF STATUTE OF LIMITATIONS

38.     Intel's monopolistic practices tolled the statute of limitations due to one or more of the following theories:

    (a)   Fraudulent concealment of its anticompetitive strategies which could not be recognized in isolation by a consumer, but was only obvious in the aggregate over time due to Intel's systematic attempt to conceal its true anticompetitive effect;

    (b)   Equitable tolling because Intel should not be able to benefit from its improper and illegal conduct;

    (c)   Discovery rule because Plaintiff and the Class were unable to reasonably discern the monopolistic practice and the harm that it was causing; and

    (d)   Continuous tort from the systematic and continuing monopolistic practices of Intel over the Class Period.

### CAUSE OF ACTION I

### Kansas Antitrust Cause of Action
### for Unlawful Maintenance of Monopoly and for Restraint of Trade
### K.S.A. 50-101, et seq.

39.     Plaintiffs restate and re-allege paragraphs 1-38 above.

40.     Through the anticompetitive and illegal conduct described above, Intel willfully maintains and, since 2000, has maintained a monopoly in the microprocessor market.  That monopoly deprives consumers of a free market economy in the sale of computers in the United States, including Kansas.

41.     Intel, unilaterally or in combination with others, has unreasonably restrained trade in the microprocessor market.

11

42.     As a direct and proximate result of the above described conduct by Intel,

Plaintiff and the Class have been injured in an amount which will be established

on a class-wide basis at trial.

## PRAYER FOR RELIEF

Plaintiff and the Class respectfully request:

1.     That the Court declare and adjudge this action to be a proper class action

pursuant to K.S.A. 60-223;

2.     That the Court find and adjudge that Intel has committed the violations of

Kansas antitrust law stated here in;

3.     That the Court enter judgment in favor of the Plaintiff and Class against

Intel for full consideration under K.S.A. 50-115 as the damages sustained by

Plaintiff and the Class;

4.     That the Court enter judgment in favor of the Plaintiff and the Class

against Intel for treble damages under K.S.A. 50-801;

5.     That Plaintiff and the Class be awarded the cost of suit, including

reasonable attorneys' fees;

6.     That the Court enter a judgment that Intel and its wholly-owned

subsidiaries are jointly and severally liable for the damages sustained from its

monopolistic conduct;

7.     That Plaintiff and the Class be granted such other and further relief as the

Court may deem proper.

## JURY TRIAL DEMANDED
## ATTORNEYS' LIEN ASSERTED

Respectfully submitted,

Rex A. Sharp KBA # 12350
Barbara C. Frankland KBA # 14198
Gunderson, Sharp & Walke, L.L.P.
4121 W. 83rd St., Ste. 256
Prairie Village, KS 66208
(913) 901-0505
(913) 901-0419 fax

Chance v. Intel Corporation, et al.

**Exhibit A**

To Class Action Petition

10-K 1 d10k.htm FORM 10-K

Table of Contents

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

# FORM 10-K

**(Mark One)**

☒ **Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

    **For the fiscal year ended December 25, 2004.**

☐ **Transition Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

    For the transition period from _____ to _____.

**Commission File Number 0-06217**

---

# INTEL CORPORATION
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **94-1672743** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **2200 Mission College Boulevard, Santa Clara, California** | **95052-8119** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code **(408) 765-8080**

Securities registered pursuant to Section 12(b) of the Act:
None

Securities registered pursuant to Section 12(g) of the Act:

Common stock, $0.001 par value

---

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.  ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Exchange Act Rule 12b-2).   Yes ☒ No ☐

Aggregate market value of voting and non-voting common equity held by non-affiliates of the registrant as of June 25, 2004, based upon the closing price of the common stock as reported by the NASDAQ* National Market on such date, was approximately
$172.9 billion
6,227 million shares of common stock outstanding as of January 28, 2005

## DOCUMENTS INCORPORATED BY REFERENCE

(1) Portions of the registrant's Proxy Statement relating to its 2005 Annual Stockholders' Meeting, to be filed subsequently—Part III.

---

**Table of Contents**

## INTEL CORPORATION

## FORM 10-K

## FOR THE FISCAL YEAR ENDED DECEMBER 25, 2004

## INDEX

| | | Page |
|---|---|---|
| **PART I** | | |
| Item 1. | Business | 1 |
| Item 2. | Properties | 21 |
| Item 3. | Legal Proceedings | 22 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 23 |
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases | 23 |

of Equity Securities
Item 6. Selected Financial Data 24
Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations 25
Item 7A. Quantitative and Qualitative Disclosures About Market Risk 43
Item 8. Financial Statements and Supplementary Data 45
Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure 81
Item 9A. Controls and Procedures 81
Item 9B. Other Information 82

**PART III**

Item 10. Directors and Executive Officers of the Registrant 83
Item 11. Executive Compensation 83
Item 12. Security Ownership of Certain Beneficial Owners and Management and Related
            Stockholder Matters 83
Item 13. Certain Relationships and Related Transactions 83
Item 14. Principal Accountant Fees and Services 83

**PART IV**

Item 15. Exhibits and Financial Statement Schedules 84

**Table of Contents**

## PART I

### ITEM 1. BUSINESS

**Industry**

We are the world's largest semiconductor chip maker, supplying advanced technology solutions for the computing and communications industries. Our goal is to be the preeminent building block supplier to the worldwide digital economy. We offer products at various levels of integration, allowing our customers flexibility to create advanced computing and communications systems and products.

Intel's products include chips, boards and other semiconductor components that are the building blocks integral to computers, servers, and networking and communications products. Our component-level products consist of integrated circuits used to process information. Our integrated circuits are silicon chips, known as semiconductors, etched with interconnected electronic switches. Developments in semiconductor design and manufacturing continue to make it possible to decrease the size of circuits and transistors etched into silicon, utilizing less space as a result. This decrease in size enables us to put increased numbers of transistors on an equivalent size chip, decrease the size of the chip or offer an increased number of integrated features. These advancements can result in higher performing microprocessors that consume less power and/or products that cost less to manufacture.

We were incorporated in California in 1968 and reincorporated in Delaware in 1989. Our Internet address is *www.intel.com*. On this web site, we publish voluntary reports, which are updated annually, outlining our performance with respect to corporate responsibility and environmental, health and safety compliance (these voluntary reports are not incorporated by reference into this filing). On our Investor Relations web site, located at *www.intc.com*, we post the following filings as soon as reasonably practicable after they are electronically filed with or furnished to the Securities and Exchange Commission: our annual report on Form 10-K, our quarterly reports on Form 10-Q, our current reports on Form 8-K, our proxy statement on Form 14A related to our annual stockholders' meeting and any amendments to those reports or statements filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended. All such filings on our Investor Relations web site are available free of charge. The content on

any web site referred to in this filing is not incorporated by reference into this filing unless expressly noted otherwise.

## Products

Our products include microprocessors; chipsets; motherboards; flash memory; communications infrastructure components, including network and embedded processors; wired and wireless connectivity products; products for networked storage; application processors; and cellular baseband chipsets.

Our customers include:

- original equipment manufacturers (OEMs) and original design manufacturers (ODMs) who make computer systems, cellular handsets and handheld computing devices, and telecommunications and networking communications equipment;

- PC and network communications products users (including individuals, large and small businesses, and service providers) who buy PC components and board-level products, as well as Intel's networking and communications products, through distributor, reseller, retail and OEM channels throughout the world; and

- other manufacturers, including makers of a wide range of industrial and communications equipment.

Our primary focus is on developing advanced integrated silicon technology solutions, which we believe will provide the performance necessary to help accelerate the convergence of computing and communications capabilities with digital content. Convergence refers to having computing and communications capabilities in an integrated product solution. We also provide key components for the networking and communications infrastructure used to connect technology users.

We believe that users of computing and communications devices want improved performance, which includes faster processor performance and/or improved capabilities such as multithreading or multitasking, lower system power consumption, seamless connectivity, improved security, reliability, ease of use and interoperability among devices. Our goal is to incorporate features addressing these capabilities into our various products to meet user demands. We believe that our customers who build computing and communications systems and devices will benefit if our products incorporating these capabilities are based on a platform solution. We define a platform as a collection of silicon components and software designed to provide a better user solution when used in combination than if used separately.

1

## Table of Contents

For 2004, the company consisted of two product-line operating segments, the Intel Architecture business and the Intel Communications Group (ICG). Both of our operating segments use their core competencies in the design and manufacture of integrated circuits, as well as key silicon and platform capabilities, to provide building blocks for technology solutions. The Intel Architecture business provides advanced technologies to support the desktop, mobile and enterprise computing market segments. ICG offers products such as flash memory, as well as platform solutions for the wireless handheld computing and communications market segments. In addition, ICG offers wired and wireless connectivity products and key networking and communications infrastructure components. In 2004, we combined our communications-related businesses into a single organization, ICG. Previously, these communications

businesses were in two separate product-line operating segments: the former Intel Communications Group and the Wireless Communications and Computing Group.

In January 2005, we announced a planned reorganization of our business groups to bring all major product groups in line with the company's strategy to drive development of complete technology platforms. These new business units include the Mobility Group, the Digital Enterprise Group, the Digital Home Group, the Digital Health Group and the Channel Platforms Group. We expect this reorganization to become effective in 2005. Because the reporting period for this Form 10-K is as of December 25, 2004, the business groups discussed below and the results of operations for our operating segments in this filing are presented under the organizational structure that existed as of December 25, 2004.

### Intel Architecture Business

The Intel Architecture business develops platform solutions based on our microprocessors, chipsets and motherboard products, which we optimize for use in the desktop, mobile or server computing market segments. The end-user products into which our products are ultimately integrated are determined by our customers based on how they choose to meet specific user requirements.

Net revenue for the Intel Architecture operating segment made up approximately 85% of our consolidated net revenue in 2004. Revenue from sales of microprocessors within the Intel Architecture operating segment represented approximately 72% of consolidated net revenue in 2004. Our microprocessor business generally has followed a seasonal trend; however, there can be no assurance that this trend will continue. For the past five years, the company's sales of microprocessors were higher in the second half of the year than in the first half of the year. Consumer purchases of PCs have been higher in the second half of the year, primarily due to back-to-school and holiday demand. In addition, technology purchases from businesses have tended to be higher in the second half of the year.

A *microprocessor* is the central processing unit (CPU) of a computer system. It processes system data and controls other devices in the system, acting as the "brains" of the computer. One indicator of microprocessor performance is its clock speed, the rate at which its internal logic operates, which is measured in units of hertz, or cycles processed per second. One megahertz (MHz) equals one million cycles processed per second, and one gigahertz (GHz) equals one billion cycles processed per second. As computers continue to support increased usage models, other factors are becoming increasingly important to overall system performance. Examples include the amount of memory storage, the speed of memory access, the microarchitecture design of the CPU and the speed of communication between the CPU and the chipset. A faster bus, for example, allows for faster data transfer into and out of the processor, enabling increased performance. A bus carries data between parts of the system. A common way to categorize microprocessor design architectures is by the number of bits (the smallest unit of information on a machine) that the processor can handle at one time. Microprocessors currently are designed to process 32 bits or 64 bits of information at one time. Microprocessors with 64-bit addressing capability can address significantly more memory than 32-bit microprocessors. The Intel® Pentium®, Intel® Celeron® and Intel® Xeon™ branded products are based on our 32-bit architecture (IA-32), while Intel® Itanium® branded products are based on 64-bit architecture. Another way to provide 64-bit processing capability is for processors based on 32-bit architecture to have 64-bit address extensions. Certain of our Pentium® 4 and Intel Xeon products have 64-bit address extensions. The memory stored on a chip is measured in bytes (8 bits), with 1,024 bytes equaling a kilobyte (KB), 1.049 million bytes equaling a megabyte (MB) and 1.074 billion bytes equaling a gigabyte (GB). Cache is a memory that can be located directly on the microprocessor, permitting quicker access to frequently used data and instructions. Some of our microprocessors have additional levels of cache, second-level (L2) cache and third-level (L3) cache, to offer higher levels of performance.

2

Worldwide, these competitors range in size from large, established, multinational companies with multiple product lines to smaller companies and new entrants to the marketplace that compete in specialized market segments. In some cases, our competitors are also our customers and/or suppliers. With the convergence in computing and communications products, product offerings will continue to cross over into multiple categories, offering us new opportunities but also resulting in more competition. In markets where our competitors have established products and brand recognition, it may be inherently difficult for us to compete against them.

Most of our products, including all of our Intel architecture microprocessors and chipsets, as well as our flash memory and embedded processors within ICG, are built in our own manufacturing facilities. We believe that our network of manufacturing facilities and assembly and test facilities gives us a competitive advantage. This network enables us to have more direct control over our processes, quality control, product cost, volume and timing of production, and other factors. These types of facilities are very expensive, and many of our competitors do not own such facilities because they cannot afford to do so or because their business models involve the use of third-party facilities for manufacturing and assembly and test. These "fabless semiconductor companies" include Broadcom Corporation, NVIDIA Corporation, QUALCOMM Incorporated and VIA Technologies, Inc. Some of our competitors own portions of such facilities through investment or joint-venture arrangements with other companies. There is a group of third-party manufacturing companies (foundries) and assembly and test subcontractors that offer their services to companies without owned facilities or companies needing additional capacity. These foundries and subcontractors may also offer to our competitors intellectual property, design services, and other goods and services. Competitors who outsource their manufacturing and assembly and test operations can significantly reduce their capital expenditures.

12

---

## Table of Contents

We plan to continue to cultivate new businesses and work with the computing and communications industries through standards bodies, trade associations, OEMs, ODMs, and independent software and operating system vendors to align the industry to offer products that take advantage of the latest market trends and usage models. These efforts include helping to create the infrastructure for wireless network connectivity. We are also working with these industries to develop software applications and operating systems that take advantage of our microprocessors, chipsets and other next-generation semiconductor devices with higher performance. We frequently participate in industry initiatives designed to discuss and agree upon technical specifications and other aspects of technologies that could be adopted as standards by standards-setting organizations. Our competitors may also participate in the same initiatives, and our participation does not ensure that any standards or specifications adopted by these organizations will be consistent with our product planning.

Companies in the semiconductor industry often rely on the ability to license patents from each other in order to compete in today's markets. Many of our competitors have broad cross-licenses or licenses with us, and under current case law, some such licenses may permit these competitors to pass our patent rights on to others. If one of these licensees becomes a foundry, our competitors might be able to avoid our patent rights in manufacturing competing products. In addition to licensing our patents to competitors, our participation in industry initiatives may require us to license our patents to other companies that adopt certain industry standards or specifications, even when such organizations do not adopt standards or specifications proposed by Intel. Any Intel patents implicated by our participation in such initiatives might not, in some situations, be available for us to enforce against others who might be infringing those patents. We cannot be assured that the patents and licenses on our products will be honored in all regions in which we compete. In various geographies where our business is growing, we have no assurance about the scope of rights that we can enforce against others, or that others may assert against us. In addition, in certain regions, governments may adopt regulations or courts may render decisions requiring compulsory licensing of intellectual property to others, or requiring that products meet specified standards that serve to favor

local companies, negatively impacting Intel's ability to achieve an economic return for its innovation and investment.

### Intel Architecture Business

We continue to be largely dependent on the success of our microprocessor business. Many of our competitors, including Advanced Micro Devices, Inc. (AMD), our primary microprocessor competitor, market software-compatible products that are intended to compete with Intel architecture-based processors. We also face competition from companies offering rival microprocessor designs, such as International Business Machines Corporation (IBM), which supplies microprocessors to Apple Computer, Inc. IBM is also jointly developing a rival architecture design with Sony Corporation and Toshiba Corporation. We currently offer desktop, mobile and server microprocessor products based on our 32-bit architecture; enterprise-class servers and supercomputing product offerings based on 64-bit architecture; and workstation and server solutions based on the IA-32 architecture with 64-bit extension technology that are able to run both 32-bit and 64-bit software applications. AMD offers competing microprocessor product offerings for servers, workstations and desktops that are able to run existing 32-bit and 64-bit software applications. We continuously evaluate all of our product offerings and the timing of their introduction, taking into account factors such as customer requirements, availability of infrastructure to take advantage of product performance, and maturity of applications software for each type of processor in the relevant market segments.

Our desktop processors compete with products offered by AMD, IBM and VIA, among others. Our mobile microprocessor products compete with products offered by AMD, IBM, Transmeta Corporation and VIA, among others. Our server processors compete with software-compatible products offered by AMD and with products based on rival architectures, including those offered by Hewlett-Packard Company, IBM and Sun Microsystems, Inc. Our chipsets compete in the various market segments against different types of chipsets that support either our microprocessor products or rival microprocessor products. Competing chipsets are produced by companies such as ATI Technologies, Inc., Broadcom, NVIDIA, Silicon Integrated Systems Corporation (SIS) and VIA. We also compete with companies offering graphics components and other special-purpose products used in the desktop, mobile and server market segments. One aspect of our business model is to incorporate higher performance and advanced properties into the microprocessor and chipset, the demand for which may increasingly be affected by competition from companies, such as ATI and NVIDIA, whose business models are based on incorporating performance into chipsets and other components, such as graphics controllers.

13

**Table of Contents**

### Intel Communications Group

Within ICG, we are focused on developing component-level products for the wireless handheld computing and communications market segments. We also are developing products that we believe will help continue to build out the Internet.

Component-level products for the wireless handheld computing and communications market segments include flash memory products, application processors and cellular baseband chipsets. In our various market segments, our products currently compete with the products of other companies, such as QUALCOMM, Samsung Electronics Co., Ltd., Spansion LLC (a subsidiary of AMD), STMicroelectronics NV and Texas Instruments Incorporated. The megabit demand of the products that make use of flash memory is increasing, and our NOR flash memory products face increased competition from companies that manufacture NAND flash memory products, as OEMs look for opportunities to use NAND flash memory products with additional random access memory or in combination with NOR flash memory for

deferred tax assets recorded on our balance sheet will ultimately be recovered. However, should there be a change in our ability to recover our deferred tax assets, our tax provision would increase in the period in which we determined that the recovery was not likely.

In addition, the calculation of our tax liabilities involves dealing with uncertainties in the application of complex tax regulations. We recognize liabilities for anticipated tax audit issues in the U.S. and other tax jurisdictions based on our estimate of whether, and the extent to which, additional tax payments are probable. If we ultimately determine that payment of these amounts is unnecessary, we reverse the liability and recognize a tax benefit during the period in which we determine that the liability is no longer necessary. We record an additional charge in our provision for taxes in the period in which we determine that the recorded tax liability is less than we expect the ultimate assessment to be. For a discussion of current tax matters, see "Note 10: Provision for Taxes" and "Note 18: Contingencies" in Part II, Item 8 of this Form 10-K.

29

---

**Table of Contents**

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS
(Continued)

**Results of Operations**

*Overview*

In 2004, we experienced another year of double-digit growth in annual revenue and gross margin dollars. Our Intel Architecture business contributed most of this growth, largely from higher unit sales of microprocessors. The Intel Architecture business continues to represent a large percentage of our business, accounting for 85% of our 2004 consolidated net revenue. Within ICG, we saw 28% growth in revenue, mostly driven by higher unit sales of our flash memory products. In 2004, we also ramped the production of our 90-nanometer process technology on 300-millimeter (mm) wafers, and exited the year with the majority of our processor shipments to the computing industry based on this technology. We continue to see strength in both our emerging and mature markets. For 2004, we increased the operating profit in our Intel Architecture business by 17% and reduced the losses slightly in our communications business. In addition, our business continued to generate significant cash, and we were able to use $7.5 billion to buy back our stock and pay $1.0 billion in dividends while maintaining our strong financial position.

In 2005, we are planning for further growth in both annual revenue and gross margin dollars, with higher unit sales for microprocessors. However, we are also expecting higher manufacturing start-up costs related to the ramp of our 65-nanometer process technology, particularly in the first half of 2005. Growth in sales and profitability depends on our ability to successfully ramp new products, and to obtain continuing benefits from the productive use of our manufacturing assets. We expect to introduce our first dual-core processors in 2005, as we continue to focus on enabling more capabilities, performance and flexibility for users beyond processor speed. We also plan to design our products around entire platforms. In line with this platform focus, in January 2005, we announced a reorganization to align our business groups across our major platform initiatives. Because the reporting period for this Form 10-K is as of December 25, 2004, the results of operations for all comparative periods, including the comparison of the 2003 to 2002 results, are presented under the organizational structure that existed as of December 25, 2004.

The following table sets forth certain consolidated statements of income data as a percentage of net revenue for the periods indicated:

|  | 2004 | 2003 | 2002 |
|---|---|---|---|
| Net revenue | 100.0% | 100.0% | 100.0% |
| Cost of sales | 42.3% | 43.3% | 50.2% |
| Gross margin | 57.7% | 56.7% | 49.8% |
| Research and development | 14.0% | 14.5% | 15.1% |
| Marketing, general and administrative | 13.6% | 14.2% | 16.2% |
| Impairment of goodwill | — | 2.0% | — |
| Amortization and impairment of acquisition-related intangibles and costs | 0.5% | 1.0% | 2.0% |
| Purchased in-process research and development | — | — | 0.1% |
| Operating income | 29.6% | 25.0% | 16.4% |

The following table sets forth information on our geographic regions for the periods indicated:

| (Dollars in Millions) | 2004 | | 2003 | | 2002 | |
|---|---|---|---|---|---|---|
|  | Revenue | % of Total | Revenue | % of Total | Revenue | % of Total |
| Americas | $ 7,965 | 23% | $ 8,403 | 28% | $ 8,648 | 32% |
| Asia-Pacific | 15,380 | 45% | 12,161 | 40% | 10,073 | 38% |
| Europe | 7,755 | 23% | 6,868 | 23% | 6,139 | 23% |
| Japan | 3,109 | 9% | 2,709 | 9% | 1,904 | 7% |
| Total | $ 34,209 | 100% | $ 30,141 | 100% | $ 26,764 | 100% |

Table of Contents

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS
### (Continued)

Our net revenue for 2004 was $34.2 billion, an increase of $4.1 billion, or 13.5%, compared to 2003. This increase was primarily due to higher net revenue from sales of microprocessors in our Intel Architecture business accompanied by higher net revenue for ICG.

Our Asia-Pacific region's revenue made up the largest portion of our total revenue during 2004 and increased 26%, reflecting both growth in local consumption and movement of more of the production for

our customers' PC supply chain to Asia. This movement in the supply chain negatively affected the Americas region, with a decrease in revenue of 5% in 2004 compared to 2003. Japan revenue increased 15%, and the Europe region's revenue increased 13% in 2004 compared to 2003.

Overall gross margin dollars were $19.7 billion, an increase of $2.7 billion, or 16%, compared to 2003. Our overall gross margin percentage increased to 57.7% in 2004 from 56.7% in 2003. The gross margin percentage for the Intel Architecture business was higher than in 2003, and the gross margin percentage in our communications business was lower than in 2003. See "Business Outlook" on page 40 of this section for a discussion of gross margin expectations.

Our net revenue for 2003 was $30.1 billion, an increase of 13% compared to 2002. This increase in net revenue was primarily from our Intel Architecture business, which had increased sales of microprocessors and chipsets. This increase was partially offset by lower net revenue for ICG.

In 2003, our Asia-Pacific region's revenue made up the largest portion of our total revenue and increased 21% compared to 2002, reflecting growth in local consumption and movement of more of the production for our customers' PC supply chain to Asia. Revenue in Europe improved, increasing 12%, in 2003 compared to 2002. Japan experienced substantial improvement with increased revenue of 42%, primarily driven by retail sales as well as higher notebook exports by Japanese manufacturers. Revenue from the Americas region continued to decrease as a percent of our total revenue and declined 3% in 2003 compared to 2002. In 2003, we continued to experience growth in emerging markets in Asia and Europe, and began to see some evidence of higher technology infrastructure spending in mature markets in Europe and the U.S.

Our overall gross margin percentage increased to 56.7% for 2003 from 49.8% in 2002. Improved gross margin within the Intel Architecture business as well as a shift in the total company revenue mix to the higher margin Intel Architecture business contributed to our improved total gross margin. Improvement in the Intel Architecture gross margin was partially offset by a decline in the gross margin percentage for ICG.

### Intel Architecture Business

The revenue and operating income for the Intel Architecture operating segment for the three years ended December 25, 2004 were as follows:

| (In Millions) | 2004 | 2003 | 2002 |
|---|---|---|---|
| Microprocessor revenue | $ 24,463 | $ 21,937 | $ 18,676 |
| Chipset, motherboard and other revenue | 4,704 | 4,241 | 3,671 |
| Total revenue | $ 29,167 | $ 26,178 | $ 22,347 |
| Operating income | $ 12,067 | $ 10,354 | $ 6,498 |

Revenue for the Intel Architecture operating segment increased by $3.0 billion, or 11%, in 2004 compared to 2003. Revenue from sales of microprocessors increased 12% while revenue from sales of

chipsets and motherboards increased 11%. The increase in Intel Architecture revenue was primarily due to higher unit sales for microprocessors in the computing market segment. Sales of microprocessors designed for the desktop, mobile and server market segments all increased substantially in 2004. Consistent with this increase in sales of microprocessors, we also experienced higher unit sales of our chipsets and motherboards in 2004 compared to 2003. We ramped our 90-nanometer process technology in 2004, and exited the year with the majority of our microprocessors shipped being manufactured on this technology.

Operating income increased to $12.1 billion in 2004 compared to $10.4 billion in 2003. The 17% increase was primarily due to the impact of higher revenue and lower unit costs for microprocessors, as well as approximately $160 million of lower manufacturing start-up costs. These increases in operating income were partially offset by higher operating expenses and a $162 million charge in Q1 2004 relating to a settlement agreement with Intergraph Corporation.

31

**Table of Contents**

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS
### (Continued)

For 2003, revenue for the Intel Architecture operating segment increased by $3.8 billion, or 17%, compared to 2002. Revenue from sales of microprocessors increased 17% while revenue from sales of chipsets and motherboards increased 16%. The increase in Intel Architecture revenue was primarily due to significantly higher unit sales and to a lesser extent due to a slightly higher average selling price for microprocessors, as well as significantly higher unit sales of chipsets in 2003. During 2003, we rapidly ramped the Intel Centrino mobile technology and the Pentium M processor for mobile computers. We also saw increased sales of Pentium 4 processors with HT Technology and higher sales of Intel Xeon processors in the server market segment.

Operating income increased by $3.9 billion, or 59%, in 2003 compared to 2002. The increase was primarily due to the impact of higher revenue, lower unit costs for microprocessors and chipsets, and charges for under-utilized factory capacity that were lower than in 2002 by approximately $150 million. These improvements were partially offset by approximately $390 million of higher start-up costs in 2003 related to the ramp of 90-nanometer technology on 300mm wafer manufacturing.

### *Intel Communications Group*

The revenue and operating loss for the ICG operating segment for the three years ended December 25, 2004 were as follows:

| (In Millions) | 2004 | 2003 | 2002 |
|---|---|---|---|
| Revenue | $5,027 | $3,928 | $4,288 |
| Operating loss | $ (791) | $ (824) | $ (817) |

Revenue increased by $1.1 billion, or 28%, in 2004 compared to 2003, primarily due to higher revenue from higher unit sales of flash memory products, embedded processing components and wireless connectivity products. Revenue from flash memory products increased to $2.3 billion in 2004 from $1.6 billion in 2003.

Chance v. Intel Corporation, et al.

**Exhibit B**

To Class Action Petition

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ADVANCED MICRO DEVICES, INC., a )
Delaware corporation, and AMD )
INTERNATIONAL SALES & SERVICE, ) Civil Action No _1:05-cv-00441_
LTD., a Delaware corporation, )
)
                            Plaintiffs, )   **JURY TRIAL DEMANDED**
)
        vs )
)
INTEL CORPORATION, a Delaware )
corporation, and INTEL KABUSHIKI )
KAISHA, a Japanese corporation, )
)
                            Defendants )


# COMPLAINT

Plaintiffs ADVANCED MICRO DEVICES, INC. and AMD INTERNATIONAL

SALES & SERVICE, LTD. (hereafter collectively, "AMD"), by and through their undersigned

attorneys, and for their complaint against INTEL CORPORATION and its worldwide family of

dominated subsidiaries, including INTEL KABUSHIKI KAISHA (hereafter collectively, "Intel"),

aver on knowledge as to themselves and their own acts and on information and belief as to all

other matters, as follows.

## NATURE OF THE ACTION

1      Like Standard Oil at the turn of the Nineteenth Century and Alcoa Aluminum

during the Twentieth, Intel holds a monopoly in a market critical to our economy:

microprocessors that run the Microsoft Windows and Linux families of operating systems

(hereinafter the "x86 Microprocessor Market"). Although AMD competes with Intel in this

global market, Intel possesses unmistakable and undeniable market power, its microprocessor revenues accounting for approximately 90% of the worldwide total (and 80% of the units).

2. Just like Standard Oil and Alcoa before it, for over a decade Intel has unlawfully maintained its monopoly by engaging in a relentless, worldwide campaign to coerce customers to refrain from dealing with AMD. Among other things,

- Intel has forced major customers into exclusive or near-exclusive deals;

- it has conditioned rebates, allowances and market development funding on customers' agreement to severely limit or forego entirely purchases from AMD,

- it has established a system of discriminatory, retroactive, first-dollar rebates triggered by purchases at such high levels as to have the practical and intended effect of denying customers the freedom to purchase any significant volume of processors from AMD;

- it has threatened retaliation against customers introducing AMD computer platforms, particularly in strategic market segments;

- it has established and enforced quotas among key retailers effectively requiring them to stock overwhelmingly, if not exclusively, Intel-powered computers, thereby artificially limiting consumer choice,

- it has forced PC makers and technology partners to boycott AMD product launches and promotions,

- and it has abused its market power by forcing on the industry technical standards and products which have as their central purpose the handicapping of AMD in the marketplace

3. Intel's economic coercion of customers extends to all levels – from large computer-makers like Hewlett-Packard and IBM to small system-builders to wholesale distributors to retailers such as Circuit City. All face the same choice. accept conditions that exclude AMD or suffer discriminatory pricing and competitively crippling treatment. In this way, Intel has avoided competition on the merits and deprived AMD of the opportunity to stake its prices and quality against Intel's for every potential microprocessor sale

2

4      Intel's conduct has become increasingly egregious over the past several years as AMD has achieved technological leadership in critical aspects of microprocessor architecture In April 2003, AMD introduced its Opteron microprocessor, the first microprocessor to take x86 computing from 32 bits to 64 bits – an advance that allows computer applications to address exponentially more memory, thereby increasing performance and enabling features not possible with just 32 bits. Unlike Intel's 64-bit architecture of the time (Itanium), the AMD Opteron – as well as its subsequently-introduced desktop cousin, the AMD Athlon64 – offers backward compatibility, allowing PC users to continue using 32-bit software as, over time, they upgrade their hardware. Bested in a technology duel over which it long claimed leadership, Intel increased exploitation of its market power to pressure customers to refrain from migrating to AMD's superior, lower-cost microprocessors.

5      Intel's conduct has unfairly and artificially capped AMD's market share, and constrained it from expanding to reach the minimum efficient levels of scale necessary to compete with Intel as a predominant supplier to major customers. As a result, computer manufacturers continue to buy most of their requirements from Intel, continue to pay monopoly prices, continue to be exposed to Intel's economic coercion, and continue to submit to artificial limits Intel places on their purchases from AMD. With AMD's opportunity to compete thus constrained, the cycle continues, and Intel's monopoly profits continue to flow.

6      Consumers ultimately foot this bill, in the form of inflated PC prices and the loss of freedom to purchase computer products that best fit their needs. Society is worse off for lack of innovation that only a truly competitive market can drive. The Japanese Government recognized these competitive harms when on March 8, 2005, its Fair Trade Commission (the "JFTC") recommended that Intel be sanctioned for its exclusionary misconduct directed at AMD. Intel chose not to contest the charges.

3

## JURISDICTION AND VENUE

7     The Court has subject matter jurisdiction under 28 U.S.C. § 1337 (commerce and antitrust regulation) and 28 U S C § 1331 (federal question), as this action arises under Section 2 of the Sherman Act, 15 U S C § 2, and Sections 4 and 16 of the Clayton Act, 15 U S.C. §§ 15(a) and 26  The Court has supplemental subject matter jurisdiction of the pendent state law claims under 28 U S C § 1367

8     Venue is proper because Intel Corporation and Intel Kabushiki Kaisha reside and are found in this district within the contemplation of 28 U S C § 1391 (b) and (c) and as provided in Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22  Additionally venue is proper as to Intel Kabushiki Kaisha, an alien corporation, under 28 U S C § 1391(d)

## THE PARTIES

9     Plaintiff ADVANCED MICRO DEVICES, INC  is a Delaware corporation with its principal executive offices at Sunnyvale, California   AMD designs, produces and sells a wide variety of microprocessors, flash memory devices, and silicon-based products for use in the computer and communications industries worldwide.  Plaintiff AMD INTERNATIONAL SALES & SERVICE, LTD , also a Delaware corporation based in Sunnyvale, is a wholly-owned AMD subsidiary engaged in selling AMD microprocessors outside of North America.

10.    Defendant INTEL CORPORATION is a Delaware corporation with its principal executive offices at Santa Clara, California, and it conducts business both directly and through wholly-owned and dominated subsidiaries worldwide.  Intel and its subsidiaries design, produce, and sell a wide variety of microprocessors, flash memory devices, and silicon-based products for use in the computer and communications industries worldwide.  Defendant INTEL KABUSHIKI KAISHA, a Japanese corporation, is Intel's wholly-owned and dominated subsidiary through which Intel sells its microprocessors in Japan

4

RLF1-2892812-1

## FACTUAL BACKGROUND

### Early History

11    The brain of every computer is a general-purpose microprocessor, an integrated circuit capable of executing a menu of instructions and performing requested mathematical computations at very high speed.  Microprocessors are defined by their instruction set – the repertoire of machine language instructions that a computer can follow.  So, too, are computer operating systems – software programs that perform the instructions in the set allowing the computer to perform meaningful tasks  The first generation of microprocessors, which were capable of handling 4 and then later 8 bits of data simultaneously, evolved to provide 16-bit capability (the original DOS processors), then sometime later a 32-bit capability (allowing the use of advanced graphical interfaces such as later versions of Windows), and now 64-bit capability

12.    When IBM defined the original PC standards in the early 1980s, it had available to it a variety of microprocessors, each with its own instruction set – among these were microprocessors developed by Motorola, Zilog, National Semiconductor, Fairchild, Intel and AMD.  IBM opted for the Intel architecture, which utilized what became known as the x86 instruction set (after Intel's naming convention for its processors, *i.e.*, 80*86*, 801*86*, 802*86*, 803*86*), and a compatible operating system offered by Microsoft, known as DOS.  Unwilling to be consigned to a single source of supply, however, IBM demanded that Intel contract with another integrated circuit company and license it to manufacture x86 chips as a second source AMD, which had worked with Intel before in supplying microprocessors, agreed to abandon its own, competing architecture, and it undertook to manufacture x86 chips as a second source of supply  Assured that it would not be dependent upon a monopoly supplier of x86 chips, IBM introduced the PC in August 1981 – and its sales exploded

13    Although an arbitrator later found that "AMD's sponsorship helped propel Intel from the chorus line of semiconductor companies into instant stardom," Intel soon set out to torpedo the 1982 AMD-Intel Technology Exchange Agreement (the "Agreement") by which

5

each would serve as a second source for products developed by the other. For example, Intel was required by the Agreement to send AMD timely updates of its second generation 80286 chip. Instead, in a "deliberate[]" effort "to shackle AMD progress," Intel sent AMD information "deliberately incomplete, deliberately indecipherable and deliberately unusable by AMD engineers." The conduct was, in the arbitrator's words, "inexcusable and unworthy." And it was not isolated. Intel elsewhere tried to "sabotage" AMD products, engaged in "corporate extortion" and demonstrated a near-malevolent determination "to use all of its economic force and power on a smaller competitor to have its way."

14. In another underhanded effort to stifle AMD's business, Intel decided in 1984 that, the agreement between the parties notwithstanding, Intel would become the sole-source for the promising 80386 chip. To fully realize its objective, Intel engaged in an elaborate and insidious scheme to mislead AMD (and the public) into erroneously believing that AMD would be a second source, thereby keeping AMD in the Intel "competitive camp" for years. This duplicitous strategy served a broader purpose than simply preventing AMD from competing with Intel. Customers' perception that AMD would continue to serve as Intel's authorized second source was essential to Intel's aim of entrenching the x86 family of microprocessors as the industry standard (as it had been essential to IBM's original introduction of the PC). Intel was well aware that if computer manufacturers knew Intel intended to sole source its 32-bit product, they would be motivated to select alternative products produced by companies offering second sources. Intel could not preserve the appearance that AMD would second source the 386 if it terminated the contract or otherwise disclosed its actual intent. Thus, Intel stalled negotiations over product exchanges, while at the same time allowing AMD to believe that it could ultimately obtain the 386. This injured competition by deterring and impeding serious competitive challenges to Intel and directly injured AMD by depriving it of the revenues and profits it would have earned from such a challenge.

15. Intel implemented this secret plan for the purpose of acquiring and maintaining an illegal monopoly in the x86 line of microprocessors, which it did by at least 1987. As was its

6

plan, Intel's conduct drained AMD's resources, delayed AMD's ability to reverse-engineer or otherwise develop and manufacture competitive products, and deterred AMD from pursuing relationships with other firms  In so doing, Intel wrongfully secured the benefit of AMD's marketing skills and talent in support of the x86 line of microprocessors and related peripherals and secured the benefit of substantial competitively sensitive AMD information regarding its product development plans  When AMD petitioned to compel arbitration in 1987 for Intel's breach and bad faith, the arbitrator took notice of Intel's anticompetitive design: "In fact, it is no fantasy that Intel wanted to blunt AMD's effectiveness in the microprocessor marketplace, to effectively remove AMD as a competitor"

16    In 1992, after five years of litigation, the arbitrator awarded AMD more than $10 million plus prejudgment interest and a permanent, nonexclusive and royalty-free license to any Intel intellectual property embodied in AMD's own 386 microprocessor, including the x86 instruction set.  Confirmation of the award was upheld by the California Supreme Court two years later.  In bringing the litigation to a close, the arbitrator hoped that by his decision, "the competition sure to follow will be beneficial to the parties through an expanded market with appropriate profit margins and to the consumer worldwide through lower prices."  Not for the first time, and certainly not for the last, Intel's anticompetitive zeal was woefully underestimated

**AMD Moves from Second Source to Innovator**

17    Shortly after confirmation of the award, AMD settled its outstanding disputes with Intel in a 1995 agreement which gave AMD a shared interest in the x86 instruction set but required it to develop its own architecture to implement those instructions.  The settlement had the unintended benefit of forcing AMD to reinvent itself.  Beginning in the late 1990s, AMD committed its resources to innovating not just to be different, but to deliver solutions of greatest benefit to its customers  Going its own way proved beneficial: AMD's first x86 chip without Intel pin-compatibility, the Athlon microprocessor delivered in 1999, marked the first

7

(but not last) time AMD was to leapfrog Intel technologically and beat it to market with a new generation Windows microprocessor (and break the 1GHz speed barrier to boot)

18.    But AMD's biggest breakthrough came four years later when it introduced an extension of x86 architecture that took Windows processors into the realm of 64-bit computing Unlike Intel, which invested billions in its Itanium microprocessor and a new, uniquely 64-bit proprietary instruction set (which, because it was proprietary, would have been a game-ending development for AMD had it become the industry standard), AMD undertook to supplement the x86 instructions to accommodate 64-bit processing while allowing 32-bit software to be run as well. AMD's efforts culminated when, in April 2003, it brought to market its Opteron microprocessor for servers (the workhorse computers used by businesses to run corporate networks, e-commerce websites and other high-end, computationally-intense applications). Opteron was the industry's first x86 backward compatible 64-bit chip Six months later, AMD launched the Athlon64, a backward compatible 64-bit microprocessor for desktops and mobile computers

19.    The computing industry hailed AMD's introduction of 64-bit computing as an engineering triumph   Said *Infoworld* in its August 27, 2004, issue,

> You just gotta love a Cinderella story     AMD's rapid rise
> from startup to $5 billion semiconductor powerhouse is, as
> Humphrey Bogart's English teacher once said, the stuff of
> which dreams are made  .  In the process, AMD has
> become known as the company that kept Intel honest, the
> Linux of the semiconductor world  .  After decades of
> aping Intel architectures, the AMD64 architecture, rooted in
> Opteron and Athlon 64 processors, has actually been
> imitated by Intel in the form of Nocona, Intel's 64-bit
> version of Xeon  In a stunning reversal of fortune, Intel was
> forced to build that chip because Opteron was invading a
> server market that the Intel Itanium was supposed to
> dominate

In what represented a paradigm shift in the microprocessor world, Microsoft endorsed AMD's 64-bit instruction set and announced that Windows would support it   As noted by *Infoworld*,

8

Intel then copied AMD's technology for its own 64-bit offerings – an event that poignantly marked AMD's technological emergence   Intel still has yet to catch up

20.   AMD has since extended its AMD64 technology to the balance of AMD's microprocessor line-up (which now includes AMD Athlon 64, AMD Athlon 64 FX, Mobile AMD Athlon 64, AMD Sempron, and AMD Turion64 products)   Owing also to AMD's pioneering developments in dual-core processors and its introduction of an improved architecture that speeds up microprocessor communications with memory and input/output devices, AMD has seized technological leadership in the microprocessor industry   Its innovation has won for it over 70 technology leadership and industry awards and, in April 2005, the achievement of being named "Processor Company of 2005" at, to Intel's embarrassment, an Intel-sponsored industry awards show

21.   Tellingly, AMD's market share has not kept pace with its technical leadership   Intel's misconduct is the reason   Intel has unlawfully maintained the monopoly IBM bestowed on it and systematically excluded AMD from any meaningful opportunity to compete for market share by preventing the companies that buy chips and build computers from freely deploying AMD processors; by relegating AMD to the low-end of the market, by preventing AMD from achieving the minimum scale necessary to become a full-fledged, competitive alternative to Intel, and by erecting impediments to AMD's ability to increase its productive capacity for the next generation of AMD's state of the art microprocessors   Intel's exclusionary acts are the subject of the balance of this complaint

## THE x86 PROCESSOR INDUSTRY

### Competitive Landscape

22.   The x86 versions of Windows and Linux, the two operating systems that dominate the business and consumer computer worlds, have spawned a huge installed base of Windows- and Linux-compatible application programs that can only run the x86 instruction set. This has given Intel effective ownership of personal computing   Although other

9

microprocessors are offered for sale, the non-x86 microprocessors are not reasonably interchangeable with x86 microprocessors because none can run the x86 Windows or Linux operating systems or the application software written for them.

23. The relevant product market is x86 microprocessors because a putative monopolist in this market would be able to raise the prices of x86 microprocessors above a competitive level without losing so many customers to other microprocessors as to make this increase unprofitable. While existing end-users can theoretically shift to other operating-system platforms, high switching costs associated with replacing existing hardware and software make this impractical. Further, the number of new, first-time users who could choose a different operating-system platform is too small to prevent an x86 microprocessor monopolist from imposing a meaningful price increase for a non-transitory period of time. Computer manufacturers would also encounter high switching costs in moving from x86 processors to other architectures, and no major computer maker has ever done it. In short, demand is not cross-elastic between x86 microprocessors and other microprocessors at the competitive level.

24. The relevant geographic market for x86 microprocessors is worldwide. Intel and AMD compete globally; PC platform architecture is the same from country to country; microprocessors can be easily and inexpensively shipped around the world, and frequently are; and the potential for arbitrage prevents chipmakers from pricing processors differently in one country than another.

25. Intel dominates the worldwide x86 Microprocessor Market. According to published reports, over the past several years it has consistently achieved more than a 90% market share as measured by revenue, while AMD's revenue share has remained at approximately 9%, with all other microprocessor manufacturers relegated to less than 1%. Intel has captured at least 80% of x86 microprocessor unit sales in seven of the last eight years. Since 1999, AMD's worldwide volume share has hovered at 15%, only once penetrating barely the 20% level. The following chart is illustrative.

10

**x86 Worldwide CPU Unit Market Share**

|        | 1997  | 1998  | 1999  | 2000  | 2001  | 2002  | 2003  | 2004  |
|--------|-------|-------|-------|-------|-------|-------|-------|-------|
| Intel  | 85.0% | 80.3% | 82.2% | 82.2% | 78.7% | 83.6% | 82.8% | 82.5% |
| AMD    | 7.3%  | 11.9% | 13.6% | 16.7% | 20.2% | 14.9% | 15.5% | 15.8% |
| Others | 7.5%  | 7.9%  | 4.2%  | 1.1%  | 1.1%  | 1.4%  | 1.7%  | 1.7%  |

26    Intel's x86 family of microprocessors no longer faces any meaningful competition other than from AMD   National Semiconductor acquired Cyrix in 1997 but shuttered it less than two years later.  At the beginning of this year only two other x86 chip makers remained, Via Technologies, Inc. and Transmeta Corporation – which together account for less than 2% of the market.  Transmeta has since announced its intention to cease selling x86 microprocessors, and Via faces dim prospects of growing its marketshare to a sustaining level

27    Intel is shielded from new competition by huge barriers to entry   A chip fabrication plant ("fab") capable of efficiently mass-producing x86 microprocessors carries a price tag of at least $2.5 to $3.0 billion   In addition, any new entrant would need the financial wherewithal to underwrite the billions more in research and development costs to design a competing x86 microprocessor and to overcome almost insurmountable IP and knowledge barriers

**Customers for x86 Microprocessors**

28.    Annual worldwide consumption of x86 microprocessors currently stands at just over 200 million units per year and is expected to grow by 50% over the remainder of the decade.  Relatively few microprocessors are sold for server and workstation applications (8.75 million in 2004), but these command the highest prices.  Most x86 microprocessors are used in desktop PCs and mobile PCs, with desktops currently outnumbering mobile by a margin of three to one.  Of the total worldwide production of computers powered by x86 microprocessors, 32% are sold to U.S. consumers;  U.S. sales of AMD-powered computers account for 29% of AMD's production

11

29. The majority of x86 microprocessors are sold to a handful of large OEMs (original equipment manufacturers), highly visible companies recognized throughout the world as the leading computer makers. Regarded by the industry as "Tier One" OEMs over most product categories are: Hewlett-Packard ("HP"), which now also owns Compaq Computer; Dell, Inc ; IBM, which as of May 1, 2005, sold its PC (but not server) business to Lenovo; Gateway/eMachines; and Fujitsu/Fujitsu Siemens, the latter a Europe-based joint venture. Toshiba, Acer, NEC and Sony are also commonly viewed as Tier One OEMs in the notebook segment of the PC market. HP and Dell are the dominant players, collectively accounting for over 30% of worldwide desktop and mobile sales, and almost 60% of worldwide server sales. Both are U S -based companies, as are IBM and Gateway/eMachines; and all but Gateway have U.S. manufacturing operations (as does Sony, which operates a North American production facility in San Diego).

30. Worldwide, the Tier One OEMs collectively account for almost 80% of servers and workstations (specialty high-powered desktops), more than 40% of worldwide desktop PCs, and over 80% of worldwide mobile PCs. According to industry publications, unit market share in 2004 among the Tier One OEMs were as follows.

### OEM Market Shares – 2004

| Company | Server/WS | Desktop | Mobile |
|---|---|---|---|
| Hewlett-Packard | 29 86% | 13.69% | 16.23% |
| Dell | 28.34% | 16.18% | 17.27% |
| IBM/Lenovo | 14 46% | 3.69% | 9.20% |
| Fujitsu/Siemens | 3.70% | 2.83% | 6.88% |
| Acer | 0.81% | 1.85% | 8.53% |
| Toshiba | 0.31% | 0.05% | 12 73% |
| NEC | 2.06 | 2.02% | 4.50% |
| Sony | -- | 0.76% | 4.23% |
| Gateway/eMachines | 0.16% | 2.48% | 1.45% |
| Total | 79.70% | 43.55% | 81.02% |

12

31 The balance of x86 production is sold to smaller system builders and to independent distributors. The latter, in turn, sell to smaller OEMs, regional computer assemblers, value-added resellers and other, smaller distributors. Currently, distributors account for over half of AMD's sales

32. OEMs have adopted a variety of business models, including sales directly to customers through web-based e-commerce, sales through company-employed sales staffs (who target IT professionals and Fortune 1000 companies) and sales through a network of independent distributors (who focus on smaller business customers). With the exception of Dell, which markets to consumers only directly (mostly over the internet), most OEMs also sell through retail chains. Intel and AMD compete not only to have OEMs incorporate their microprocessors into their retail platforms but also to convince retailers to allocate shelf-space so that the platforms containing their respective microprocessors can be purchased in the retailers' stores

33 Through its economic muscle and relentless marketing – principally its *"Intel Inside"* and *"Centrino"* programs which financially reward OEMs for branding their PCs as Intel machines – Intel has transformed the OEM world. While once innovative companies themselves, the OEMs have largely become undifferentiated distributors of the Intel platform, offering *"Intel Inside"* and *"Centrino"* computers largely indistinguishable from those of their rivals. As their products have become commoditized, the Tier One OEMs operate on small or negative margins, and, as shown in the following chart, the overwhelming portion of PC profit flows to Intel

13

**Operating Margins 2001-04 – Intel vs. OEMs**



34.     This profit drain has left OEMs and others in the distribution chain in a quarter-to-quarter struggle to eke out even a modest return on their assets, thereby making them continually susceptible to Intel's economic coercion, which is described next.

## INTEL'S UNLAWFUL PRACTICES

35.     Intel has maintained its x86 microprocessor monopoly by deploying a host of financial and other exclusionary business strategies that in effect limit its customers' ability and/or incentive to deal with AMD. Although differing from customer to customer and segment to segment, the Intel arsenal includes direct payments in return for exclusivity and near-exclusivity; discriminatory rebates, discounts and subsidies conditioned on customer "loyalty" that have the practical and intended effect of creating exclusive or near-exclusive dealing arrangements; threats of economic retaliation against those who give, or even contemplate giving, too much of their business to AMD, or who refuse to limit their AMD business to Intel-approved models, brands, lines and/or sectors, or who cooperate too closely with AMD's promotion of its competitive processors; and misuse of industry standards-setting processes so as to disadvantage AMD products in the marketplace.

14

36    Intel's misconduct is global  It has targeted both U.S and offshore customers at all levels to prevent AMD from building market share anywhere, with the goal of keeping AMD small and keeping Intel's customers dependent on Intel for very substantial amounts of product. In this way, OEMs remain vulnerable to continual threats of Intel retaliation, AMD remains capacity-constrained, the OEMs remain Intel-dependent, and Intel thereby perpetuates its economic hold over them, allowing it to continue to demand that customers curtail their dealings with AMD  And the cycle repeats itself: by unlawfully exploiting its existing market share, Intel is impeding competitive growth of AMD,  thereby laying foundation for the next round of foreclosing actions with the effect that AMD's ability to benefit from its current technological advances is curtailed to the harm of potential customers and consumers

37.   The following is not intended as an exhaustive catalog of Intel's misconduct, or a complete list of its unlawful acts, but only as examples of the types of improper exclusionary practices that Intel has employed.

**1. Practices Directed At OEMs**

*a. Exclusive and Near-Exclusive Deals*

38    **Dell**  In its history, Dell has not purchased a single AMD x86 microprocessor despite acknowledging Intel shortcomings and customer clamor for AMD solutions, principally in the server sector. As Dell's President and CEO, Kevin Rollins, said publicly last February.

> Whenever one of our partners slips on either the economics or technology, that causes us great concern  .  . For a while, Intel admittedly slipped technologically and AMD had made a step forward. We were seeing that in customer response and requests

39    Nonetheless, Dell has been and remains Intel-exclusive  According to industry reports, Intel has bought Dell's exclusivity with outright payments and favorable discriminatory pricing and service. In discussions about buying from AMD, Dell executives have frankly conceded that they must financially account for Intel retribution in negotiating pricing from AMD.

15

40. **Sony** With the introduction of its Athlon microprocessor in 1999, AMD began to make notable inroads into Intel's sales to major Japanese OEMs, which export PCs internationally including into the U.S By the end of 2002, AMD had achieved an overall Japanese unit market share of approximately 22%. To reverse the erosion of its business, in 2003 Intel paid Sony multimillion dollar sums, disguised as discounts and promotional support, in exchange for absolute microprocessor exclusivity. Sony abruptly cancelled an AMD Mobile Athlon notebook model Soon thereafter, it cancelled plans to release AMD Athlon desktop and notebook computers As a result, AMD's share of Sony's business dropped from 23% in 2002 to 8% in 2003, and then to 0%, where it remains today In proceedings brought by the JFTC, Intel has accepted the JFTC charges of misconduct with respect to Sony.

41. **Toshiba**. Like Sony, Toshiba was once a significant AMD customer, but also like Sony, Toshiba received a very substantial payment from Intel in 2001 not to use AMD processors Toshiba thereupon dropped AMD. Its executives agreed that Intel's financial inducements amounted to "cocaine," but said they were hooked because reengaging with AMD would jeopardize Intel market development funds estimated to be worth $25-30 million per quarter. Toshiba made clear to AMD that the tens of millions of dollars of additional marketing support was provided on the explicit condition that Toshiba could not use AMD microprocessors In proceedings brought by the JFTC, Intel has accepted the JFTC charges of misconduct with respect to Toshiba.

42. **NEC** AMD also enjoyed early success with NEC, capturing nearly 40% of its microprocessor purchases for notebooks and desktops in the first quarter of 2002. In May 2002, Intel agreed to pay NEC more than 300 million yen per quarter in exchange for caps on NEC's purchases from AMD The caps assured Intel at least 90% of NEC's business in Japan, and they established an overall worldwide quota on NEC's AMD dealings The impact was immediate. While AMD had maintained an 84% share of NEC's Japanese consumer desktop business in the third quarter of 2002, after the payments, AMD's share quickly plummeted to virtually zero in the first quarter of 2003 NEC has made clear to AMD that its Japanese share

16

must stay in the single digits pursuant to NEC's agreement with Intel  Worldwide, AMD's share dipped from nearly 40% to around 15%, where it stands today  In proceedings brought by the JFTC, Intel has accepted the JFTC charges of misconduct with respect to NEC.

43  **Fujitsu**.  In the summer of 2002, Fujitsu informed AMD that Intel had pressured Fujitsu to remove Fujitsu's AMD-powered desktop models from Fujitsu's website  Fujitsu complied by making any potential AMD-buyer click past Intel products to get to the AMD offerings  Then, in early 2003, Intel moved to lock up an even greater share of Fujitsu's business  Intel offered an undisclosed package of financial incentives in return for Fujitsu's agreement to restrict its dealings with AMD  Fujitsu's catalog currently limits AMD to a single notebook product  In proceedings brought by the JFTC, Intel has accepted the JFTC charges of misconduct with respect to Fujitsu.

44.  **Hitachi**.  According to the JFTC, Intel has also purchased an exclusive-dealing arrangement with Hitachi, which had been a substantial AMD customer  The agreement caused AMD's Hitachi business to fall precipitously  For example, during the first part of 2002, AMD was shipping 50,000 Athlon microprocessors to Hitachi per quarter  But by the middle of the year, AMD sold no microprocessors to Hitachi at all  In proceedings brought by the JFTC, Intel has accepted the JFTC charges of misconduct with respect to Hitachi

45.  **Gateway/eMachines**.  From 2001 to 2004, Gateway was exclusively Intel.  In 2001 former Gateway CEO, Ted Waitt, explained to an AMD executive that Intel offered him large sums not to deal with AMD, which he could not refuse.  "I have to find a way back to profitability  If by dropping you, I become profitable, that is what I will do."  Shortly thereafter, Gateway stopped purchasing from AMD and issued a press release announcing its Intel exclusivity.  The announcement came within weeks of similar public announcements of Intel exclusivity by both IBM and Micron

46.  **Supermicro**  Intel's exclusive dealing also extends to small, specialty OEMs of which Supermicro is a good example.  Supermicro, the preeminent system assembler for servers and other high-end computers, historically has followed the Dell strategy of never

17

buying from AMD. This arrangement foreclosed AMD from a large part of the approximately one fifth of the server sector not controlled by the Tier One OEMs. Following two years of negotiation, Supermicro finally agreed last year to begin developing an Opteron-powered server; however, it so feared Intel retaliation that it secretly moved the AMD development to quarters behind Supermicro's main manufacturing facility. Further, it forbade AMD from publicizing the product or beginning any marketing prior to its actual release. When, in April 2005, Supermicro finally broke away from years of Intel exclusivity, it restricted distribution of its newly-released Opteron-powered product to only sixty of its customers and promoted them with a glossy, upscale brochure devoid of its name and labeled "secret and confidential."

### b. *Product-Line, Channel or Geographic Restrictions*

47    Intel has also bought more limited exclusivity from OEMs in order to exclude AMD from the most profitable lines or from channels of distribution best tailored to take advantage of AMD's price/performance advantage over Intel. In exchange for discriminatory discounts, subsidies or payments, for example, Intel has largely foreclosed AMD from the lucrative commercial desktop sector. Intel has focused on the major OEMs because, when IT executives from Fortune 1000 companies purchase desktop computers, they look for a strong brand on the box – Dell, IBM or HP. Knowing this, Intel has relentlessly fought to block the introduction of an AMD-powered commercial desktop by the major OEMs who have not ceded total exclusivity to Intel. What follows, again, are only representative examples of Intel misconduct.

48    **HP.** In 2002, when AMD set out to earn a place in HP's commercial desktop product roadmap, HP demanded a $25 million quarterly fund to compensate it for Intel's expected retaliation. Eager to break into the commercial market, and to earn a place in HP's successful "Evo" product line, AMD agreed instead to provide HP with the first million microprocessors for free in an effort to overcome Intel's financial hold over HP. On the eve of the launch, HP disclosed its plan to Intel, which told HP it considered AMD's entry into HP's commercial line a "Richter 10" event. It immediately pressured HP into (1) withdrawing the

18

AMD offering from its premier "Evo" brand and (2) withholding the AMD-powered computer from HP's network of independent value-added resellers, the HP's principal point of access to small business users for whom the computer was designed in the first place   Intel went so far as to pressure HP's senior management to consider firing the HP executive who spearheaded the AMD commercial desktop proposal   As a result of Intel's coercion, the HP-AMD desktop offering was dead on arrival   HP ended up taking only 160,000 of the million microprocessors AMD offered <u>for free</u>   As of today, HP's AMD-equipped commercial desktops remain channel-restricted, and AMD's share of this business remains insignificant

49.   Intel also purchased HP's exclusivity for its most popular notebook line.  HP captured 15% of the U S  retail market last Christmas with an Intel-powered 14 1" display notebook (the "DV 1000") with a popular power saving feature called Quick Play   When AMD sought to convince HP to carry a similar AMD-powered notebook, HP declined   It explained that Intel had paid between $3 and $4 million to lock up this product line for at least one year

50.   **Gateway**.  After Gateway's 2004 merger with eMachines, AMD attempted to revive the relationship it had enjoyed with Gateway until 2001, but experienced extremely limited success   While Gateway built one AMD-powered desktop model at the request of Circuit City, AMD remains locked out entirely of Gateway's direct internet sales, its commercial offerings and its server line.  According to Gateway executives, their Company has paid a high price for even its limited AMD dealings.  They claim that Intel has beaten them into "guacamole" in retaliation

51.   **IBM**   AMD and IBM began negotiations in August 2000 over a proposed commercial PC business partnership   After seven months and with a deal nearing completion, Intel approached IBM with an incentive-based program under which Intel would become IBM's "preferred supplier" for processors in commercial products   "Preferred" meant exclusive.  IBM accepted Intel's proposal and terminated discussions with AMD.  In return for

19

that exclusivity, according to IBM executive Ed Thum, Intel paid IBM "millions of dollars in market development funds."

52    Intel also acted to thwart AMD efforts to partner with IBM on servers. Although IBM joined AMD as a launch partner when it introduced its Opteron 64-bit server chip in April 2003 – signaling to the industry and IT professionals its confidence in the product – Intel soon dissuaded IBM from aggressively marketing Opteron servers. After investing heavily in its design, IBM consigned its one Opteron computer model to a single target market segment (High Performance and Technical Computing). This was done, according to an industry report (confirmed by an IBM executive), because Intel paid IBM to shelve any further Opteron development. IBM also took Intel money in 2004 to scrap plans for a multiple-microprocessor Opteron server it had already designed and previewed with customers.

53    Intel has also purchased IBM exclusivity in its "ThinkCentre" line of commercial desktops. When AMD pressed IBM to add an Athlon 64 model to its "ThinkCentre" roadmap, IBM executives explained that the move would cost them important Intel subsidies, and they declined.

54    **Fujitsu**. In 2002, Fujitsu and AMD formed an alliance to develop a low-power commercial notebook (FMV Lifebook MG Series) scheduled to go to market in the first quarter of 2003, which AMD spent over 20 million yen designing. Shortly before the launch, Fujitsu told AMD that Intel would not allow it to launch an AMD-powered commercial notebook, and the project died. To this day, AMD remains locked out of Fujitsu's commercial notebook lines. Intel's exclusionary conduct with Fujitsu extends beyond commercial notebooks. In the consumer space, for example, Intel purchased total exclusivity for Fujitsu's FM-Biblo NB consumer notebook line. When AMD tried to break Intel's lock on Fujitsu notebooks by offering to match any Intel discount, Fujitsu made clear that there was no price AMD could pay because Intel simply would not allow it. To this day, AMD remains locked out of Fujitsu's Biblo line.

20

55    **Fujitsu-Siemens**.  Fujitsu-Siemens, a European joint-venture, was once a mainstay for AMD's desktop business, with AMD chips powering over 30% of Fujitsu-Siemens' offerings in the consumer sector.  In early 2003, Intel offered Fujitsu-Siemens a "special discount" on Celeron processors which Fujitsu-Siemens accepted in exchange for hiding its AMD computers on its website and removing all references to commercial AMD-powered products in the company's retail catalog.

56    Intel has also succeeded in convincing Fujitsu-Siemens to impose market restrictions on its AMD-powered PCs.  Its parent, Fujitsu, currently sells an AMD-equipped Lifebook S2010, a commercial notebook, but only in the U.S. and Japan.  Fujitsu-Siemens has declined AMD's plea to offer the machine in the European market as well.  Similarly, Fujitsu-Siemens designed for the European market the FMC Lifebook MG Series notebook.  But it refused to offer that computer in Asia or North America.  Finally, although Fujitsu-Siemens produces an AMD commercial desktop, the Scenico, it refuses to advertise it on its website, offering it instead only as a build-to-order product.  Having invested significantly to bring these computers to market, Fujitsu-Siemens has been able to offer no explanation for its refusal to exploit them worldwide.  AMD's unit share of Fujitsu-Siemens' business recently fell below 30% for the first time in four years.

57.    **NEC.**  Intel was forced to relax its hold on NEC's business when long-time NEC customer, Honda Motor Company, demanded that NEC supply it with servers powered by AMD's Opteron microprocessors.  After underwriting the considerable expense of designing and manufacturing an Opteron server for Honda, NEC then inexplicably refused to market the product to any of its other customers.

58    There is no reason, other than Intel's chokehold on the OEMs, for AMD's inability to exploit its products in important sectors, particularly commercial desktops.  These computers, which large corporate customers buy in the tens of thousands at a time, represent a lucrative opportunity for the supplier.  Yet, the microprocessors that power them are identical to microprocessors in consumer computers, a sector in which AMD has won both praise and

21

market share. The only material difference between the consumer and commercial segments is that many more system builders supply desktops to consumers, making it more difficult for Intel to control their microprocessor choice

### c. Exclusionary Rebates

59.   Intel has also imposed on OEMs a system of first-dollar rebates that have the practical and intended effect of creating exclusive or near-exclusive dealing arrangements and artificially foreclosing AMD from competing for a meaningful share of the market  In general, the rebate schemes operate as follows: quarterly, Intel unilaterally establishes for each of its customers a target level of purchases of Intel microprocessors. If the customer achieves the target, it is entitled to a rebate on all of the quarter's purchases of all microprocessors – back to the very first one – generally in the neighborhood of 8-10% of the price paid  Intel provides the rebate in cash at the quarter's close.  OEMs operate on razor-thin margins, so qualifying for an Intel rebate frequently means the difference between reporting a profit or a loss in the coming – and closely watched – quarterly earnings.

60   In contrast to "volume discounts" that sellers offer on a graduated and non-discriminatory basis to reflect cost efficiencies that accrue when dealing in larger quantities, Intel's is a system of "penetration" or "loyalty" rebates designed to exclude AMD from a substantial portion of the market. Intel intentionally sets a rebate trigger at a level of purchases it knows to constitute a dominant percentage of a customer's needs.  It is able to develop discriminatory, customer-by-customer unit or dollar targets that lock that percentage (without ever referencing it) because industry publications accurately forecast and track anticipated sales and because OEM market shares – which industry publications also report weekly, monthly and quarterly – do not change significantly quarter to quarter

61   Intel's retroactive discounts can operate to price microprocessors so low that AMD is put at a competitive disadvantage it cannot overcome.  Consider an OEM which anticipates purchasing 100 microprocessors that both Intel and AMD sell for $100 each.  Intel knows that because of its prior model introductions, the customer will have to buy 60 from

22

Intel  The customer considers buying its expected balance for its new models from AMD, but Intel offers it a rebate that will entitle it to a 10% retroactive discount if, but only if, it purchases 90 units or more.  If the customer buys 30 of the 40 additional units from Intel to qualify for the rebate, its incremental cost for the 30 will be $3,000 (30 units at $100/unit) less the 10% rebate going back to the first unit it purchased, which amounts to $900 (90 units x $10/unit), for a total of $2,100

62.   AMD can only capture the 30 units if it offers a price that makes the customer indifferent between getting the Intel rebate and getting an overall equivalent deal on AMD microprocessors  Thus, for the 30 units that are up for grabs, AMD would have to lower its price to $70 per unit (because 30 units x $70/unit equals the $2,100 net cost for buying from Intel).  In effect, the rebate forces AMD to charge $20 dollars less than the $90 discounted Intel price if it attempts to get any business from the customer at all.  That is because it is selling the customer only 30 units over which it has to spread a $900 discount while Intel can spread it out over 90.  At the end of the day, this creates a serious competitive disadvantage for AMD.  As shown in the example, AMD is forced to discount its price three times as much as Intel just to match the Intel discount – not because its processors are inferior – far from it –  but because Intel has assured for itself – by its past predatory practices – a significant base of assured demand which enables Intel to inexpensively spread its first-dollar discount  Importantly, this new base of demand – driven by the OEM's purchasing – will enable Intel to repeat its exclusionary practice when the next line of models is unveiled

63   At least in the short run, most if not all of the major OEMs must engage significantly with Intel (1) because AMD is too small to service all their needs while continuing to satisfy other customer demand; (2) because to meet customer expectations, OEMs must assure commercial computer buyers that specifications, including the microprocessor, will remain unchanged during the product's lifecycle, and (3) because Intel has encouraged end-users to specify that processors be of the same family among similar computers in one installation, as this is perceived to increase reliability (although technically

23

this is not the case). Intel uses its retroactive discounts to make its large, captive market share self-perpetuating  In any one quarter, AMD cannot economically match Intel's retroactive rebate because it competes for too small a share of the customer's volume over which to spread the dollars necessary to equal the customer's total Intel cost savings  As a result, it loses the business and thus goes into the next selling cycle with Intel imbedded in additional customer product over which Intel can spread its rebates  This serves again to artificially constrain AMD's opportunity to match Intel's ensuing round of retroactive discounts  Intel's inter-temporal leveraging of its market share effectively forecloses AMD from ever having a fair opportunity to compete

64.   Intel exacts a severe penalty from OEMs who fail to meet their targets.  For example, during the fourth quarter of 2004, AMD succeeded in getting on the HP retail roadmap for mobile computers, and its products sold very well, helping AMD capture nearly 60% of HP's U.S. retail sales for the quarter.  Intel responded by withholding HP's fourth quarter rebate check and refusing to waive HP's failure to achieve its targeted rebate goal.  Instead, Intel "allowed" HP to make up the shortfall in succeeding quarters when HP promised Intel at least 90% of HP's mainstream retail business.

65.   Intel has deployed a variety of variants of this basic rebate scheme   In the case of one European OEM, for example, Intel imposes the additional condition that the customer purchase target volumes of specific processors, generally microprocessors against which AMD's products compete particularly well   In the case of another, Intel offers as an inducement discounted microprocessors rather than rebates.  In the case of the European division of one U.S  OEM, Intel has imposed a target of between 70-90% of the customer's requirements.  Rather than qualifying the customer for a cash rebate, however, meeting the target entitles the OEM to purchase designated processors at up to 20% below "normal" cost, thereby enabling the customer to obtain favorable pricing on bundled products (e.g., a Centrino-series processor and chipset) and/or to receive product offerings not available to competitors.

24

66. Intel makes similar offers to smaller OEMs but they are generally unwritten, and Intel leaves undefined the consequences of failing to meet a target. Thus, a customer falls short at its peril, knowing only that it may lose its account with Intel and have to source future products from Intel distributors, which is both more expensive and provides less security of supply than direct purchase

67. The salient features of all of Intel's rebate schemes are that they are discriminatory and market-foreclosing. If the customer chooses to purchase any significant quantity of microprocessors from AMD, it will not qualify for its rebate, and its price will be higher on all the Intel processors it buys across the board. By tailoring targets to each customer's size and anticipated volume, Intel locks up significant percentages of the market much more effectively and at a lesser cost to itself – but to a greater harm to AMD and ultimately consumers – as compared to offering such rebates for comparable purchase levels to all customers on a nondiscriminatory basis.

68. Intel's use of retroactive rebates leads, in some cases, to below-cost pricing on incremental sales. The following example shows why a customer's incremental cost of purchasing from Intel those units that both Intel and AMD could supply (the "contested sales") can be zero or even negative – a price AMD cannot match. Consider an OEM which has purchased 90 units of Microprocessor A at $100 per unit under an Intel rebate scheme that entitles it to a 10% first-dollar discount but only after it purchases more than 90 units. Its cost for the 90 processors is $9,000. The OEM is now considering an additional purchase of a further 10 units. If it makes the additional purchase from Intel, the OEM will meet the expenditure condition and will qualify for the 10% per unit discount on all units. Accordingly, the total spent will remain $9,000. The incremental cost of the 10 additional microprocessors – as well as Intel's incremental revenue – will be zero (the $1,000 additionally spent, less the $1,000 thereby saved). In other words, this scheme leads to incremental units being offered to the OEMs for nothing, leaving AMD hopelessly boxed out

25

69.   Importantly, even if Intel were to earn some incremental revenue on these marginal units, these additional revenues could be below the incremental cost of their production. As a result, Intel's additional profit on the sale would be negative, but for the fact that it had a long-run exclusionary effect on AMD.  (Obviously, if Intel earns no revenues on its additional sales, it has to be foregoing profits.)  As this analysis shows, some of Intel's discriminatory, retroactive rebates amount to unlawful, predatory below-cost pricing.

70   Even where Intel's prices are above cost on the incremental volumes and overall despite its retroactive rebate schemes, these rebates enable Intel to lower prices selectively in the contested market segment while maintaining higher prices in its captive market.  For example, Intel can offer rebates which are granted across the entire volume of sales but which are triggered only if the OEM increases its purchases beyond the portion of its requirements which is captive to Intel.  Indeed, Intel can even price above the "monopoly" level for the volumes below the benchmark and offer huge discounts for additional purchases knowing full well that the OEM will not buy less than the benchmark and, instead, source the overwhelming share of its purchases from Intel thereby "qualifying" for the putative rebate while at the same time denying AMD any reasonable volume opportunity.

71.   The use of retroactive rebates to limit AMD to a small share of an OEM's business heightens the obstacle to inducing the OEM to launch AMD-powered platforms OEMs incur substantial expense in designing and engineering a new computer, and make the investment only if they foresee a substantial chance of selling a sufficient volume to recoup it Intel's rebate and other business strategies effectively cap the volumes of AMD-powered products that an OEM can sell   Hence, Intel's practices exacerbate normal impediments to entry and expansion

### d.  Threats of Retaliation

72   Beyond exclusive dealing, product and channel restrictions and exclusionary rebates, Intel has resorted to old-fashioned threats, intimidation and "knee-capping" to deter OEMs from dealing with AMD   Intel has a variety of pressure points at its disposal: it can

26

unilaterally reduce or withdraw a discount, rebate or subsidy, it can impose a discriminatory price increase on a disfavored customer, extend a price cut to that customer's competitor, or force retailers into dropping the customer's computers and buying from its competitor instead; or it can delay or dispute an allowance or rebate – all of which can turn a profitable quarter for an OEM into an unprofitable one. Other pressure points on accounts it deems disloyal include threatening to delay or curtail supplies of scarce processors or essential technical information Examples abound

73   As Gateway executives have recounted, Intel's threats beat them into "guacamole." But Gateway is not alone. Prior to its merger with HP, Compaq Computer received Intel threats every time it engaged with AMD  In late 2000, for example, Compaq's CEO, Michael Capellas, disclosed that because of the volume of business he had given to AMD, Intel withheld delivery of server chips that Compaq desperately needed  Reporting that "he had a gun to his head," Capellas informed an AMD executive that he had to stop buying AMD processors.

74   In 2002, Intel pointed its gun at NEC. Intel threatened to discontinue providing NEC with the technological roadmap of future Intel products if NEC did not convert its entire line of Value Star L computers to Intel microprocessors. Without that roadmap, NEC would be at a distinct competitive disadvantage  Predictably, NEC succumbed and eliminated AMD from the Value Star L series in 2002 and 2003

75   NEC's European subsidiary, NEC-CI, which operates NEC's European and non-Japanese Asian divisions, reported that Intel executives said they would "destroy" NEC-CI for engaging with AMD in the commercial desktop segment. Intel told NEC-CI's retailers that NEC-CI's AMD dealings could impair its ability to supply products to its customers, and when NEC-CI resisted the pressure, Intel imposed a discriminatory price increase

76   AMD had been engaged in discussions with IBM about introducing an Opteron "blade" server, when IBM suddenly announced that any such product it distributed could not

27

bear an IBM logo. When pressed for an explanation, IBM reported that it could not appear overly supportive of AMD server products because it feared Intel retaliation.

### e. *Interference with AMD Product Launches*

77    Key to gaining quick market acceptance of a new microprocessor is a chipmaker's ability to develop a lineup of reputable launch partners, consisting of OEMs prepared to roll out products featuring the chip, major customers who are willing to buy and embrace it, and other industry allies, such as major software vendors and infrastructure partners who can attest to its quality and reliability. Particularly for commercial and enterprise (*i.e.*, server-work station) purchasers, a successful and impressive "launch" is essential to generating confidence among the computer professionals who will be the potential audience for the new microprocessor.

78    Aware of the importance of product launches, Intel has done its utmost to undermine AMD's. Set forth below are several examples.

79.    AMD's September 23, 2003, launch of Athlon64 was a watershed event for the Company. Upon learning the launch schedule, Intel did its best to disrupt it. For example, Acer committed to support the AMD rollout by making a senior executive available for a videotaped endorsement and by timing the introduction of two computers, a desktop and a notebook, to coincide with AMD events planned for Cannes, San Francisco and Taiwan. Days before the event, Intel CEO, Craig Barrett, visited Acer's Chairman, CEO and President in Taiwan, expressed to them Intel's "concern" and said Acer would suffer "severe consequences" if it publicly supported AMD's launch. The Barrett visit coincided with an unexplained delay by Intel providing $15-20 million in market development funds owed to Acer. As a result, Acer withdrew from the launch in the U.S. and Taiwan, pulled its promotional materials, banned AMD's use of the video, and delayed the announcement of its Athlon64-powered computers. Acer's President subsequently reported that the only thing different about Intel's threats was the messenger – they were "usually done by lower ranking managers," not Intel's CEO.

28

80    HP also withdrew precipitously from the Athlon64 launch after committing to participate. HP had agreed to support the launch by producing a promotional video and by sending senior executives to all three launch sites. Just before launch, however, HP manager, John Romano, pulled the video and announced that HP would only be sending a junior manager, and then only to Europe.

81    Other AMD customers and channel partners reporting Intel coercion to withdraw from the Athlon64 launch were Lenovo, NEC-CI and Best Buy.

82    Intel also disrupted AMD's launch of its Opteron server chip, which was rolled out on April 22, 2003, with few in attendance and little industry support. A computer industry journal reported Intel's fingerprints. "They all [vendors] told me that prior to the launch, they received a phone call from Intel. Intel asked if they were going to the launch. If they replied yes, the Intel rep asked them if it was 'important to them to go', or 'if they really wanted to go.' Pressing the vendors, I got the same response, 'Intel is too smart to threaten us directly, but it was quite clear from that phone call that we would be risking our various kickback money if we went.'"

83    Other companies that reported being intimidated from participating in the Opteron launch were MSI, Atipa, Solectron and Fujitsu-Siemens. Indeed, Intel representatives told Fujitsu-Siemens' executives in the weeks preceding the Opteron launch that if they attended, they would be the only Tier One OEM showing its support as all of the others would back out. With the exception of IBM, Intel was right.

84    These are not isolated examples, but rather illustrations of Intel's relentless campaign to undermine marketing efforts by its one remaining competitor. For example, IBM pulled its AMD-powered computers from the 2004 Palisades eServer and PC Show, citing a contractual agreement with Intel said to prohibit it from endorsing those competitive products. And at the 2004 Super Computing Show, an annual conference devoted to high performance computing, Intel offered two other AMD customers money to remove AMD systems from their

29

booths  At CeBit, Intel threatened to pull a half million dollars of support from Fujitsu-Siemens for displaying AMD products (which were removed).

### f. Product Bundling

85.    Intel also uses product bundling as an exclusionary weapon in a variety of ways Intel's most common deployment is in bidding for a new OEM platform: it bundles microprocessors with free (or heavily discounted) chipsets or motherboards, often offered in amounts exceeding the OEM's requirements for the new platform.  (The excess, of course, is only compatible with Intel processors, thereby providing the OEM a strong inducement to go with Intel rather than AMD on uncommitted models.)  AMD does not sell chipsets or motherboards; they are provided by independent suppliers such as ATI, nVidia and Via which incur their own costs and control their own pricing.  Hence, to match Intel's bundled microprocessor-chipsets-motherboards offer, AMD must extend a discount on its microprocessors that will not only match any Intel discount on the microprocessors themselves but also will compensate the OEM for the savings it will lose on independent Intel chipset and motherboard purchases  The additional compensation AMD is forced to provide through a discount on the sale of microprocessors alone makes AMD's sale of microprocessors potentially unremunerative, and it also enables Intel to avoid competing with AMD directly on microprocessor price and quality by imposing disproportionate burdens on AMD that are wholly unrelated to AMD's product quality which, as has been demonstrated, is frequently superior to that of Intel's

86.  As retaliation for dealing with AMD, Intel has also used chipset pricing as a bludgeon  For example, in 2003, Acer had committed to launch the AMD Athlon XP.  Acer executives worldwide had been working with AMD to bring the product to market post-launch But, on the eve of the launch the Acer management in Taiwan pulled the plug.  AMD learned from Acer executives that Intel had threatened to raise chipset prices by $10 on all Intel-based Acer systems if *any* processor business was awarded to AMD outside of Europe.

30

87    Intel's dealings with OEMs are unlawfully exclusionary, have no pro-competitive justification, and are intended to maintain its monopoly.

## 2. Practices Directed At Distributors

88    Intel uses many of the same tactics it practices on OEMs to restrict distributors from carrying AMD processors or selling AMD products into markets it deems strategic  For example, it entered into an exclusive deal with Synnex, which is one of the largest U.S distributors  Given Intel's 80% plus market share, there is no pro-competitive justification for this arrangement

89.   As with OEMs, Intel offers discounts and rebates to distributors on the condition that they not do business with AMD, either worldwide or in strategic sub-markets  For example, in December 2004, Ingram Micro, Intel's biggest distributor in China, suddenly cut off discussions to distribute AMD chips as well.  A high-ranking Ingram Micro official later reported to AMD that Ingram Micro had no choice because Intel proffered loyalty rebates that were too lucrative to pass up

90    Intel also offers a panoply of special programs for distributors who carry Intel microprocessors exclusively. marketing bonuses, increased rebates, credit programs for new customers (credits that can be used for all products from Intel and any other suppliers), payment for normal freight charges, and special inventory assistance such as credits to offset inventory costs  When such more nuanced means of achieving exclusivity fail, Intel has simply bribed distributors not to do business with AMD.  For example, a high-ranking Tech Data executive turned down $1 million to stop doing business with AMD, which caused the Intel representatives to ask, "How much would it take?"

91.   Intel also offers retroactive rebates triggered when a distributor reaches a prescribed buying quota.  Like the rebates offered to OEMs, the intent is to inflict economic punishment on those who do too much AMD business  But, unlike OEMs, distributors remain ignorant of the goals Intel has set for them or the precise consequences of failing to meet them.

31

Intel does not share this information with them; they simply receive a check at the end of a quarter. As a result, every AMD chip they purchase, they buy at their peril.

92. Finally, those distributors who choose to do business with AMD have been conditioned to expect Intel retaliation. For example, when ASI, one of the largest computer hardware and software distributors, began distributing AMD processors, Intel demanded that it exclude AMD personnel from its ASI Technology Shows and its General Managers' meetings. Until recently, ASI refused master distributor status from AMD, despite the financial benefits attached, because it feared that such a public alignment with AMD would trigger Intel retaliation. When, in January 2005, it finally accepted Master Distributor status, Intel began reducing the level of market development funds ASI received.

93. Avnet Inc., one of the world's largest computer equipment distributors and an avid AMD supporter, has also received its share of Intel intimidation. Thus, Avnet cited Intel as the reason it could not distribute AMD parts to the industrial sector. And when AMD launched its Opteron server chip, Intel made clear it would make it "painful" for Avnet were it to begin distributing that chip. When Avnet did so anyway, Intel threatened to cut if off. Another distributor got even worse treatment. In retaliation for Supercom's AMD dealings in Canada, Intel pressured Supercom's customers to switch to another distributor.

94. These are not the only distributors that Intel has attempted to coerce from doing business with AMD. Others include R.I.C. in Germany, Paradigit in the Netherlands, and Quote Components, also in the Netherlands.

95. Intel's dealings with distributors are unlawfully exclusionary, have no pro-competitive justification, and are intended to maintain its monopoly.

**3. Practices Directed At Retailers**

96. In both the U.S. and internationally, approximately one fifth of desktop and notebook computers is purchased at retail stores. A handful of retailers dominate the U.S. PC market: Best Buy and Circuit City are the largest. Other significant but smaller retailers are Walmart/Sams Club, Staples, Office Depot and Office Max.

32

97.   Most of the PCs sold at retail are sold during four or five "buying seasons" that correspond to events on the calendar ("Dads and Grads," "Back to School," "Holiday," etc.), and retailers refresh their inventory for each  A chipmaker faces a two-step process to get its platform on retail shelves: first, it must convince one or more OEMs to build machines using its microprocessor at a suggested price point (called "getting on the roadmap"), and second, it must convince the retailer to stock and devote shelf space to these machines.  Shelf space does not come for free.  The major retailers demand market development funds ("MDF") in exchange.  MDF can consist of cooperative advertising support, but more frequently it comprises a marketing-related opportunity that a chipmaker must buy for tens of thousands of dollars, for example, space in a Sunday circular, an in-store display or an internet training opportunity with the chain's sales staff  The MDF required to secure shelf space can run as high as $25 per box depending on the computer price point and how urgently the competing chipmakers want the shelf space.

98.   Intel has historically enjoyed an advantage over AMD at retail because, using many of the strategies described above, it has had greater access to the OEMs' roadmaps and the ability to exert pressure to keep AMD out of their product plans  Also, it has significantly greater financial resources with which to buy retail shelf space

99   But to leverage those advantages, Intel has also made exclusive deals with many key retailers around the world.  For example, until recently Office Depot declined to stock AMD-powered notebooks regardless of the amount of MDF AMD offered, citing its "premier" status with Intel that would be put at risk.  Fry's is Fujitsu's only retailer in the United States  When Intel learned that Fry's was very successfully marketing a Fujitsu's Athlon™ XP-based notebook, it offered Fry's a large payment to remove it from its shelves.

100   The story is even worse in Europe  AMD has been entirely shut out from Media Markt, Europe's largest computer retailer, which accounts for 35% of Germany's retail sales. Intel provides Media Markt between $15-20 million of MDF annually, and since 1997 Media Markt has carried Intel computers exclusively   Intel subsidies also foreclose AMD from Aldi,

33

a leading German food retail chain, whose PC sales account for an additional 15-20% of the German market

101. In the United Kingdom, Intel has locked up substantially all of the business of DSG (Dixon Services Group), operator of three major chains including Dixon and PC World that collectively account for two thirds of the U.K. PC market. In exchange for Intel payments, DSG has agreed to keep AMD's share of its business below 10%. Like Media Markt, DSG reports that Intel penalizes it with reduced MDF just on account of the small amount of business it does with AMD. Toys'R'Us in the U.K. is also exclusive to Intel. Time, another U.K. retailer (which builds computers as well), took a substantial MDF payment from Intel in exchange for near-exclusivity on notebooks during the first half of 2004, and it reports that Intel has withheld discounts because Time has introduced too many AMD Athlon64 desktop models. In France, Intel has brought pressure on the largest retailers, including Conforama, Boulanger, causing them to cease dealing with AMD or drastically reduce their AMD business.

102. AMD has nonetheless made some progress in gaining retail market share. Because of price/performance advantages, which are key in retail, OEMs build approximately 15% of their U.S. domestic market desktops with AMD processors, within notebook roadmaps, AMD represents approximately 10%. On a shelf-space to sales basis, AMD has generally outperformed Intel. For instance, in the desktop segment during the fourth quarter of 2004, AMD-equipped computers captured between a 33%-38% share of Circuit City's sales, despite being limited to five of the 25 models (20%) on the Circuit City shelves. And with approximately 15% of the shelf space allotted to its products at Best Buy and CompUSA, AMD computers accounted for roughly 30% and 22% of their sales, respectively. These numbers confirm that AMD's products perform well at retail, provided that space is available.

103. In fact, Intel's sales staff was instructed "not to let this happen again." As a result, Intel instituted a rebate program similar to what it foisted on OEMs, with similar exclusionary effect. Under this program, Intel provides full MDF payments to retailers, such as Best Buy and Circuit City, only if they agree to limit to 20% not just the shelf space devoted to AMD-

34

based products, but also the share of revenues they generate from selling AMD platforms. If AMD's share exceeds 20%, the offending retailer's marketing support from Intel is cut by 33% *across all products*

104. This is how the program works at Circuit City. If less than 20% of Circuit City's notebook revenue derives from AMD-based computers (30% for desktops), Intel has agreed to pay Circuit City $15 in MDF per Intel-powered machine, but if the AMD percentage reaches or exceeds 20%, Circuit City's MDF subsidy is cut to $10. This creates a $5 per box "tax" on the retailer for doing 20% or more of its dollar volume with AMD-powered machines, and this "tax" is applicable to all of the Intel-powered machines that the retailer buys, back to the very first machine.

105. The following illustrates the competitive disadvantage this creates for AMD: if Circuit City were to purchase only Intel-powered notebooks for its 200,000-unit inventory in a quarter, Intel would pay it $15 of MDF per computer, or a total of $3 million. However, if Circuit City were to reduce its purchases of Intel-based notebooks to 80% (160,000 units) so that it could stock a modest number of AMD-powered computers, Intel MDF would fall to $1.6 million ($10 MDF/unit times 160,000 units). Were AMD to match Intel's $10 per unit MDF on the 40,000 units it supplied, Circuit City would receive an additional $400,000, bringing its total MDF to $2 million, leaving it $1 million worse off for doing business with AMD. For AMD to make Circuit City "whole," it would have to vastly increase its MDF on its 20% share to $35 MDF per unit (40,000 x $35 = $1.4M), which together with Intel's $1.6 million would bring the total MDF back to $3 million. In other words, to just capture a 20% share, AMD must offer two or three times as much MDF as Intel – because it has far fewer units over which to spread the difference. Given these perverse economies, Circuit City is not likely to allocate less than 80% of its notebook sales to Intel, even if it means taking AMD stock off the shelves at the end of a quarter. (Indeed, to avoid inadvertently running afoul of the limitation, a prudent distributor would keep AMD's share well short of 20%.)

35

106. Nor is Intel above threatening retailers to gain preferred treatment. For example, at the recent CeBit computer show in Hanover, Germany (the largest computer show in the world), a German chain, Vobis, hung an AMD Turion64 banner from its booth as part of a co-marketing agreement with AMD and its OEM partner (Yakamo) to announce AMD's new mobile microprocessor. Intel's German general manager and its vice president for mobile products demanded that the Turion64 banner be removed. When Vobis' CEO declined, the Intel representatives threatened immediately to stop microprocessor shipments to Vobis' supplier. The banner was removed before the CeBit show opened.

107. Intel's dealings with retailers are unlawfully exclusionary, have no pro-competitive justification, and are intended to maintain its monopoly.

### 4. Intel's Standard Setting and Other Technical Abuses

#### a. *Intel's Exclusion of AMD from Industry Standards*

108. Companies within the computer industry often agree to design certain aspects of their products in accordance with industry standards to ensure broad compatibility. Indeed, standards are not only ubiquitous in the computer industry, they are essential. But when a company is unfairly excluded from the standards-setting process or is denied timely access to the standard, competition can be restrained in a way that reverberates throughout the entire market. Intel has employed, and continues to employ, a variety of tactics that have the purpose and effect of excluding and/or hampering AMD's full and active participation in the development of important industry standards. It has also worked to deny AMD timely access to such standards. Its efforts have hampered AMD's ability to vigorously compete in the market.

109. By way of example, Intel and AMD each develop and manufacture memory controller technologies that allow their processors and related components to communicate with memory. Intel designs and manufactures an entirely separate chip for this purpose, known as the Graphics and Memory Controller Hub, but AMD embeds its memory controllers directly into its processors, thus dispensing with the need for an extra chip and speeding up

36

communication. Both companies need to know and have access to memory standards well in advance of producing their processors and/or chipsets so that their memory controller designs will be compatible with the next generation of memory devices

110   The Joint Electron Device Engineering Council ("JEDEC") is the industry organization responsible for the standards governing the most recent generations of computer memory chips. Even though JEDEC was already developing the standards for the next generation of memory chips, Intel convened a secret committee that it dubbed the Advanced DRAM Technology ("ADT") Consortium to develop a competing memory standard.

111   The ADT Consortium was cleverly structured with multiple tiers of membership, each with different levels of access to information  The majority of companies were consigned to the lowest tier, meaning that they would receive access to the memory standard only upon its completion, but not during its development. The actual development effort was undertaken by companies with the highest tier membership status, which Intel reserved for itself and the major memory manufacturers. No other companies were allowed input or full access to the standard during its development by the ADT Consortium.

112   AMD desperately needed access to the developing standard, and input into its definition, in order to be able to launch a microprocessor with updated memory controller technology at the same time as Intel. AMD lobbied repeatedly for higher tier membership status, but was continually turned down  Intel had structured the ADT Consortium's rules to require a unanimous vote – a rule that gave Intel veto power – over any decision to allow AMD to join the development committee; and it used that veto power to cause the Consortium arbitrarily to reject AMD's application.

113   By foreclosing AMD from input or access to the memory standard during its development process, Intel deliberately placed AMD at a severe competitive disadvantage  As a consequence of its exclusion, AMD had no opportunity to monitor participants' suggestions and to object to Intel-proposed features that were without substantial benefit to consumers and were instead motivated by Intel's desire to disadvantage AMD's microprocessor architecture.

37

Furthermore, by keeping the ADT Consortium memory standard-setting process shrouded in secrecy, Intel was able to gain a significant head start. While the ADT Consortium was ultimately unsuccessful in implementing an industry standard, this type of exclusionary conduct exemplifies Intel's attempts to use industry standard-setting to competitively disadvantage AMD in an unlawfully exclusionary manner.

114. Indeed, Intel is attempting a repeat performance with respect to a new memory standard, this time excluding AMD by avoiding the open standard-setting committee entirely. Intel is currently coercing the major memory producers into signing non-disclosure agreements and working exclusively with Intel in a "secret" committee to develop the next generation memory interface standard. Once under this agreement, the memory manufacturers are prohibited from sharing information about their own product designs implementing the memory interface standard. This has the effect of preventing AMD from completing the design of its processor memory controllers until Intel permits memory manufacturers to communicate their interface specifications to the industry.

115. By this scheme, Intel tightens its control over the industry by converting what the component manufacturers intend as a public standard into a proprietary one, and thereby guarantees itself an undeserved head-start and unfair competitive advantage.

### b. Intel's Promotion of Industry Standards that Disadvantage AMD

116. Even where it has been unable to exclude AMD from participating in the development of industry standards, Intel has attempted to drive the adoption of standards having no substantial consumer benefit and whose sole or dominant purpose was to competitively disadvantage AMD based on its highly integrated microprocessor architecture.

117. As an example, in 2004, JEDEC began developing standards governing the design of the memory modules for next generation ("DDR3") memory devices. These modules, known as dual inline memory modules, or "DIMMs," consisted of printed circuit boards upon which a number of memory chips were mounted. The DIMMs connected the memory chips to the computer's motherboard through a series of metal connectors known as "pins." One

38

purpose of the JEDEC standards was to define the functions of these pins so as to enable chipmakers to design compatible memory controllers that would allow their microprocessors and the memory on the DIMMs to communicate.

118   The JEDEC committee, which consists of members representing companies throughout the computer industry, had already adopted a scheme for defining the pins for the previous generation ("DDR2") DIMMs used in desktop and laptop computers.  When the JEDEC committee began work on standards for DDR3 memory modules for desktop computers, Intel proposed that the committee adopt a pin definition similar to that used for the DDR2 memory modules.  This proposal made perfect sense, as Intel explained to the committee, because it allowed DDR3 memory controllers to be compatible with DDR2 and DDR3 memory modules.

119.  However, when the JEDEC committee began to define the pins for DDR3 laptop memory modules in this consistent manner, Intel completely reversed its position, counter-proposing instead that the committee rearrange the pin definitions.  Intel's proposal had no discernable technical merit or basis.

120.  In fact, Intel's motivation for proposing modification of the laptop memory module pin definition was to competitively disadvantage AMD   Any modification to the laptop memory module pin definition would require Intel and AMD to make corresponding modifications of their memory controllers   AMD's microprocessor design, while representing a huge breakthrough in integration, embeds the memory controller directly into its microprocessor.  While this produces significant computing advantages, modification of an embedded memory controller requires significantly more time and expense.

121   Knowing this vulnerability, Intel proposed its modified DDR3 memory module pin definition for laptop computers for the purpose of delaying AMD's introduction of a technologically superior part   While Intel's proposal was ultimately rejected by the JEDEC committee, confirming the proposal's complete lack of technical merit, this is yet another example of how Intel has attempted to drive industry standards to achieve its exclusionary ends.

39

### c. Intel's Leveraging of Its Other Product Lines to Unfairly Disadvantage AMD in the Marketplace

122  Intel has also designed and marketed microprocessor-related products with the goal of compromising performance for those who opt for AMD solutions, even if it requires sacrificing its own product quality and integrity

123.  An example is Intel's compilers.  Generally, independent software vendors ("ISVs") write software programs in high-level languages, such as C, C++, or Fortran  Before these programs can be understood by a computer system, they must be translated into object code – a machine-readable language – by a software program called a compiler.  Different companies write compilers for different operating systems (Windows, Linux, etc.) and for different programming languages (C, C++, Fortran, etc.).  Intel offers compilers for use with a variety of different operating systems and programming languages.

124  Intel's compilers are designed to perform specialized types of optimizations that are particularly advantageous for ISVs developing software programs that rely heavily upon floating point or vectorized mathematical calculations.  Such programs include, for example, mathematical modeling, multimedia, and video game applications.

125  Intel has designed its compiler purposely to degrade performance when a program is run on an AMD platform  To achieve this, Intel designed the compiler to compile code along several alternate code paths  Some paths are executed when the program runs on an Intel platform and others are executed when the program is operated on a computer with an AMD microprocessor  (The choice of code path is determined when the program is started, using a feature known as "CPUID" which identifies the computer's microprocessor.)  By design, the code paths were not created equally  If the program detects a "Genuine Intel" microprocessor, it executes a fully optimized code path and operates with the maximum efficiency.  However, if the program detects an "Authentic AMD" microprocessor, it executes a different code path that will degrade the program's performance or cause it to crash

40

126   ISVs are forced to choose between Intel's compilers, which degrade the performance of their software when operated with AMD microprocessors, or third-party compilers, which do not contain Intel's particular optimizations   Sadly for AMD and its customers, for legitimate reasons Intel's compilers appeal to certain groups of ISVs, especially those developing software programs that rely heavily on floating point and vectorized math calculations   Unbeknownst to them, performance of their programs is degraded when run on an AMD microprocessor not because of design deficiencies on the part of AMD, but deviousness on the part of Intel

## EFFECTS OF INTEL'S MISCONDUCT

127   Intel's unlawful conduct has caused and will continue to cause substantial harm to competition in the market for x86 microprocessors in domestic, import, and export trade.  Were it not for Intel's acts, AMD and others would be able to compete for microprocessor business on competitive merit, both domestically and internationally, bringing customers and end-product consumers lower prices, enhanced innovation, and greater freedom of choice.

128.  Intel's anticompetitive acts both inside and outside the territorial boundaries of the United States have a direct, substantial, and reasonably foreseeable effect on trade and commerce that is not trade and commerce with foreign nations, and on United States import trade and commerce   In maintaining its monopoly by unlawfully denying rivals a competitive opportunity to achieve minimum levels of efficient scale, Intel must necessarily exclude them from the product market worldwide.  As the domestic U S. market is but an integral part of the world market, successful monopolization of the U S. market is dependent on world market exclusion, lest foreign sales vitalize a rival's U S. competitive potential.

129.  Intel's Sherman Act violative conduct throughout the world has caused and will continue to cause substantial harm to the business of AMD in the domestic, import, and export trades, in the form of artificially constrained market share, lost profits and increased costs of capital   Additionally, that same conduct has had, and will continue to have, a direct,

41

substantial, and reasonably foreseeable effect on AMD's ability to sell its goods to foreign customers in restraint of its U S -based and directed business, including its U.S. export business. These harms are evidenced by the following.

- When AMD first entered the server market in 2002 with its Athlon microprocessor – a part designed for desktops, not servers – the small OEMs and white-box vendors deploying the chip nonetheless managed to secure approximately 3% of the worldwide server market  AMD introduced its next generation Opteron microprocessor for servers the following year, and the chip won rave reviews and passionate customer testimonials, including Best of Show at the June 2003 ClusterWorld Conference and Expo and Best Processor award in July 2003 from InfoWorld  Nonetheless, by means of its exclusionary and anticompetitive conduct, as of the Fourth Quarter 2004, Intel had limited AMD's worldwide server market share to less than 5%, not appreciably more than before it introduced the Opteron.

- Intel's exclusionary conduct has successfully boxed AMD out of the notebook sector  Its exclusive deals with Dell, Sony and Toshiba alone bar AMD from a third of the world market and half of U.S  domestic sales.  Intel's economic coercion and fidelity rebates have foreclosed AMD from an appreciable share of the remainder

- AMD's Athlon64 is widely recognized as fully competitive with Intel's best desktop offering with the added benefit that it can run 64-bit software.  Nonetheless, with the exception of a channel-restricted HP machine and a single Fujitsu-Siemens' model, AMD has failed to get a single major OEM – which collectively dominate the lucrative commercial desktop sector – to launch broadly an Athlon64 commercial desktop. Fortune 500 companies won't take a chance on AMD unless it partners with a Tier One desktop OEM, but Intel's exclusionary conduct, including its economic coercion of Dell, HP, IBM, Gateway and Acer, prevents that from happening.  As a result, AMD's commercial desktop share is no greater now than it was in 2002.

42

## CLAIMS FOR RELIEF

## CLAIM 1

### Willful Maintenance of a Monopoly
### In Violation of Sherman Act, Section 2

130  AMD realleges and incorporates by reference the averments set forth in paragraphs 1 through 129

131.  The x86 Microprocessor Market is a relevant product market within the meaning of the antitrust laws

132  The relevant geographic market is the world

133  Intel possesses monopoly power in the relevant market, maintaining a market share of over 90% by revenue and 80% by unit volume

134.  Substantial barriers to entry and expansion exist in the relevant market

135.  Intel has the power to control prices and exclude competition.

136.  Intel has engaged in conduct with anticompetitive effects to unlawfully maintain and enhance its monopoly in the relevant market and to keep prices high, to stifle competition and to eliminate consumer choice through unlawfully exclusionary behavior designed to keep AMD weak, undersized, and unable to achieve a minimum efficient scale of operation needed to become a viable substitute for Intel with respect to significant customers, or to an essential portion of the market   It has done so with the intent to maintain its monopoly in the relevant market

137  There is no legitimate business justification for Intel's conduct

138  AMD has suffered and will continue to suffer injury to its business and property.

139  Intel's conduct has caused and will continue to cause injury to the relevant market in the form of higher prices and reduced competition, innovation and consumer choice.

43

## CLAIM 2

### Secret Discriminatory Rebates and Discounts
### In Violation of California Business and Professions Code § 17045

140   AMD realleges and incorporates by reference the averments in paragraphs 1 through 129.

141   California Business & Professions Code § 17045 provides in pertinent part.

> 17045.  The secret payment or allowance of rebates, refunds, commissions, or unearned discounts, whether in the form of money or otherwise, or secretly extending to certain purchasers special services or privileges not extended to all purchasers purchasing upon like terms and conditions, to the injury of a competitor and where such payment or allowance tends to destroy competition, is unlawful

142   As set forth above, particularly in paragraphs 59 through 71, 89 through 91 and 103 through 105, Intel has systematically engaged in a scheme to extend discriminatory secret rebates and discounts to OEMs, distributors, retailers and others for the purpose of injuring AMD and tending to destroy competition.

143   Intel has also secretly given engineering funds, advance technical information, and other benefits to certain customers but not to others similarly situated   This conduct constitutes special services or privileges not extended to all customers purchasing upon like terms and conditions.  AMD has information that this practice is occurring, but due to Intel's nondisclosure agreements and engendered customer fear, AMD as well as Intel's other customers do not know the extent or degree of the preferential treatment

144.  Intel keeps secret its discriminatory rebates and discounts by, among other things, purposely concealing from one customer discounts it extends to another, and by signing customers, retailers and other beneficiaries of its secret discounts and rebates to nondisclosure and confidentiality agreements.

44

145   Intel's conduct emanated from its Santa Clara, California headquarters, and/or was intended to and did harm California residents, including AMD, and is therefore subject to California law

146   Intel's secret rebates, unearned discounts, and preferential treatment of certain customers are mechanisms to divert sales and customers away from AMD   Intel targets these mechanisms at AMD's actual and potential customers   Intel bestows them to reward those customers who cease or curtail their dealings with AMD, and withholds them to punish customers who do not.  As a result, AMD has lost millions of dollars in potential sales.

147   Intel's secret payment of rebates and unearned discounts, and its secret and discriminatory bestowal of special services and privileges, tend to diminish and destroy competition in the relevant product market.

## CLAIM 3

### Interference with Prospective Economic Advantage
### In Violation of California Business and Professions Code § 17045

148   AMD realleges and incorporates by reference the averments in paragraphs 1 through 129

149   Intel intentionally interfered with AMD's prospective economic advantage

150   AMD has enjoyed economic relationships with OEMs, distributors, retailers, and other actual and potential customers and partners which contained the probability of future economic benefit

151   With knowledge of these relationships, Intel has engaged in intentional, wrongful conduct designed to interfere with and disrupt AMD's relationships with these third parties  As set forth above, Intel has made direct payments in return for exclusivity and near-exclusivity; offered discriminatory rebates, volume discounts and subsidies conditioned on customer "loyalty", threatened economic retaliation against those who gave, or contemplated giving, too much of their business to AMD or who refused to limit AMD to Intel-approved

45

models, lines and/or sectors, or who cooperated too closely with AMD's promotion of its competitive processors.

152. Intel's actions were independently wrongful as they violated federal and state law, were in restraint of trade, and were independently tortious

153. Intel's intentional, wrongful conduct resulted in the actual disruption of AMD's relationships with these third parties. As set forth above, Intel's conduct caused these third parties (i) to cease purchasing microprocessors from AMD, (ii) to limit their purchases of microprocessors from AMD, (iii) to abstain from purchasing microprocessors from AMD in the first instance, (iv) to restrict sales of products containing AMD microprocessors, (v) to abandon planned AMD offerings, (vi) to restrict distribution and marketing of planned AMD offerings, and (vii) to withdraw from participating in AMD product launches and promotions.

154 AMD has suffered economic harm proximately caused by Intel's conduct in the form of artificially constrained market share, increased costs of capital, lost profits and sales, as well as lost publicity and promotion

155. Intel's conduct emanated from its Santa Clara, California headquarters, and/or was intended to and did harm California residents, including AMD, and is therefore subject to California law

156. Intel is not entitled to the "competition privilege" because Intel employed improper means and intended to create and/or to continue an illegal restraint of competition.

157 Intel acted both oppressively and maliciously with intent to cause injury to AMD and with conscious disregard for the rights of others. As such, AMD is entitled to punitive damages, in addition to compensatory damages, as permitted by law

46

## DEMAND FOR TRIAL BY JURY

158. Pursuant to Fed. R. Civ. P. 38(b), AMD demands trial by jury of all issues so triable under the law

## PRAYER FOR RELIEF

WHEREFORE, AMD PRAYS THIS COURT:

A. Find that Intel is wrongfully maintaining its monopoly in the x86 Microprocessor Market in violation of Section 2 of the Sherman Act and award AMD treble damages in an amount to be proven at trial, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a).

B. Find that Intel has made secret payments and allowance of rebates and discounts, and secretly and discriminatorily extended to certain purchasers special services or privileges, all in violation of California Business & Professions Code § 17045, and pursuant thereto award AMD treble damages for its resulting lost profits in an amount to be proven at trial

C. Find that Intel has intentionally interfered with valuable business relationships of AMD to its economic detriment and award AMD damages in an amount to be proven at trial for its resulting losses, as well as punitive damages, as permitted by law

D. Grant injunctive relief prohibiting Intel and all persons, firms and corporations acting on its behalf or under its direction or control from engaging in any further conduct unlawful under Section 2 of the Sherman Act or Section 17045 of the California Business and Professions Code

E. Award AMD such other, further and different relief as may be necessary or appropriate to restore and maintain competitive conditions in the x86 Microprocessor Market

47

F.    Award AMD attorney's fees and costs of the action

Respectfully submitted,

_[signature]_
Jesse A. Finkelstein (#1090)
  finkelstein@rlf.com
Frederick L. Cottrell, III (#2555)
  cottrell@rlf.com
Chad M. Shandler (#3796)
  shandler@rlf.com
Steven J. Fineman (#4025)
  fineman@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, DE   19899
(302) 651-7700

Attorneys for Plaintiffs Advanced Micro
Devices, Inc. and AMD International Sales &
Service, Ltd

OF COUNSEL:
Charles P. Diamond, Esq.
  cdiamond@omm.com
Linda J. Smith, Esq.
  lsmith@omm.com
O'Melveny & Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA  90067
(310) 246-6800

Mark A. Samuels, Esq.
  msamuels@omm.com
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA 90071
213-430-6340

Dated:  June 27, 2005

48

Chance v. Intel Corporation, et al.

# Exhibit C

To Class Action Petition

Case 1:05-cv-00265-JJF-KMH Document 63-6 Filed 05/22/2006 Page of 010

**washingtonpost.com**

Advertisement

# AMD files antitrust suit against Intel

By Paul Thomasch
Reuters
Tuesday, June 28, 2005; 12:18 PM



NEW YORK (Reuters) - Advanced Micro Devices Inc. <AMD.N> has filed an antitrust suit charging that Intel Corp. <INTC.O>, its chief rival, used everything from threats to kickbacks in illegally building the world's largest computer-chip business.

The suit, filed in U.S. District Court in Delaware, is the latest shot in a two-decade battle between the companies and comes after a recent ruling by Japanese antitrust authorities that Intel violated anti-monopoly laws and stifled competition with AMD.

The 48-page suit expands those charges, alleging that Intel "has resorted to old-fashioned threats, intimidation and knee capping" around the world to sell its microprocessors, the brain of every computer.

Comparing its rival to the Standard Oil monopoly of the 19th Century, AMD charged that Intel coerced 38 companies, including such household names as Dell Inc. <DELL.O>, Sony Corp. <6758.T> and Gateway Inc. <GTW.N>, as it took control of 90 percent of the revenue generated by microprocessor sales.

"Everywhere in the world, customers deserve freedom of choice and the benefits of innovation -- and these are being stolen away in the microprocessor market," AMD Chief Executive Hector Ruiz said in a statement on Tuesday.

Charles Diamond, an attorney with O'Melveny & Myers LLP who led AMD's investigation, said in an interview that the company could seek "hundreds of millions of dollars if not billions of dollars" in damages and hopes to have the case before a jury by the end of 2006.

Diamond said he would be open to settlement discussions. He declined to say whether any talks have yet taken place related to the suit, which paints a dark picture of cutthroat practices in the chip business.

In one instance, AMD charged, former Compaq Computer CEO Michael Capellas said in 2000 that Intel "had a gun to his head" and he would have to stop buying from AMD.

"GUACAMOLE"

In another instance outlined in the lawsuit, Gateway executives told AMD that Intel had "beaten them into 'guacamole'" in retaliation for doing business with AMD, according to the papers.

It also said former Gateway CEO Ted Waitt told AMD that Intel offered him large sums not to deal with AMD.

"I have to find a way back to profitability," the complaint quotes Waitt as saying. "If by dropping you I become profitable, that is what I will do."

Case 1:05-cv-01302-JJF-KMW   Document 2-6   Filed 05/06/2005   Page 2 of 10

AMD shares were up 37 cents at $17.04 in midday trade in New York Stock Exchange trading but are down 24 percent this year.

Shares of Intel were up 25 cents at $26.11 on Nasdaq and are up 11 percent this year. The company could not be reached for comment.

The suit projects an image of Intel markedly at odds with its popular reputation as a place where its founder still sits in a cubicle alongside rank-and-file workers and envisions the pace of technological advancement over the span of decades.

Indeed, the complaint portrays Intel CEO Craig Barrett as an executive who employed arm twisting and intimidation to keep his business intact.

In 2003, the complaint says, Barrett visited the CEO of Taiwan computer maker Acer Inc. <2353.TW> before the introduction of AMD's Athlon 64 line of chips and threatened "severe consequences" if he supported the launch.

Some of Intel's clean image was tarnished by its recent troubles in Japan, where the Fair Trade Commission in March said Intel's local unit had violated antitrust laws with sales practices that sought to switch domestic computer makers like Hitachi Ltd. <6501.T> and Sony away from rival chips.

Intel also faces scrutiny from European Union investigators looking into complaints from AMD.

"We are trying to bust open Intel's chokehold over the computer companies and get the right to compete freely and fairly for every processor they buy," Diamond said.

"This is about fair and open competition. This is about giving our customers, the computer manufacturers, freedom to buy from whom they choose, and this is about giving consumers the right to buy the best products at the lowest prices to suit their needs," he said.

"That's not happening right now." (Additional reporting by Cal Mankowski, Eric Auchard and Sinead Carew)

© 2005 Reuters

**Advertising Links**                                                    What's this?

**Refinance Rates Hit Record Lows**
Get $150,000 loan for $720 per month. Refinance while rates are low.
www.lowermybills.com

**Save on All Your Calls with Vonage**
When looking for local regional and long distance calling, use Vonage to make calls to all
50 states and Canada. Get voicemail, great international rates and more. Sign up today.
www.vonage.com

**MyCashNow - $100 - $1,500 Overnight**
Payday Loan Cash goes in your account overnight. Very low fees. Fast decisions. Direct
deposit is not required. No credit check. Confidential - secure.
www.mycashnow.com

Chance v. Intel Corporation, et al.

**Exhibit D**

To Class Action Petition

**Exhibit 21.1**

# INTEL CORPORATION
## SUBSIDIARIES (All 100% Owned)

| Subsidiaries of the Registrant | State or Other Jurisdiction of Incorporation |
|---|---|
| Components Intel de Costa Rica, S.A. | Costa Rica |
| Intel Americas, Inc. | Delaware, USA |
| Intel Asia Finance Ltd. | Cayman Islands |
| Intel Capital Corporation | Cayman Islands |
| Intel Copenhagen ApS | Denmark |
| Intel Corporation (UK) Ltd. | England and Wales |
| Intel Electronics Finance Limited | Cayman Islands |
| Intel Electronics Ltd. | Israel |
| Intel Europe, Inc. | California, USA |
| Intel International | California, USA |
| Intel International B.V. | Netherlands |
| Intel Ireland Limited | Cayman Islands |
| Intel Israel (74) Limited | Israel |
| Intel Kabushiki Kaisha | Japan |
| Intel Malaysia Sdn. Berhad | Malaysia |
| Intel Massachusetts, Inc. | Delaware, USA |
| Intel Offshore G.C. Ltd. | Cayman Islands |
| Intel Overseas Funding Corporation | Cayman Islands |
| Intel Phils. Holding Corporation | California, USA |
| Intel Products (M) Sdn. Bhd. | Malaysia |
| Intel Puerto Rico, Ltd. | Cayman Islands |
| Intel Semiconductor Limited | Delaware, USA |
| Intel Technology Finance Limited | Cayman Islands |
| Intel Technology Phils., Inc. | Philippines |
| Intel Technology Sdn. Berhad | Malaysia |
| Mission College Investments Ltd. | Cayman Islands |

Chance v. Intel Corporation, et al.


**Exhibit E**


To Class Action Petition



*The following statements are based on current expectations. These statements are forward-looking, and actual results may differ materially. Please see the Risk Factors Regarding Forward-Looking Statements in this release for a description of certain important risk factors that could cause actual results to differ, and refer to Intel's annual and quarterly reports on file with the Securities and Exchange Commission (SEC) for a more complete description of the risks. These statements do not include the potential impact of any mergers, acquisitions, divestitures or other business combinations that may be completed after April 18, 2005. These statements also do not include any impact related to the expensing of stock options under the Financial Accounting Standards Board's Statement 123R, which is effective for quarters beginning after June 15, 2005. Expensing of stock options would decrease gross margin, increase expenses (including R&D expenses) and affect the tax rate.*

## Business Outlook as of June 8, 2005

- Revenue for the second quarter to be between $9.1 billion and $9.3 billion, as compared to the previous range of $8.6 billion to $9.2 billion, primarily driven by ongoing strong demand for notebook products.

- The second-quarter gross margin percentage is expected to be approximately 57 percent, plus or minus a point, as compared to the previous expectation of 56 percent, plus or minus a couple of points.

- Gains from equity investments and interest and other are expected to be approximately $100 million, higher than the previous expectation of approximately $70 million.

- Intel's tax rate for the second quarter is expected to be 26 percent, plus or minus a point, as compared to the previous expectation of approximately 31 percent, primarily due to an increase in estimated research and development (R&D) tax credits. The tax rate for the third and fourth quarters is expected to be slightly lower than the previous expectation of 31 percent.

- All other expectations are unchanged.

## Business Outlook as of April 18, 2005

- Revenue in the second quarter is expected to be between $8.6 billion and $9.2 billion.

- Gross margin percentage for the second quarter is expected to be approximately 56 percent, plus or minus a couple of points, as compared to 59.3 percent in the first quarter. The gross margin percentage expectation for 2005 is now 59 percent, plus or minus a few points, as compared to the previous expectation of 58 percent, plus or minus a few points. The gross margin percentage could vary from expectations based on changes in revenue levels, product mix and pricing, manufacturing yields, changes in unit costs, variations in inventory valuation, excess or obsolete inventory, capacity utilization and the existence of excess capacity, impairments of long-lived assets, including manufacturing, assembly/test and intangible assets, and the timing and execution of the manufacturing ramp and associated costs, including start-up costs.

- Expenses (R&D plus MG&A) in the second quarter are expected to be approximately $2.6 billion. Expenses, particularly certain marketing and compensation expenses, could vary from expectations depending on the level of demand for Intel's products and the level of revenue and profits.

- The R&D spending expectation for 2005 is unchanged at approximately $5.2 billion.

- Capital spending for 2005 is now expected to be between $5.4 billion and $5.8 billion, higher than the previous expectation of between $4.9 billion and $5.3 billion, driven primarily by stronger than anticipated business and increased confidence in the company's 65nm process technology ramp.

- Gains from equity investments and interest and other in the second quarter are expected to be approximately $70 million.

- The tax rate for the second, third and fourth quarters is currently expected to be approximately 31 percent. This expectation does not reflect the impact of any potential repatriation of cash under the American Jobs Creation Act. The tax rate expectation is based on current tax law and current expected income and assumes Intel continues to receive tax benefits for export sales. The tax rate may be affected by the closing of acquisitions or divestitures, the jurisdiction in which profits are determined to be earned and taxed, changes in the estimates of credits, benefits and deductions, the resolution of issues arising from tax audits with various tax authorities and the ability to realize deferred tax assets.

- Depreciation for the second quarter is expected to be $1.1 billion, plus or minus $100 million. The depreciation expectation for the full year is unchanged at $4.4 billion, plus or minus $100 million.

- Amortization of acquisition-related intangibles and costs is expected to be approximately $35 million in the second quarter and approximately $125 million for the full year.

## Risk Factors Regarding Forward-Looking Statements

*The statements in this document that refer to plans and expectations for the second quarter, the year and the future are forward-looking statements that involve a number of risks and uncertainties. Many factors could affect Intel's actual results, and variances from Intel's current expectations regarding such factors could cause actual results to differ materially from those expressed in these forward-looking statements. Intel presently considers the factors accompanying certain of such statements above and set forth below to be the important factors that could cause actual results to differ materially from Intel's published expectations. A more detailed discussion of these factors, as well as other factors that could affect Intel's results, is contained in Intel's SEC filings, including the report on Form 10-K for the year ended Dec. 25, 2004.*

- Intel operates in intensely competitive industries. Revenue and the gross margin percentage are affected by the demand for and market acceptance of Intel's products, the availability of sufficient inventory to meet demand, pricing pressures and actions taken by Intel's competitors, and the timing of new product introductions. Factors that could cause demand to be different from Intel's expectations include changes in customer order patterns, including order cancellations, changes in the level of inventory at customers, and changes in business and economic conditions.

- Gains or losses from equity securities and interest and other could vary from expectations depending on equity market levels and volatility, gains or losses realized on the sale or exchange of securities, impairment charges related to marketable, non-marketable and other investments, interest rates, cash balances and changes in fair value of derivative instruments.

- Intel's results could be impacted by unexpected economic, social and political conditions in the countries in which Intel, its customers or its suppliers operate, including security risks, possible infrastructure disruptions and fluctuations in foreign currency exchange rates.

- Intel's results could also be affected by adverse effects associated with product defects and errata (deviations from published specifications), and by litigation or regulatory matters involving intellectual property, stockholder, consumer, antitrust and other issues, such as the litigation and regulatory matters described in Intel's SEC reports.

# District Judge Tom R. Smith

## Chief Judge

### 26TH Judicial District, Division One

200 E. 6th Street
Hugoton, KS    67951
e-mail 26judge1@pld.com

Phone (620) 428-6500
Cell Phone (620) 544-5464
Fax (620) 428-3212

July 8, 2005

Mr. Rex A. Sharp
Attorney at Law
4121 W. 83rd St., Suite 256
Prairie Village, KS    66208

<u>SENT BY FAX (913-901-0419)</u>

Re:    Case No. 05CV97
        Seward County, Kansas

Dear Counsel:

Your Order to Appoint Special Process Server is defective in form in that the Order as submitted does not indicate the name of Defendant or Defendants to be served, nor does it indicate the name of the country in which service is to take place.

Please submit the correct Order to Appoint Special Process Server.

Tom R. Smith, Chief Judge    *mjh*
620-626-3237

TRS:mjh
Original: Court file
fc: Counsel

CLERK OF THE DISTRICT COURT
415 N. WASHINGTON, STE. 103
LIBERAL, KS 67901
620-626-3375

CHECK NO. 10205

FIRST NATIONAL BANK
LIBERAL, KS 67901
83-283/1011

DATE July 08 2005

AMOUNT $39.00

PAY

Overage refund, case number 2005-CV-000097

************ Thirty-Nine and 00/100 Dollars***********

TO THE
ORDER
OF

Rex A Sharp

Marvin D Chance Jr vs. Intel Corporation, etal.

VOID AFTER 90 DAYS

CLERK OF THE DISTRICT COURT

⑆010205⑆ ⑈101102831⑈ 020 0 117⑆

10205

CLERK OF THE DISTRICT COURT

Overage refund, case number 2005-CV-000097

Check Amount $39.00

Check Number 10205

Date July 08 2005

Rex A Sharp
4121 W 83rd Street
Suite 256
Prairie Village KS 66208

10205

# IN THE DISTRICT COURT IN AND FOR
# SEWARD COUNTY, KANSAS

MARVIN D. CHANCE, JR.,                )
on behalf of himself and all          )
others similarly situated,            )
                                      )
          Plaintiffs,                 )
                                      )
v.                                    )     Case No.   05 CV 97
                                      )
INTEL CORPORATION, a Delaware         )
corporation, and INTEL KABUSHIKI      )
KAISHA, a Japanese corporation,       )
                                      )
          Defendants                  )
_____ )

## MOTION TO APPOINT SPECIAL PROCESS SERVER

Plaintiff, Marvin D. Chance, Jr., respectfully moves this Court for an order authorizing APS International, Ltd. to effect service of process on defendant Intel Kabuskiki Kaisha in Japan in accordance with the Hague Convention and international law.

Respectfully submitted,

Rex A. Sharp KS#12350
Barbara C. Frankland, KS#14198
Gunderson, Sharp & Walke, L.L.P.
4121 West 83rd Street, Suite 256
Prairie Village, KS 66208
(913)901-0500 (telephone)
(913)901-0419 (facsimile)

ATTORNEYS FOR PLAINTIFF

## IN THE DISTRICT COURT
## SEWARD COUNTY, KANSAS

MARVIN D. CHANCE, JR.,　　　　　)
on behalf of himself and　　　　　)
all others similarly situated,　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　　　　Plaintiff,　　　)
　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　)　　Case No. 05-CV-97
　　　　　　　　　　　　　　　　　)
INTEL CORPORATION, a Delaware　　)
corporation, and INTEL KABUSHIKI　)
KAISHA, a Japanese corporation,　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　　　　Defendants.　　)
_____　)

(Pursuant to Chapter 60)

### FIRST AMENDED CLASS ACTION PETITION[1]

Marvin D. Chance, Jr. ("Plaintiff"), by and through his undersigned

attorneys, allege against INTEL CORPORATION and its worldwide family of

dominated subsidiaries, including INTEL KABUSHIKI KAISHA, (hereafter

collectively, "Intel") an antitrust violation and on information and belief would

show the Court and jury as follows:

### NATURE OF THE ACTION

1.　　Intel manufactures x86 microprocessors, the central processing unit

(CPU) of most computer systems.  The microprocessor processes system data and

controls other devices in the system, acting as the "brains" of the computer.

Intel's microprocessors run the popular Microsoft Windows and Linux families of

operating systems.

---

[1] This Amended Petition is the same as the Original Petition except it omits the
previously attached exhibits which Intel already has or has access to.

2.     In 2004, Intel's revenue from sales of microprocessors was $24.5 billion, approximately 72% of its consolidated net revenue of $34.2 billion. *See* Intel Corporation's 2004 Form 10-K (hereafter "10-K"), at 2, 30.

3.     As Intel proudly declares in the opening sentences of its Form 10-K for the year ended December 25, 2004, it is "the world's largest semiconductor chipmaker. . . [It's] goal is to be the preeminent building block supplier to the worldwide digital economy." *See* 10-K at 1

4.     To achieve its goal of being "the preeminent building block supplier to the worldwide digital economy," Intel engaged in numerous anticompetitive strategies, including threats, intimidation, kickbacks, and retaliation.  Intel designed these strategies to quash product-based competition on price and performance in the microprocessor industry.  The specific strategies are more completely detailed in the Complaint filed in *Advanced Micro Devices, Inc. and AMD International Sales & Service, Ltd. v. Intel Corporation and Intel Kabushiki Kaisha,* Case No. 1:05-cv-00441, (USDC DE, June 27, 2005) ("the AMD Complaint").

5.     By its own admission, Advanced Micro Devices, Inc. (AMD) is Intel's primary microprocessor competitor. *See* 10-K at p. 13.

6.     In addition to direct competitors like AMD, Intel's anticompetitive strategies impact consumers of computers operating with Intel microprocessors.  The inability of AMD and other microprocessor manufacturers to compete fairly and openly in the worldwide digital economy deprives consumers of the right to buy the best product to suit their needs at the lowest price. *See* Reuters article, "AMD files antitrust suit against Intel," June 28, 2005.  As detailed in the AMD

2

Complaint, "[c]onsumers ultimately foot this bill, in the form of inflated PC prices and the loss of freedom to purchase computer products that best fit their needs. Society is worse off for lack of innovation that only a truly competitive market can drive." AMD Complaint, at 3, ¶ 6.

7.     Plaintiff Marvin D. Chance, Jr., is a consumer of computers using Intel microprocessors.  As such, he and the Class he seeks to represent are indirect purchasers of Intel's x86 microprocessors who have been damaged by Intel's anticompetitive, monopolistic conduct in violation of Kansas' antitrust statutes. Consequently, Plaintiff and the Class (plaintiffs) seek overcharge and full consideration damages, statutory penalties, attorneys' fees, and costs.

## JURISDICTION AND VENUE

8.     Jurisdiction is proper in this Court under the Kansas antitrust statutes, K.S.A. 50-101, et seq., pursuant to the Kansas long arm statute K.S.A. 60-308(b)(1), (2), and/or (7), and general jurisdiction.  Intel's monopolistic conduct in the sale and distribution of its microprocessors adversely affects and has affected the Kansas market for computers installed with Intel microprocessors and has directly damaged plaintiffs.

9.     Venue is proper in this Court because Intel transacted business, committed an illegal or tortious act, substantially affected the Kansas trade and commerce in the computer microprocessor market, and injured plaintiffs in Seward County, Kansas where Plaintiff bought computers with Intel microprocessors.

10.     Plaintiff and each member of the class has incurred damages under Kansas law in an amount less than $75,000, even if trebled, and neither plaintiffs nor

any other member of the class seeks damages exceeding $75,000, nor do their damages individually exceed $75,000 inclusive of interest and attorneys' fees and all relief of any nature sought hereunder. Further plaintiffs assert no federal question or statute and plaintiffs' state law causes of action are not federally preempted. Plaintiffs allege a cause of action solely under the laws of Kansas and specifically deny any attempt to state a cause of action under the laws of the United States of America including without limitation the Sherman Antitrust Act.

11.     More than 2/3rds of the members of the proposed plaintiff class are residents of Kansas. All class members were principally harmed in Kansas. No injunctive relief is sought. The class-wide claim is **less than** $5 million. No other class claims have been filed by anyone in the prior three years asserting the same or similar factual allegations against any of the defendants.

## THE PARTIES

12.     Plaintiff Marvin D. Chance, Jr. is a resident of Seward County, Kansas, who purchased a personal computer with an Intel microprocessor during the Class Period.

13.     Defendant INTEL CORPORATION is a Delaware corporation with its principal executive offices at Santa Clara, California, and it conducts business both directly and through wholly-owned and dominated subsidiaries worldwide. Intel and its subsidiaries design, produce, and sell a variety of microprocessors, flash memory devices, and silicon-based products for use in the computer and communications industries worldwide. *See* 10-K, List of Subsidiaries.

14.     Intel is a foreign corporation registered with the Kansas Secretary of State. It is currently active and in good standing.

15.     Defendant INTEL KABUSHIKI KAISHA ("Intel KK"), a Japanese

corporation, is Intel's wholly owned and dominated subsidiary through which

Intel sells its microprocessors in Japan.   *See* 10-K, List of Subsidiaries.

## THE MICROPROCESSOR MARKET

16.     For many years, Intel's x86 microprocessors have garnered 90% of the

revenue and 80% of the units sold in the world's microprocessor market.

17.     As reported in Intel's 2004 10-K, at 31, Intel had net consolidated revenue

from the sales of microprocessors of almost $ 24.5 billion, an increase of $3.0

billion from the prior year.

18.     With $24.5 billion in worldwide revenue from sales of Intel

microprocessors, such sales in Kansas account for many millions of dollars per

year.

19.     Published reports identify Intel as the market leader with over 90% of the

market share as measured by revenue.  AMD is second with 9%.  Other

manufacturers make up the remaining 1%.

20.     With over 90% of the market, Intel's monopoly enables it to control

pricing for the microprocessors, achieving gross margin percentages approaching

60%. *See* 10-K at 30.  *See* Intel Business Outlook (reporting expected gross

margin percentage for 2005 as 59%).

21.     Despite attempted entries into the computing market by other

microprocessor manufacturers, Intel has captured the Windows and Linux

operating systems that dominate the consumer and business worlds.  Other

microprocessors cannot be substituted, giving Intel a captive market.

22.     Moreover, computer manufacturers will not invest in developing alternative computer architectures because it is impractical.  First, the cost of switching consumers to computers using other microprocessors is too great given the need to replace hardware and software when compared with upgrading. Second, the market of new first time users is too small to create competition in a generally already entrenched market.  Third, competitors cannot meet the huge barriers to entry, such as construction of fabrication facilities and funding of research and development costs.  Fourth, with the exception of AMD, the two remaining competitors in the microprocessor market, Transmeta Corporation and Via Technologies, Inc., are struggling with around 1% of the market.

23.     Hence, the computer microprocessor market is essentially homogenous.  It is the same from country to country, state to state, city to city.  Further, the ease of shipping microprocessors worldwide maintains price consistency which, in turn, deters arbitrage.

24.     To combat Intel's monopoly, AMD compelled arbitration under the 1982 AMD-Intel Technology Exchange Agreement and prevailed after seven years of litigation and appeals.  After confirmation of the arbitration award by the California Supreme Court in 1994, the arbitrator expressed hope that "the competition sure to follow will be beneficial to the parties through an expanded market with appropriate profit margins and to the consumer worldwide through lower prices." *See* AMD Complaint at 7, ¶16.

25.     However, even after losing the arbitration battle, Intel still intended, at that time, and to this day, to become the "preeminent building block supplier to

the worldwide digital economy" and recommitted to its anticompetitive strategies in order to achieve its monopolistic goal. *See* AMD Complaint at 6, ¶15.

26. These strategies include:

    a. Forcing major customers into exclusive or near-exclusive deals;

    b. Conditioning rebates, allowances and market development funding on customers' agreements to minimize or eliminate its purchases of microprocessors from competitors, particularly AMD;

    c. Establishing a tiered system of retroactive, first-dollar rebates to serve as an incentive for the customers' purchase of microprocessors at high volumes that effectively locked in Intel as the supplier and locked out other microprocessor manufacturers;

    d. Threatening retaliation against customers introducing other manufacturers' computer platforms, particularly in strategic market segments;

    e. Enforcing quotas among key retailers and requiring them to stock overwhelmingly, if not exclusively, Intel-powered computers thereby limiting consumers' choice;

    f. Providing financial rewards through the "Intel Inside" and "Centrino" programs to OEM customers for branding their personal computers with "Intel" indicators;

    g. Forcing PC makers and technology partners to boycott other manufacturers' product launches and promotions;

h.      Forcing technical standards and products on the industry to secure for itself and to prevent competitors from altering the microprocessor market.

27.     Intel particularly targeted its "primary competitor" AMD by the use of these abusive, exclusionary tactics. *See* AMD Complaint at 15-41.

28.     Further, these tactics are unlawfully exclusionary, have no pro-competitive justification, and are intended to maintain Intel's monopoly of the x86 microprocessor market.

29.     They are anticompetitive tactics in that they prevented distribution of competing products, stifled innovation, wrongfully induced retailers and distributors to stop carrying the competitors' products, and reduced or eliminated competitors' meaningful access to computer manufacturers, trade shows, and ultimately consumers, all of which had the combined intent and effect of preserving Intel's monopoly.

30.     In Kansas, these abusive monopolistic practices effectively eliminated the consumers' right to purchase the best computing product to suit their needs at the most competitive price.

31.     The above mentioned abusive monopolistic practices by Intel have had the following effects on Kansas consumers:

i.      Restraint or elimination of competition in the sale of computers in Kansas;

ii.     Injury to actual and potential competitors in the Kansas market; and

iii.    Higher prices to Kansas consumers who were deprived of the benefits of free, competitive, innovative, and unrestrained markets.

8

32.     As a result of Intel's monopolistic practices, Plaintiff and the Class have paid higher prices for computers than they would have paid in a competitive market and have been injured thereby.

## CLASS ALLEGATIONS

33.     Plaintiff brings this action under KSA 60-223(a), and (b) (3) on behalf of himself and a "Class" defined as:

> Individuals or entities who have purchased for end use and not for resale, computers with Intel microprocessors at any time from January 1, 2000 to the present (the "Class Period") who reside in or have their purchasing entity in the Kansas counties of Seward, Greeley, Hamilton, Stanton, Morton, Wichita, Kearney, Grant, Stevens, Scott, Finney, Haskell, Gray, Meade, Ford, Clark, Kiowa, and Comanche.

34.     <u>Numerosity</u>.  Plaintiff does not know the exact number of class members, but reasonably believes that the class members number at least in the thousands and are geographically dispersed throughout the aforementioned Kansas counties such that joinder of all class members is impracticable.

35.     <u>Commonality</u>.  There are questions of law and/or fact, common to the class, including but not limited to:

    a.     Whether the Kansas computing market is the relevant market for determining whether a monopoly exists;

    b.     Whether Intel, individually or in consort with its subsidiaries and affiliates, collectively, have monopoly power in the Kansas computing market;

    c.     Whether Intel willfully maintained monopoly power or restrained competition in the computing market;

    d.     Whether Intel engaged in anticompetitive behavior unilaterally or in combination with others in order to maintain its monopoly in the microprocessor market;

    e.     Whether Intel's monopolistic conduct caused artificial and non-competitive pricing for computers sold in Kansas;

> f. Whether Plaintiffs and class members were injured by Intel's conduct and, if so, the appropriate class-wide measure of damages.

36. <u>Typicality and Adequacy</u>. Plaintiff's claims are typical of the claims of the Class who bought computers with Intel x86 microprocessors in the aforementioned Kansas counties, including Seward County, and who seek effectively the same relief of monetary damages. Plaintiff will fairly and adequately represent the interests of the Class and has no conflicts with any member of the Class. Furthermore Plaintiff has retained competent legal counsel experienced in Kansas antitrust and class action litigation.

37. <u>Common questions of law and/or fact predominate and class actions are superior under K.S.A. 60-223(b)(3)</u>. A class action to resolve these issues is far superior for the fair and efficient adjudication of the controversy so as to concentrate the litigation in a single proceeding to eliminate the burden on the courts and the parties. Thousands of lawsuits throughout the state of Kansas would be undesirable, unmanageable, and cost prohibitive. Whatever difficulties may exist in the management of the class action will be greatly outweighed by the class action procedure.

## TOLLING OF STATUTE OF LIMITATIONS

38. Intel's monopolistic practices tolled the statute of limitations due to one or more of the following theories:

> (a) Fraudulent concealment of its anticompetitive strategies which could not be recognized in isolation by a consumer, but was only obvious in the aggregate over time due to Intel's systematic attempt to conceal its true anticompetitive effect;

(b) Equitable tolling because Intel should not be able to benefit from its improper and illegal conduct;

(c) Discovery rule because Plaintiff and the Class were unable to reasonably discern the monopolistic practice and the harm that it was causing; and

(d) Continuous tort from the systematic and continuing monopolistic practices of Intel over the Class Period.

## CAUSE OF ACTION I

### Kansas Antitrust Cause of Action
### for Unlawful Maintenance of Monopoly and for Restraint of Trade
### K.S.A. 50-101, et seq.

39.    Plaintiffs restate and re-allege paragraphs 1-38 above.

40.    Through the anticompetitive and illegal conduct described above, Intel willfully maintains and, since 2000, has maintained a monopoly in the microprocessor market. That monopoly deprives consumers of a free market economy in the sale of computers in the United States, including Kansas.

41.    Intel, unilaterally or in combination with others, has unreasonably restrained trade in the microprocessor market.

42.    As a direct and proximate result of the above described conduct by Intel, Plaintiff and the Class have been injured in an amount which will be established on a class-wide basis at trial.

## PRAYER FOR RELIEF

Plaintiff and the Class respectfully request:

1.     That the Court declare and adjudge this action to be a proper class action pursuant to K.S.A. 60-223;

2.     That the Court find and adjudge that Intel has committed the violations of Kansas antitrust law stated here in;

3.     That the Court enter judgment in favor of the Plaintiff and Class against Intel for full consideration under K.S.A. 50-115 as the damages sustained by Plaintiff and the Class;

4.     That the Court enter judgment in favor of the Plaintiff and the Class against Intel for treble damages under K.S.A. 50-801;

5.     That Plaintiff and the Class be awarded the cost of suit, including reasonable attorneys' fees;

6.     That the Court enter a judgment that Intel and its wholly-owned subsidiaries are jointly and severally liable for the damages sustained from its monopolistic conduct;

7.     That Plaintiff and the Class be granted such other and further relief as the Court may deem proper.

**JURY TRIAL DEMANDED**
**ATTORNEYS' LIEN ASSERTED**

Respectfully submitted,

_____
Rex A. Sharp KBA # 12350
Barbara C. Frankland KBA # 14198
Gunderson, Sharp & Walke, L.L.P.
4121 W. 83rd St., Ste. 256
Prairie Village, KS 66208
(913) 901-0505
(913) 901-0419 fax

# IN THE DISTRICT COURT IN AND FOR
## SEWARD COUNTY, KANSAS

MARVIN D. CHANCE, JR.,　　　　　)
on behalf of himself and all　　　　　)
others similarly situated,　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　Plaintiffs,　　　　　)
　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　)　　　Case No.　　05CV97
　　　　　　　　　　　　　　　　　)
INTEL CORPORATION, a Delaware　)
corporation, and INTEL KABUSHIKI　)
KAISHA, a Japanese corporation,　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　Defendants　　　　　)
_____)

## ORDER TO APPOINT SPECIAL PROCESS SERVER

IT IS HEREBY ORDERED,

　　that APS International, Ltd. is authorized to effect service of process on the defendant,

INTEL KABUSHIKI KAISHA, in Japan in accordance with the Hague Convention and

international law.

Dated:　___8/26/05___　　　_____
　　　　　　　　　　　　　　　　　JUDGE

# IN THE DISTRICT COURT IN AND FOR
# SEWARD COUNTY, KANSAS

FILED
CLERK OF DIST. COURT
SEWARD COUNTY

2005 AUG 22  AM 11 32

MARVIN D. CHANCE, JR.,          )
on behalf of himself and all    )
others similarly situated,      )
                                )
          Plaintiffs,           )
                                )
v.                              )          Case No.     05CV97
                                )
INTEL CORPORATION, a Delaware   )
corporation, and INTEL KABUSHIKI)
KAISHA, a Japanese corporation, )
                                )
          Defendants            )
_____)

## MOTION TO APPOINT SPECIAL PROCESS SERVER

Plaintiff, Marvin D. Chance, Jr., respectfully moves this Court for an order authorizing APS International, Ltd. to effect service of process on defendant Intel Kabuskiki Kaisha in Japan in accordance with the Hague Convention and international law.

Respectfully submitted,

Rex A. Sharp, KS#12350
Barbara C. Frankland, KS#14198
Gunderson, Sharp & Walke, L.L.P.
4121 West 83rd Street, Suite 256
Prairie Village, KS 66208
(913)901-0500 (telephone)
(913)901-0419 (facsimile)

ATTORNEYS FOR PLAINTIFF

## IN THE DISTRICT COURT IN AND FOR
## SEWARD COUNTY, KANSAS

MARVIN D. CHANCE, JR., and    )
MORTGAGES UNLIMITED, INC.,    )
a Kansas corporation, on behalf of    )
themselves and all others    )
similarly situated,    )
    )
    Plaintiffs,    )
    )
v.    )    Case No.   05-CV-97
    )
INTEL CORPORATION, a Delaware    )
corporation, and INTEL KABUSHIKI    )
KAISHA, a Japanese corporation,    )
    )    **FILED BY FAX**
    Defendants    )

## PLAINTIFFS' MOTION
## FOR EXTENSION OF TIME TO SERVE DEFENDANT INTEL KK

Plaintiffs move for an extension of time in which to serve Defendant Intel

KK. In support of this motion, Plaintiffs would show the Court as follows:

    1.    Defendant INTEL KABUSHIKI KAISHA ("Intel KK") is a Japanese

corporation. Further, it is Intel Corporation's wholly owned and dominated

subsidiary through which Intel sells its microprocessors in Japan.

    2.    To effect service on Intel KK, an alien corporation, Plaintiffs must

comply with the requirements of the Hague Convention and international law.

    3.    By Order dated August 26, 2005, the Court appointed APS

International, Ltd. as special process server for service on Intel KK.

    4.    APS International, Ltd. reports effecting service on Intel KK will

take up to sixteen (16) weeks.

WHEREFORE, Plaintiffs move the Court for an Order extending the time in which Plaintiffs have to serve Defendant Intel KK for sixteen (16) weeks or until December 26, 2005.

Respectfully submitted:

Rex A. Sharp KBA # 12350
Barbara C. Frankland KBA # 14198
Gunderson, Sharp & Walke, L.L.P.
4121 W. 83rd St., Ste. 256
Prairie Village, KS 66208
(913) 901-0505
(913) 901-0419 fax

# IN THE DISTRICT COURT IN AND FOR
## SEWARD COUNTY, KANSAS

FILED
CLERK OF DIST. COURT
SEWARD COUNTY

2005 SEP 2 PM 3 46

MARVIN D. CHANCE, JR., and )
MORTGAGES UNLIMITED, INC., )
a Kansas corporation, on behalf of )
themselves and all others )
similarly situated, )
)
            Plaintiffs, )
)
v. )        Case No.   05CV97
)
INTEL CORPORATION, a Delaware )
corporation, and INTEL KABUSHIKI )
KAISHA, a Japanese corporation, )
)
            Defendants )

## ORDER GRANTING EXTENSION OF TIME TO SERVE DEFENDANT

      Plaintiffs move for an extension of time of sixteen (16) weeks in which to

serve Defendant Intel KK, a Japanese corporation, in compliance with the Hague

Convention and international law.

      THEREFORE, Plaintiffs' motion is GRANTED.  Plaintiffs have sixteen

weeks from the date of this Order in which to affect service on Intel KK.

DATED: September ___1___, 2005

                                            Tom R. Smith
                                            District Court Judge

Respectfully submitted:

Rex A. Sharp KBA # 12350
Barbara C. Frankland KBA # 14198
Gunderson, Sharp & Walke, L.L.P.
4121 W. 83rd St., Ste. 256
Prairie Village, KS 66208
(913) 901-0505
(913) 901-0419 fax

Case 5:05-cv-04026-J-KMD  Document 63-8  Filed 05/22/2005  Page 7 of 10

# IN THE DISTRICT COURT IN AND FOR
## SEWARD COUNTY, KANSAS

FILED
CLERK OF DIST. COURT
SEWARD COUNTY

2005 SEP 8 AM 11 26

MARVIN D. CHANCE, JR., and )
MORTGAGES UNLIMITED, INC., )
a Kansas corporation, on behalf of )
themselves and all others )
similarly situated, )
)
        Plaintiffs, )
)
v. )      Case No.    <u>05CV97</u>
)
INTEL CORPORATION, a Delaware )
corporation, and INTEL KABUSHIKI )
KAISHA, a Japanese corporation, )
)
        Defendants )

## <u>ORDER GRANTING EXTENSION OF TIME TO SERVE DEFENDANT</u>

Plaintiffs move for an extension of time of sixteen (16) weeks in which to

serve Defendant Intel KK, a Japanese corporation, in compliance with the Hague

Convention and international law.

THEREFORE, Plaintiffs' motion is GRANTED. Plaintiffs have sixteen

weeks from the date of this Order in which to affect service on Intel KK.

DATED: September _7_, 2005

_Tom R. Smith_
District Court Judge

Respectfully submitted:

Rex A. Sharp KBA # 12350
Barbara C. Frankland KBA # 14198
Gunderson, Sharp & Walke, L.L.P.
4121 W. 83rd St., Ste. 256
Prairie Village, KS 66208
(913) 901-0505
(913) 901-0419 fax

# IN THE DISTRICT COURT
# SEWARD COUNTY, KANSAS

MARVIN D. CHANCE, JR.,     )
on behalf of himself and     )
all others similarly situated,     )
     )
     Plaintiff,     )
     )
v.     )     Case No. 05-CV-97
     )
INTEL CORPORATION, a Delaware     )
corporation, and INTEL KABUSHIKI     )
KAISHA, a Japanese corporation,     )
     )
     Defendants.     )
     )

(Pursuant to Chapter 60)
## RETURN OF SERVICE

I certify that on the 1st of September, 2005, I served a copy of the summons, together with

a copy of the Original First Amended Petition to Defendant on:

> The Corporation Company, Inc.
> 515 South Kansas Avenue
> Topeka, Kansas 66603
>
> Resident Agent for Defendant Intel Corporation

By certified mail at the above address. Said signed return receipt is attached hereto and made a

part of this return.

_____     _____     _____
Signature     Title     Date

*********************************************************************

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

The Corporation Company, Inc.
515 South Kansas Avenue
Topeka, Kansas 66603

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X B Parks ☐ Agent
☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

B Parks

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☑ No

3. Service Type
☑ Certified Mail    ☐ Express Mail
☐ Registered    ☐ Return Receipt for Merchandise
☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
(Transfer from service label)   7099 3400 0017 8486 3238

PS Form 3811, August 2001    Domestic Return Receipt    102595-02-M-1540

2

# FACSIMILE TRANSMISSION COVER SHEET
## FORM FOR RULE 119(d)(3)

DATE:     October 3, 2005


TO:    Clerk of the District Court, Seward County,
       Civil Department
       FAX Number: (620) 626-3302

       Case Number:    05-CV-97

       Caption:     MARVIN D. CHANCE, JR.,

                         vs.
                 INTEL CORPORATION, et al.

FROM:     Robert W. Coykendall
          MORRIS, LAING, EVANS, BROCK
           & KENNEDY, CHARTERED
          300 N. Mead, Suite 200
          Wichita, Kansas  67202-2722

          Kansas Supreme Court Registration Number: 10137
          Telephone Number: (316) 262-2671
          Fax Number: (316) 262-6226
          Attorney for:  (Name)

       1.    Please file the following transmitted document.  NOTE: Document length
is limited to 10 pages.  A cover sheet must separate each document filed.

          Document Name                        Number of Pages

       **Notice to Plaintiff and this Court of**          **34**
       **Removal of Action**

   2.    ☐  Docket Fee $_____   ☐  Other $_____(Describe)

          I authorize the above fees to be charged to the following account:

          ☐ VISA                      Account No._____
          ☐ MASTERCARD               Expiration Date _____



LAW OFFICES OF

# MORRIS LAING

Evans Brock & Kennedy, Chtd.

| | | | |
|---|---|---|---|
| Ralph R. Brock | Michael Lennen | Kimberly K. Bonifas | *Resident in Topeka Office |
| Joseph W. Kennedy | Karl R. Swartz | Richard A. Kear | |
| Robert I. Guenthner | Roger L. Theis | Cameron V. Michaud | |
| Ken M. Peterson | Richard F. Hayse* | Ryan M. Peck | Lester L. Morris |
| Robert D. Overman | Thomas R. Docking | Shannon M. Braun | 1901 - 1966 |
| A.J. Schwartz, Jr. | Diane S. Worth | Will B. Wohlford | |
| Donald E. Schrag | Tim J. Moore | | Verne M. Laing |
| William B. Sorensen, Jr. | Janet Huck Ward | | 1907 - 2000 |
| Jeffery L. Carmichael | Roger N. Walter* | Of Counsel | |
| Robert W. Coykendall | James D. Young | Gerald L. Michaud | Ferd E. Evans, Jr. |
| Robert K. Anderson | Kelly S. Herzik | Robert P. Burns | 1919 - 1991 |
| Susan R. Schrag | Luke A. Sobba* | Gladys Hoefer | |
| | | John W. Johnson | Dennis L. M. Feeney |
| | | | 1953 - 2001 |

Sender's email: rcoykendall@morrislaing.com

September 30, 2005

**VIA FACSIMILE (620) 626-3345**

Seward County District Court
Clerk's Office
Attn: Carolyn
415 N. Washington Street
Liberal, Kansas 67901

**FILED BY FAX**

Re:  *Marvin D. Chance, Jr. vs. Intel Corporation*
Case No. 05 CV 97

Dear Carolyn:

Pursuant to our telephone conversation, I would appreciate it if you could please provide our office with a copy of the above referenced file. Please forward the file copy and invoice to my attention to the address listed below.

Thank you for your attention to this matter. Should you have any questions regarding this request, please feel free to contact me.

Sincerely,

Nancy Cox, Legal Secretary for
Robert W. Coykendall



LAW OFFICES OF

# MORRIS LAING

Evans Brock & Kennedy, Chtd.

Old Town Square
300 N. Mead, Suite 200 ● Wichita, KS 67202-2722
**T**: 316.262.2671 ● **F**: 316.262.6226
● www.rcoykendall@morrislaing.com

## FAX TRANSMITTAL SHEET

**FROM:**      **ROBERT W. COYKENDALL**

**TO:**          **CAROLYN, SEWARD COUNTY CLERK'S OFFICE**

**FAX:**        (620) 626-3345

**DATE:**      September 30, 2005

**RE:**          *Chance vs. Intel Corporation*

Total Number of Pages: ___2___ (Including Cover Letter)

If you do not receive all pages of this transmission, please contact **NANCY COX** at (316) 262-2671.

**MESSAGE:**

### Confidentiality Notice

The information contained in this facsimile message is attorney privileged and confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this telecopied information is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone to arrange for the return of the documents to us.

MORRIS, LAING, EVANS, BROCK
& KENNEDY, CHARTERED
300 N. Mead, Suite 200
Wichita, Kansas 67202-2722
Phone: (316) 262-2671
Facsimile: (316) 262-6226

FILED BY FAX

### IN THE TWENTY-SIXTH JUDICIAL DISTRICT
### DISTRICT COURT, SEWARD COUNTY, KANSAS
### CIVIL DEPARTMENT

| | |
|---|---|
| MARVIN D. CHANCE, JR.,<br>on behalf of himself and<br>all others similarly situated,<br><br>            Plaintiff,<br><br>vs.<br><br>INTEL CORPORATION, a Delaware<br>corporation, and INTEL KABUSHIKI<br>KAISHA, a Japanese corporation,<br><br>            Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)        Case No.  05-CV-97<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## NOTICE TO PLAINTIFF AND THIS COURT OF REMOVAL OF ACTION

TO PLAINTIFF MARVIN D. CHANCE, JR., HIS ATTORNEYS OF RECORD, AND

THIS HONORABLE COURT:

PLEASE TAKE NOTICE THAT a Notice of Removal of this action was filed in the

United States District Court for the District of Kansas on October 3, 2005, by defendant Intel

Corporation pursuant to 28 U.S.C. §§ 1332(d) and 1453(b).  The Court is respectfully requested

to proceed no further in this action, unless and until the action is remanded by the United States

District Court.

A copy of the Notice of Removal is attached to this Notice as Exhibit 1.

Respectfully submitted,

Tim J. Moore, SC#14104
Robert W. Coykendall, SC#10137
MORRIS, LAING, EVANS, BROCK
& KENNEDY, CHARTERED

and

David M. Balabanian
Christopher B. Hockett
Joy K. Fuyuno
BINGHAM McCUTCHEN LLP
Three Embarcadero Center
San Francisco, CA 94111-4067
Telephone: (415) 393-2000
Facsimile: (415) 393-2286

Richard A. Ripley
Gregory F. Wells
BINGHAM McCUTCHEN LLP
1120 20th Street, NW, Suite 800
Washington, DC 20036
Telephone: (202) 778-6150
Facsimile: (202) 778-6155

*Attorneys for Defendant*
*INTEL CORPORATION*

2

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing Notice to Plaintiff and this Court of Removal of Action was served by depositing same with the U. S. Postal Service, first class mail, postage prepaid, on the 3rd day of October, 2005, to the following:

Rex Sharp
Gunderson, Sharp & Walke, LLP
4121 West 83rd Street, Ste. 256
Prairie Village, KS 66208

Robert W. Coykendall

3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

MARVIN D. CHANCE, JR.,        )
on behalf of himself and        )
all others similarly situated,      )
                                          )          FILED BY FAX
                    Plaintiff,       )
                                          )
vs.                                    )          Case No. 05-CV-97
                                          )
INTEL CORPORATION, a Delaware   )
corporation, and INTEL KABUSHIKI    )
KAISHA, a Japanese corporation,      )
                                          )
                    Defendants.    )
_____)

### DEFENDANT INTEL CORPORATION'S NOTICE OF REMOVAL

TO THE CLERK OF THE ABOVE-ENTITLED COURT:

Pursuant to 28 U.S.C. §§ 1332(d) and 1453(b), defendant Intel Corporation ("Intel")

hereby removes to this Court the state court action described below, on the basis of the Class

Action Fairness Act of 2005 ("CAFA"). In support of this notice, Defendant states:

1.       On August 22, 2005, plaintiff filed an action in the District Court of Seward

County, Kansas, entitled *Marvin D. Chance, Jr., on behalf of himself and all others similarly*

*situated, Plaintiff, versus Intel Corporation, a Delaware corporation and Intel Kabushiki*

*Kaisha, a Japanese corporation, Defendants,* as Civil Case No. 05-CV-97. The plaintiff,

Marving D. Chance, Jr., a Kansas resident, seeks damages against Intel for himself and a

purported class of similarly situated residents of eighteen Kansas counties for violations of the

Kansas Antitrust Act, Kan. Stat. Ann. § 50-101, et. seq.



# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

MARVIN D. CHANCE, JR.,        )
on behalf of himself and         )
all others similarly situated,      )
                             )
        Plaintiff,        )
                             )
vs.                            )    Case No.
                             )
INTEL CORPORATION, a Delaware    )
corporation, and INTEL KABUSHIKI   )
KAISHA, a Japanese corporation,    )
                             )
        Defendants.      )

## DEFENDANT INTEL CORPORATION'S NOTICE OF REMOVAL

TO THE CLERK OF THE ABOVE-ENTITLED COURT:

Pursuant to 28 U.S.C. §§ 1332(d) and 1453(b), defendant Intel Corporation ("Intel")

hereby removes to this Court the state court action described below, on the basis of the Class

Action Fairness Act of 2005 ("CAFA"). In support of this notice, Defendant states:

1.      On August 22, 2005, plaintiff filed an action in the District Court of Seward

County, Kansas, entitled *Marvin D. Chance, Jr., on behalf of himself and all others similarly*

*situated, Plaintiff, versus Intel Corporation, a Delaware corporation and Intel Kabushiki*

*Kaisha, a Japanese corporation, Defendants*, as Civil Case No. 05-CV-97. The plaintiff,

Marving D. Chance, Jr., a Kansas resident, seeks damages against Intel for himself and a

purported class of similarly situated residents of eighteen Kansas counties for violations of the

Kansas Antitrust Act, Kan. Stat. Ann. § 50-101, et. seq.

2.    Both at the time of the commencement of this action in state court and as of the

date of this removal, Intel Corporation was a Delaware corporation with its principle place of

business in Santa Clara, California.

3.    This Court original jurisdiction under 28 U.S.C. § 1332(d)(2). It is a class action

in which the class population exceeds 100 members,[1] diversity exists between at least one

plaintiff (Mr. Chance, a Kansas resident) and Intel, and the complaint generally alleges claims

that facially involve an aggregate amount in controversy, including the requested statutory

attorney's fees, in excess of the sum or value of $5,000,000, exclusive of interest and costs. 28

U.S.C. §§ 1332(d)(2), 1332(5)(b).

4.    Although plaintiff alleges without factual support that the class-wide claim is less

than $5 million, *see* Complaint ¶ 11, Intel's fact-based estimate shows that the amount placed in

controversy by Mr. Chance's Complaint exceeds $5 million. *See* Declaration of Gregory F.

Wells, attached as Exhibit A.  Plaintiff's conclusory allegation is not sufficient to defeat removal.

*See Yeroushalmi v. Blockbuster, Inc.,* No. CV 05-225-AHM(RCX), 2005 WL 2083008, at *2

(C.D. Cal. July 11, 2005) ("It is clear in the context of removal, even before CAFA, plaintiff's

allegation simply does not control or end the amount in controversy analysis."); *see also* S. Rep.

109-14, at 44 (2005), *reprinted in* 2005 U.S.S.C.A.N. 3, 41-42 (if seeking remand, "plaintiff

should have the burden of demonstrating that 'all matters in controversy' do not 'in the aggregate

exceed the sum or value of $5,000,000,' exclusive of interest and costs...").

---

[1]    Plaintiff alleges that class numbers "at least in the thousands." (Complaint ¶ 34).

5.      The Wichita Division of the United States District Court for the District of Kansas is the proper venue because it is the district and division embracing the place where the state court action is pending. *See* D. Kan. Rule 81.1(b).

6.      Intel's removal is timely. Plaintiff served Intel Corporation with the summons and complaint on September 1, 2005, as reflected in plaintiff's proof of service, attached hereto as Exhibit B.

7.      Intel will promptly notify the plaintiff and the District Court of Seward County, Kansas of this removal.

8.      Pursuant to D. Kan. Rule 40.2, Intel designates the place of trial of this action as Wichita, Kansas. This designation is without prejudice to the transfer of this case by the Judicial Panel on Multidistrict Litigation for coordinated or consolidated pretrial proceedings, pursuant to 28 U.S.C. § 1407.

9.      Intel attaches hereto, as Exhibits C and D respectively, a true and correct copy of the Complaint and the Summons.

Respectfully submitted,


/s/Robert W. Coykendall
Tim J. Moore, SC#14104
Robert W. Coykendall, SC#10137
MORRIS, LAING, EVANS, BROCK
 & KENNEDY, CHARTERED
300 N. Mead, Suite 200
Wichita, Kansas 67202-2722
Telephone: (316) 262-2671
Facsimile: (316) 262-6226
Email: tmoore@morrislaing.com
       rcoykendall@morrislaing.com

David M. Balabanian
Christopher B. Hockett
Joy K. Fuyuno
BINGHAM McCUTCHEN LLP
Three Embarcadero Center
San Francisco, CA 94111-4067
Telephone: (415) 393-2000
Facsimile: (415) 393-2286

Richard A. Ripley
Gregory F. Wells
BINGHAM McCUTCHEN LLP
1120 20th Street, NW, Suite 800
Washington, DC 20036
Telephone: (202) 778-6150
Facsimile: (202) 778-6155

*Attorneys for Defendant*
*INTEL CORPORATION*

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of October, 2005, I electronically filed the foregoing
with the Clerk of the Court by using the CM/ECF system. I further certify that I mailed the
foregoing document and the notice of electronic filing by first-class mail to the following non-
CM/ECF participants:

Rex Sharp
Gunderson, Sharp & Walke, LLP
4121 West 83rd Street, Ste. 256
Prairie Village, KS 66208

/s/Robert W. Coykendall
Robert W. Coykendall

**EXHIBIT A**

# UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

MARVIN D. CHANCE, JR.,      )
on behalf of himself and      )
all others similarly situated,    )
                            )
           Plaintiff,     )
                            )
v.                            )
                            )
INTEL CORPORATION, a Delaware  )
corporation, and INTEL KABUSHIKI )
KAISHA, a Japanese corporation,   )
                            )
          Defendants.    )

## DECLARATION OF GREGORY F. WELLS

1.       My name is Gregory F. Wells. I am over the age of 18 and competent to give testimony. If called upon, I would testify as to the facts in this Declaration.

2.       I am an associate at the law firm of Bingham McCutchen LLP. Bingham McCutchen represents Intel Corporation in this matter.

3.       According to its website (http://www.bls.gov/cps/home.htm), the Current Population Survey (CPS) is a monthly survey of households conducted by the Bureau of Census for the Bureau of Labor Statistics. The Bureau of Census produces a tool called DataFerret (dataferret.census.gov) that allows detailed searching of the data in the CPS database.

4.       The CPS conducts an annual Computer and Internet Use Survey, which asks participants whether they own a personal computer and in what year the newest computer in their household was purchased. The data for 2004 and 2005 (YTD) assume purchases equivalent to the most recent published survey, 2003. The responses to these questions provide a direct estimate of the number of personal computers purchased in Kansas for each year:

| Year | New Computers Purchased |
|------|------------------------|
| 2000 | 162,061 |
| 2001 | 112,672 |
| 2002 | 163,669 |
| 2003 | 179,042 |
| 2004 | 179,042 |
| 2005 (YTD)[1] | 134,282 |
| TOTAL | 930,768 |

5.    Plaintiff alleges that Intel has an 80 percent market share on a unit sales basis.
*See* Complaint, ¶ 16. Multiplying this alleged market share (.80) by the total new computers
purchased (930,768) results in an estimate that 744,614 home computers with Intel
microprocessors were sold to Kansas households during the class period.

6.    Plaintiff's proposed class definition is limited to eighteen Kansas counties:
Seward, Greeley, Hamilton, Stanton, Morton, Wichita, Kearney, Grant, Stevens, Scott, Finney,
Haskell, Gray, Meade, Ford, Clark, Kiowa, and Comanche ("Class Counties"). *See* Complaint, ¶
33.

7.    The Bureau of Census reported that, on average, from 2000-2003 (the most recent
year for which data is available), 5.62 percent of the population of Kansas resides in the Class
Counties. A copy of the Census data is attached as Exhibit 1 to this Declaration.

8.    Multiplying the estimated total number of Intel computers sold into Kansas
(744,614) by the Class Counties' population percentage (.0562) results in an estimated 41,847
new Intel home computers purchased during the Class Period by purchasers in the Class
Counties.[2]

---

[1]    2005 Year To Date includes purchases from January 1, 2005 through August 31, 2005.
[2]    This estimate understates the volume of computers sold into the Class Counties during the class period
because the Census data does not include computers purchased by Kansas businesses. Plaintiff seeks
damages with respect to those business computers as well. Complaint ¶ 33.

9.     Plaintiff seeks recovery of "full consideration under K.S.A. § 50-115 as the damages sustained by Plaintiff and the Class." *See* Complaint, Prayer For Relief, § 3.

10.    A plain reading of this prayer is that Plaintiff seeks to recover the purchase price of these computers.  Assuming, only for purposes of estimating the amount in controversy, that the alleged class was entitled to recover that measure of damages, then the aggregate value of Plaintiff's claim exceeds $5 million if the average price paid for the estimated 41,847 computers in question was greater than $120.

11.    NexTag (www.nextag.com) is a comparison shopping website that compares the retail prices charged for consumer products over time.  Using NexTag data for the 10 most popular desktop PCs sold, I was able to estimate that the average sales price of a desktop PC for 2005 was $463.  That average price is nearly four times the level needed for the aggregate value of the claim that Plaintiff asserts to exceed $5 million.  Plaintiff also seeks to recover for Intel processors sold in notebook computers which, as a general matter, are priced even higher.

Under penalty of perjury, I declare that the foregoing is true and accurate to the best of my knowledge.

Dated: October 3, 2005

Gregory D. Wells

| Geographic Area | Population estimates | | | | | April 1, 2000 | |
|---|---|---|---|---|---|---|---|
| | July 1, 2003 | July 1, 2002 | July 1, 2001 | July 1, 2000 | Estimates base | Census |
| **Kansas** | 2,723,507 | 2,711,769 | 2,700,453 | 2,692,643 | 2,688,814 | 2,688,418 |
| Allen County | 13,907 | 14,111 | 14,196 | 14,377 | 14,385 | 14,385 |
| Anderson County | 8,208 | 8,140 | 8,193 | 8,098 | 8,110 | 8,110 |
| Atchison County | 16,741 | 16,748 | 16,810 | 16,758 | 16,774 | 16,774 |
| Barber County | 5,034 | 5,084 | 5,158 | 5,291 | 5,307 | 5,307 |
| Barton County | 27,467 | 27,618 | 27,777 | 28,123 | 28,205 | 28,205 |
| Bourbon County | 15,086 | 15,175 | 15,362 | 15,388 | 15,379 | 15,379 |
| Brown County | 10,442 | 10,482 | 10,635 | 10,711 | 10,724 | 10,724 |
| Butler County | 61,127 | 60,428 | 59,928 | 59,690 | 59,484 | 59,482 |
| Chase County | 3,107 | 3,067 | 2,998 | 3,032 | 3,030 | 3,030 |
| Chautauqua County | 4,185 | 4,193 | 4,263 | 4,350 | 4,359 | 4,359 |
| Cherokee County | 21,815 | 21,982 | 22,263 | 22,556 | 22,606 | 22,605 |
| Cheyenne County | 2,955 | 3,035 | 3,093 | 3,159 | 3,165 | 3,165 |
| Clark County | 2,333 | 2,361 | 2,385 | 2,386 | 2,390 | 2,390 |
| Clay County | 8,573 | 8,694 | 8,761 | 8,831 | 8,822 | 8,822 |
| Cloud County | 9,859 | 9,950 | 10,081 | 10,221 | 10,268 | 10,268 |
| Coffey County | 8,815 | 8,819 | 8,831 | 8,880 | 8,865 | 8,865 |
| Comanche County | 1,915 | 1,964 | 1,986 | 1,956 | 1,967 | 1,967 |
| Cowley County | 35,860 | 36,364 | 35,951 | 36,279 | 36,291 | 36,291 |
| Crawford County | 38,398 | 38,109 | 38,289 | 38,222 | 38,242 | 38,242 |
| Decatur County | 3,295 | 3,377 | 3,434 | 3,461 | 3,472 | 3,472 |
| Dickinson County | 19,255 | 19,141 | 19,130 | 19,372 | 19,344 | 19,344 |
| Doniphan County | 8,149 | 8,179 | 8,250 | 8,247 | 8,249 | 8,249 |
| Douglas County | 102,983 | 102,200 | 101,076 | 100,182 | 99,965 | 99,962 |
| Edwards County | 3,275 | 3,344 | 3,385 | 3,430 | 3,449 | 3,449 |
| Elk County | 3,167 | 3,191 | 3,189 | 3,226 | 3,261 | 3,261 |
| Ellis County | 27,212 | 27,311 | 27,403 | 27,422 | 27,507 | 27,507 |
| Ellsworth County | 6,347 | 6,393 | 6,450 | 6,529 | 6,525 | 6,525 |
| Finney County | 39,176 | 39,432 | 40,192 | 40,617 | 40,523 | 40,523 |
| Ford County | 33,012 | 32,431 | 32,413 | 32,573 | 32,458 | 32,458 |
| Franklin County | 25,540 | 25,291 | 25,036 | 24,872 | 24,784 | 24,784 |
| Geary County | 26,313 | 26,417 | 27,204 | 27,760 | 27,947 | 27,947 |
| Gove County | 2,910 | 2,964 | 3,010 | 3,067 | 3,068 | 3,068 |
| Graham County | 2,808 | 2,863 | 2,881 | 2,922 | 2,946 | 2,946 |

Page 1

**Annual Estimates of the Population for Counties of Kansas...**

| Geographic Area | Population estimates | | | | April 1, 2000 | |
|---|---|---|---|---|---|---|
| | July 1, 2003 | July 1, 2002 | July 1, 2001 | July 1, 2000 | Estimates base | Census |
| Grant County | 7,745 | 7,889 | 7,791 | 7,885 | 7,909 | 7,909 |
| Gray County | 6,063 | 6,046 | 5,967 | 5,922 | 5,904 | 5,904 |
| Greeley County | 1,420 | 1,461 | 1,532 | 1,542 | 1,534 | 1,534 |
| Greenwood County | 7,485 | 7,628 | 7,726 | 7,668 | 7,673 | 7,673 |
| Hamilton County | 2,666 | 2,661 | 2,677 | 2,665 | 2,670 | 2,670 |
| Harper County | 6,206 | 6,288 | 6,448 | 6,503 | 6,536 | 6,536 |
| Harvey County | 33,502 | 33,366 | 32,999 | 32,880 | 32,869 | 32,869 |
| Haskell County | 4,246 | 4,248 | 4,290 | 4,313 | 4,307 | 4,307 |
| Hodgeman County | 2,151 | 2,154 | 2,135 | 2,087 | 2,085 | 2,085 |
| Jackson County | 13,017 | 12,844 | 12,710 | 12,679 | 12,657 | 12,657 |
| Jefferson County | 18,798 | 18,700 | 18,579 | 18,465 | 18,426 | 18,426 |
| Jewell County | 3,433 | 3,508 | 3,621 | 3,763 | 3,791 | 3,791 |
| Johnson County | 486,515 | 476,009 | 463,974 | 454,514 | 451,476 | 451,086 |
| Kearny County | 4,591 | 4,607 | 4,600 | 4,515 | 4,531 | 4,531 |
| Kingman County | 8,382 | 8,399 | 8,568 | 8,677 | 8,673 | 8,673 |
| Kiowa County | 3,152 | 3,116 | 3,138 | 3,255 | 3,278 | 3,278 |
| Labette County | 22,259 | 22,339 | 22,479 | 22,750 | 22,834 | 22,835 |
| Lane County | 1,946 | 2,001 | 2,094 | 2,144 | 2,155 | 2,155 |
| Leavenworth County | 71,546 | 70,959 | 69,863 | 68,911 | 68,691 | 68,691 |
| Lincoln County | 3,498 | 3,503 | 3,554 | 3,574 | 3,578 | 3,578 |
| Linn County | 9,722 | 9,705 | 9,700 | 9,602 | 9,570 | 9,570 |
| Logan County | 2,855 | 2,945 | 2,989 | 3,047 | 3,046 | 3,046 |
| Lyon County | 35,805 | 35,774 | 35,967 | 35,962 | 35,935 | 35,935 |
| McPherson County | 29,346 | 29,362 | 29,524 | 29,585 | 29,554 | 29,554 |
| Marion County | 13,299 | 13,311 | 13,396 | 13,375 | 13,361 | 13,361 |
| Marshall County | 10,589 | 10,648 | 10,816 | 10,937 | 10,965 | 10,965 |
| Meade County | 4,662 | 4,692 | 4,684 | 4,638 | 4,631 | 4,631 |
| Miami County | 29,187 | 28,950 | 28,692 | 28,497 | 28,351 | 28,351 |
| Mitchell County | 6,707 | 6,693 | 6,771 | 6,914 | 6,932 | 6,932 |
| Montgomery County | 34,934 | 35,229 | 35,794 | 36,196 | 36,254 | 36,252 |
| Morris County | 5,995 | 6,017 | 6,077 | 6,113 | 6,104 | 6,104 |
| Morton County | 3,317 | 3,352 | 3,372 | 3,485 | 3,496 | 3,496 |
| Nemaha County | 10,500 | 10,472 | 10,447 | 10,692 | 10,717 | 10,717 |
| Neosho County | 16,580 | 16,712 | 16,883 | 16,946 | 16,997 | 16,997 |

## Annual Estimates of the Population for Counties of Kansas

| Geographic Area | Population estimates | | | | | April 1, 2000 | |
|---|---|---|---|---|---|---|---|
| | July 1, 2003 | July 1, 2002 | July 1, 2001 | July 1, 2000 | Estimates base | Census |
| Ness County | 3,158 | 3,285 | 3,354 | 3,442 | 3,454 | 3,454 |
| Norton County | 5,796 | 5,830 | 5,862 | 5,954 | 5,953 | 5,953 |
| Osage County | 16,784 | 16,804 | 16,721 | 16,767 | 16,715 | 16,712 |
| Osborne County | 4,179 | 4,281 | 4,351 | 4,433 | 4,452 | 4,452 |
| Ottawa County | 6,177 | 6,197 | 6,146 | 6,195 | 6,163 | 6,163 |
| Pawnee County | 6,796 | 6,914 | 7,034 | 7,219 | 7,233 | 7,233 |
| Phillips County | 5,657 | 5,760 | 5,871 | 6,000 | 6,001 | 6,001 |
| Pottawatomie County | 18,714 | 18,429 | 18,336 | 18,285 | 18,209 | 18,209 |
| Pratt County | 9,437 | 9,572 | 9,536 | 9,630 | 9,647 | 9,647 |
| Rawlins County | 2,843 | 2,883 | 2,905 | 2,960 | 2,966 | 2,966 |
| Reno County | 63,832 | 63,993 | 64,446 | 64,681 | 64,790 | 64,790 |
| Republic County | 5,307 | 5,443 | 5,659 | 5,804 | 5,835 | 5,835 |
| Rice County | 10,412 | 10,519 | 10,628 | 10,738 | 10,761 | 10,761 |
| Riley County | 62,291 | 61,521 | 61,998 | 62,897 | 62,842 | 62,843 |
| Rooks County | 5,417 | 5,487 | 5,581 | 5,662 | 5,685 | 5,685 |
| Rush County | 3,418 | 3,464 | 3,516 | 3,541 | 3,551 | 3,551 |
| Russell County | 6,907 | 7,025 | 7,144 | 7,349 | 7,370 | 7,370 |
| Saline County | 53,737 | 53,902 | 53,785 | 53,603 | 53,597 | 53,597 |
| Scott County | 4,806 | 4,923 | 5,086 | 5,099 | 5,120 | 5,120 |
| Sedgwick County | 462,896 | 460,643 | 456,351 | 453,463 | 452,869 | 452,869 |
| Seward County | 23,091 | 22,994 | 22,629 | 22,541 | 22,510 | 22,510 |
| Shawnee County | 170,902 | 170,314 | 170,380 | 170,047 | 169,868 | 169,871 |
| Sheridan County | 2,662 | 2,669 | 2,712 | 2,802 | 2,813 | 2,813 |
| Sherman County | 6,277 | 6,422 | 6,638 | 6,738 | 6,760 | 6,760 |
| Smith County | 4,181 | 4,294 | 4,425 | 4,522 | 4,536 | 4,536 |
| Stafford County | 4,589 | 4,665 | 4,737 | 4,768 | 4,789 | 4,789 |
| Stanton County | 2,404 | 2,428 | 2,414 | 2,405 | 2,406 | 2,406 |
| Stevens County | 5,389 | 5,340 | 5,359 | 5,463 | 5,463 | 5,463 |
| Sumner County | 25,256 | 25,484 | 25,739 | 25,982 | 25,946 | 25,946 |
| Thomas County | 7,933 | 8,049 | 8,143 | 8,175 | 8,180 | 8,180 |
| Trego County | 3,103 | 3,141 | 3,237 | 3,286 | 3,319 | 3,319 |
| Wabaunsee County | 6,767 | 6,762 | 6,813 | 6,876 | 6,885 | 6,885 |
| Wallace County | 1,621 | 1,685 | 1,700 | 1,737 | 1,749 | 1,749 |
| Washington County | 6,131 | 6,213 | 6,304 | 6,469 | 6,483 | 6,483 |

Page 3

**Annual Estimates of the Population for Counties of Kansas: April 1, 2000 to July 1, 2003**

| Geographic Area | Population estimates | | | | April 1, 2000 | |
| --- | --- | --- | --- | --- | --- | --- |
| | July 1, 2003 | July 1, 2002 | July 1, 2001 | July 1, 2000 | Estimates base | Census |
| Wichita County | 2,447 | 2,508 | 2,541 | 2,523 | 2,531 | 2,531 |
| Wilson County | 10,080 | 10,115 | 10,248 | 10,306 | 10,332 | 10,332 |
| Woodson County | 3,631 | 3,650 | 3,780 | 3,764 | 3,788 | 3,788 |
| Wyandotte County | 157,091 | 157,715 | 158,474 | 157,828 | 157,882 | 157,882 |

Note: The April 1, 2000 Population Estimates base reflects changes to the Census 2000 population from the Count Question Resolution program and geographic program revisions.

Suggested Citation:

Table 1: Annual Estimates of the Population for Counties of Kansas: April 1, 2000 to July 1, 2003 (CO-EST2003-01-20)

Source: Population Division, U.S. Census Bureau

Release Date: April 9, 2004

Page 4

**EXHIBIT B**

**CT CORPORATION**
A WoltersKluwer Company

**Service of Process Transmittal**
09/01/2005
Log Number 510510412

EVA
Roy
CC
(File)

TO:   Kristin Siebert
      Intel Corporation
      SC4-202, 2200 Mission College Boulevard
      Santa Clara, CA, 95052-8119

**RECEIVED**

SEP - 2 2005

RE:   **Process Served in Kansas**

FOR:  Intel Corporation (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Marvin D. Chance, Jr., Pltf. vs. Intel Corporation, Dft. |
| **DOCUMENT(S) SERVED:** | Summons & First Amended Petition; Demand for Jury Trial; Attorneys Lien Asserted. |
| **COURT/AGENCY:** | Seward County District Court - Kansas, KS<br>Case # 05CV97 |
| **NATURE OF ACTION:** | Class Action - Antitrust regarding microprocessors; request for certification as class action. |
| **ON WHOM PROCESS WAS SERVED:** | The Corporation Company, Inc., Topeka, KS |
| **DATE AND HOUR OF SERVICE:** | By Certified Mail on 09/01/2005 postmarked on 08/31/2005 |
| **APPEARANCE OR ANSWER DUE:** | Within 20 days |
| **ATTORNEY(S) / SENDER(S):** | Rex A. Sharp<br>Gunderson Sharp & Walke, LLP<br>4121 West 83rd Street<br>Suite 256<br>Prairie Village, KS, 66208 |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via Fed Ex Priority Overnight, 790631875036<br>Email Notification, Kristin Siebert KRISTIN.SIEBERT@INTEL.COM<br>Email Notification, Janet Craycroft janet.craycroft@intel.com |
| **SIGNED:** | The Corporation Company, Inc. |
| **ADDRESS:** | 515 South Kansas Avenue<br>Topeka, KS, 66603 |
| **TELEPHONE:** | 785-233-0593 |

Page 1 of 1 / LM

Information displayed on this transmittal is for CT Corporation's
record keeping purposes only and is provided to the recipient for
quick reference. This information does not constitute a legal opinion
as to the nature of action, the amount of damages, the answer date,
or any information contained in the documents themselves.
Recipient is responsible for interpreting said documents and for
taking appropriate action.

**EXHIBIT C**

# IN THE DISTRICT COURT
## SEWARD COUNTY, KANSAS

MARVIN D. CHANCE, JR.,    )
on behalf of himself and    )
all others similarly situated,   )
          )
       Plaintiff,   )
          )
v.            )    Case No. 05-CV-97
          )
INTEL CORPORATION, a Delaware  )
corporation, and INTEL KABUSHIKI )
KAISHA, a Japanese corporation,  )
          )
       Defendants.  )

(Pursuant to Chapter 60)

## FIRST AMENDED CLASS ACTION PETITION[1]

Marvin D. Chance, Jr. ("Plaintiff"), by and through his undersigned

attorneys, allege against INTEL CORPORATION and its worldwide family of

dominated subsidiaries, including INTEL KABUSHIKI KAISHA, (hereafter

collectively, "Intel") an antitrust violation and on information and belief would

show the Court and jury as follows:

### NATURE OF THE ACTION

1.    Intel manufactures x86 microprocessors, the central processing unit

(CPU) of most computer systems. The microprocessor processes system data and

controls other devices in the system, acting as the "brains" of the computer.

Intel's microprocessors run the popular Microsoft Windows and Linux families of

operating systems.

---

[1] This Amended Petition is the same as the Original Petition except it omits the
previously attached exhibits which Intel already has or has access to.

2.     In 2004, Intel's revenue from sales of microprocessors was $24.5 billion, approximately 72% of its consolidated net revenue of $34.2 billion. *See* Intel Corporation's 2004 Form 10-K (hereafter "10-K"), at 2, 30.

3.     As Intel proudly declares in the opening sentences of its Form 10-K for the year ended December 25, 2004, it is "the world's largest semiconductor chipmaker. . . [It's] goal is to be the preeminent building block supplier to the worldwide digital economy." *See* 10-K at 1

4.     To achieve its goal of being "the preeminent building block supplier to the worldwide digital economy," Intel engaged in numerous anticompetitive strategies, including threats, intimidation, kickbacks, and retaliation. Intel designed these strategies to quash product-based competition on price and performance in the microprocessor industry. The specific strategies are more completely detailed in the Complaint filed in *Advanced Micro Devices, Inc. and AMD International Sales & Service, Ltd. v. Intel Corporation and Intel Kabushiki Kaisha,* Case No. 1:05-cv-00441, (USDC DE, June 27, 2005) ("the AMD Complaint").

5.     By its own admission, Advanced Micro Devices, Inc. (AMD) is Intel's primary microprocessor competitor. *See* 10-K at p. 13.

6.     In addition to direct competitors like AMD, Intel's anticompetitive strategies impact consumers of computers operating with Intel microprocessors. The inability of AMD and other microprocessor manufacturers to compete fairly and openly in the worldwide digital economy deprives consumers of the right to buy the best product to suit their needs at the lowest price. *See* Reuters article, "AMD files antitrust suit against Intel," June 28, 2005. As detailed in the AMD

2

Complaint, "[c]onsumers ultimately foot this bill, in the form of inflated PC prices and the loss of freedom to purchase computer products that best fit their needs. Society is worse off for lack of innovation that only a truly competitive market can drive." AMD Complaint, at 3, ¶ 6.

7.     Plaintiff Marvin D. Chance, Jr., is a consumer of computers using Intel microprocessors. As such, he and the Class he seeks to represent are indirect purchasers of Intel's x86 microprocessors who have been damaged by Intel's anticompetitive, monopolistic conduct in violation of Kansas' antitrust statutes. Consequently, Plaintiff and the Class (plaintiffs) seek overcharge and full consideration damages, statutory penalties, attorneys' fees, and costs.

## JURISDICTION AND VENUE

8.     Jurisdiction is proper in this Court under the Kansas antitrust statutes, K.S.A. 50-101, et seq., pursuant to the Kansas long arm statute K.S.A. 60-308(b)(1), (2), and/or (7), and general jurisdiction. Intel's monopolistic conduct in the sale and distribution of its microprocessors adversely affects and has affected the Kansas market for computers installed with Intel microprocessors and has directly damaged plaintiffs.

9.     Venue is proper in this Court because Intel transacted business, committed an illegal or tortious act, substantially affected the Kansas trade and commerce in the computer microprocessor market, and injured plaintiffs in Seward County, Kansas where Plaintiff bought computers with Intel microprocessors.

10.     Plaintiff and each member of the class has incurred damages under Kansas law in an amount less than $75,000, even if trebled, and neither plaintiffs nor

3

any other member of the class seeks damages exceeding $75,000, nor do their damages individually exceed $75,000 inclusive of interest and attorneys' fees and all relief of any nature sought hereunder. Further plaintiffs assert no federal question or statute and plaintiffs' state law causes of action are not federally preempted. Plaintiffs allege a cause of action solely under the laws of Kansas and specifically deny any attempt to state a cause of action under the laws of the United States of America including without limitation the Sherman Antitrust Act.

11.    More than 2/3rds of the members of the proposed plaintiff class are residents of Kansas. All class members were principally harmed in Kansas. No injunctive relief is sought. The class-wide claim is **less than** $5 million. No other class claims have been filed by anyone in the prior three years asserting the same or similar factual allegations against any of the defendants.

### THE PARTIES

12.    Plaintiff Marvin D. Chance, Jr. is a resident of Seward County, Kansas, who purchased a personal computer with an Intel microprocessor during the Class Period.

13.    Defendant INTEL CORPORATION is a Delaware corporation with its principal executive offices at Santa Clara, California, and it conducts business both directly and through wholly-owned and dominated subsidiaries worldwide. Intel and its subsidiaries design, produce, and sell a variety of microprocessors, flash memory devices, and silicon-based products for use in the computer and communications industries worldwide. *See* 10-K, List of Subsidiaries.

14.    Intel is a foreign corporation registered with the Kansas Secretary of State. It is currently active and in good standing.

4

15.     Defendant INTEL KABUSHIKI KAISHA ("Intel KK"), a Japanese corporation, is Intel's wholly owned and dominated subsidiary through which Intel sells its microprocessors in Japan.   *See* 10-K, List of Subsidiaries.

### THE MICROPROCESSOR MARKET

16.     For many years, Intel's x86 microprocessors have garnered 90% of the revenue and 80% of the units sold in the world's microprocessor market.

17.     As reported in Intel's 2004 10-K, at 31, Intel had net consolidated revenue from the sales of microprocessors of almost $ 24.5 billion, an increase of $3.0 billion from the prior year.

18.     With $24.5 billion in worldwide revenue from sales of Intel microprocessors, such sales in Kansas account for many millions of dollars per year.

19.     Published reports identify Intel as the market leader with over 90% of the market share as measured by revenue.  AMD is second with 9%.  Other manufacturers make up the remaining 1%.

20.     With over 90% of the market, Intel's monopoly enables it to control pricing for the microprocessors, achieving gross margin percentages approaching 60%.  *See* 10-K at 30.  *See* Intel Business Outlook (reporting expected gross margin percentage for 2005 as 59%).

21.     Despite attempted entries into the computing market by other microprocessor manufacturers, Intel has captured the Windows and Linux operating systems that dominate the consumer and business worlds.  Other microprocessors cannot be substituted, giving Intel a captive market.

22.     Moreover, computer manufacturers will not invest in developing alternative computer architectures because it is impractical.  First, the cost of switching consumers to computers using other microprocessors is too great given the need to replace hardware and software when compared with upgrading. Second, the market of new first time users is too small to create competition in a generally already entrenched market.  Third, competitors cannot meet the huge barriers to entry, such as construction of fabrication facilities and funding of research and development costs.  Fourth, with the exception of AMD, the two remaining competitors in the microprocessor market, Transmeta Corporation and Via Technologies, Inc., are struggling with around 1% of the market.

23.     Hence, the computer microprocessor market is essentially homogenous.  It is the same from country to country, state to state, city to city.  Further, the ease of shipping microprocessors worldwide maintains price consistency which, in turn, deters arbitrage.

24.     To combat Intel's monopoly, AMD compelled arbitration under the 1982 AMD-Intel Technology Exchange Agreement and prevailed after seven years of litigation and appeals.  After confirmation of the arbitration award by the California Supreme Court in 1994, the arbitrator expressed hope that "the competition sure to follow will be beneficial to the parties through an expanded market with appropriate profit margins and to the consumer worldwide through lower prices." *See* AMD Complaint at 7, ¶16.

25.     However, even after losing the arbitration battle, Intel still intended, at that time, and to this day, to become the "preeminent building block supplier to

6

the worldwide digital economy" and recommitted to its anticompetitive strategies in order to achieve its monopolistic goal.  *See* AMD Complaint at 6, ¶15.

26.     These strategies include:

    a.     Forcing major customers into exclusive or near-exclusive deals;

    b.     Conditioning rebates, allowances and market development funding on customers' agreements to minimize or eliminate its purchases of microprocessors from competitors, particularly AMD;

    c.     Establishing a tiered system of retroactive, first-dollar rebates to serve as an incentive for the customers' purchase of microprocessors at high volumes that effectively locked in Intel as the supplier and locked out other microprocessor manufacturers;

    d.     Threatening retaliation against customers introducing other manufacturers' computer platforms, particularly in strategic market segments;

    e.     Enforcing quotas among key retailers and requiring them to stock overwhelmingly, if not exclusively, Intel-powered computers thereby limiting consumers' choice;

    f.     Providing financial rewards through the "Intel Inside" and "Centrino" programs to OEM customers for branding their personal computers with "Intel" indicators;

    g.     Forcing PC makers and technology partners to boycott other manufacturers' product launches and promotions;

7

      h.     Forcing technical standards and products on the industry to secure

for itself and to prevent competitors from altering the microprocessor

market.

27.     Intel particularly targeted its "primary competitor" AMD by the use of

these abusive, exclusionary tactics. *See* AMD Complaint at 15-41.

28.     Further, these tactics are unlawfully exclusionary, have no pro-competitive

justification, and are intended to maintain Intel's monopoly of the x86

microprocessor market.

29.     They are anticompetitive tactics in that they prevented distribution of

competing products, stifled innovation, wrongfully induced retailers and

distributors to stop carrying the competitors' products, and reduced or

eliminated competitors' meaningful access to computer manufacturers, trade

shows, and ultimately consumers, all of which had the combined intent and effect

of preserving Intel's monopoly.

30.     In Kansas, these abusive monopolistic practices effectively eliminated the

consumers' right to purchase the best computing product to suit their needs at

the most competitive price.

31.     The above mentioned abusive monopolistic practices by Intel have had the

following effects on Kansas consumers:

    i.     Restraint or elimination of competition in the sale of computers in

          Kansas;

    ii.     Injury to actual and potential competitors in the Kansas market; and

    iii.     Higher prices to Kansas consumers who were deprived of the benefits

          of free, competitive, innovative, and unrestrained markets.

32.     As a result of Intel's monopolistic practices, Plaintiff and the Class have paid higher prices for computers than they would have paid in a competitive market and have been injured thereby.

### CLASS ALLEGATIONS

33.     Plaintiff brings this action under KSA 60-223(a), and (b) (3) on behalf of himself and a "Class" defined as:

> Individuals or entities who have purchased for end use and not for resale, computers with Intel microprocessors at any time from January 1, 2000 to the present (the "Class Period") who reside in or have their purchasing entity in the Kansas counties of Seward, Greeley, Hamilton, Stanton, Morton, Wichita, Kearney, Grant, Stevens, Scott, Finney, Haskell, Gray, Meade, Ford, Clark, Kiowa, and Comanche.

34.     _Numerosity_.  Plaintiff does not know the exact number of class members, but reasonably believes that the class members number at least in the thousands and are geographically dispersed throughout the aforementioned Kansas counties such that joinder of all class members is impracticable.

35.     _Commonality_.  There are questions of law and/or fact, common to the class, including but not limited to:

a.      Whether the Kansas computing market is the relevant market for determining whether a monopoly exists;

b.      Whether Intel, individually or in consort with its subsidiaries and affiliates, collectively, have monopoly power in the Kansas computing market;

c.      Whether Intel willfully maintained monopoly power or restrained competition in the computing market;

d.      Whether Intel engaged in anticompetitive behavior unilaterally or in combination with others in order to maintain its monopoly in the microprocessor market;

e.      Whether Intel's monopolistic conduct caused artificial and non-competitive pricing for computers sold in Kansas;

9

     f.     Whether Plaintiffs and class members were injured by Intel's
conduct and, if so, the appropriate class-wide measure of damages.

36.   <u>Typicality and Adequacy</u>. Plaintiff's claims are typical of the claims of the

Class who bought computers with Intel x86 microprocessors in the

aforementioned Kansas counties, including Seward County, and who seek

effectively the same relief of monetary damages. Plaintiff will fairly and

adequately represent the interests of the Class and has no conflicts with any

member of the Class. Furthermore Plaintiff has retained competent legal counsel

experienced in Kansas antitrust and class action litigation.

37.   <u>Common questions of law and/or fact predominate and class actions are</u>

<u>superior under K.S.A. 60-223(b)(3)</u>. A class action to resolve these issues is far

superior for the fair and efficient adjudication of the controversy so as to

concentrate the litigation in a single proceeding to eliminate the burden on the

courts and the parties. Thousands of lawsuits throughout the state of Kansas

would be undesirable, unmanageable, and cost prohibitive. Whatever difficulties

may exist in the management of the class action will be greatly outweighed by the

class action procedure.

## TOLLING OF STATUTE OF LIMITATIONS

38.   Intel's monopolistic practices tolled the statute of limitations due to one or

more of the following theories:

    (a)  Fraudulent concealment of its anticompetitive strategies which could

        not be recognized in isolation by a consumer, but was only obvious in

        the aggregate over time due to Intel's systematic attempt to conceal

        its true anticompetitive effect;

(b)   Equitable tolling because Intel should not be able to benefit from its

improper and illegal conduct;

(c)   Discovery rule because Plaintiff and the Class were unable to

reasonably discern the monopolistic practice and the harm that it was

causing; and

(d)   Continuous tort from the systematic and continuing monopolistic

practices of Intel over the Class Period.

## CAUSE OF ACTION I

### Kansas Antitrust Cause of Action
### for Unlawful Maintenance of Monopoly and for Restraint of Trade
### K.S.A. 50-101, et seq.

39.   Plaintiffs restate and re-allege paragraphs 1-38 above.

40.   Through the anticompetitive and illegal conduct described above, Intel

willfully maintains and, since 2000, has maintained a monopoly in the

microprocessor market.  That monopoly deprives consumers of a free market

economy in the sale of computers in the United States, including Kansas.

41.   Intel, unilaterally or in combination with others, has unreasonably

restrained trade in the microprocessor market.

42.   As a direct and proximate result of the above described conduct by Intel,

Plaintiff and the Class have been injured in an amount which will be established

on a class-wide basis at trial.

## PRAYER FOR RELIEF

Plaintiff and the Class respectfully request:

1.      That the Court declare and adjudge this action to be a proper class action pursuant to K.S.A. 60-223;

2.      That the Court find and adjudge that Intel has committed the violations of Kansas antitrust law stated here in;

3.      That the Court enter judgment in favor of the Plaintiff and Class against Intel for full consideration under K.S.A. 50-115 as the damages sustained by Plaintiff and the Class;

4.      That the Court enter judgment in favor of the Plaintiff and the Class against Intel for treble damages under K.S.A. 50-801;

5.      That Plaintiff and the Class be awarded the cost of suit, including reasonable attorneys' fees;

6.      That the Court enter a judgment that Intel and its wholly-owned subsidiaries are jointly and severally liable for the damages sustained from its monopolistic conduct;

7.      That Plaintiff and the Class be granted such other and further relief as the Court may deem proper.

**JURY TRIAL DEMANDED**
**ATTORNEYS' LIEN ASSERTED**

Respectfully submitted,

Rex A. Sharp KBA # 12350
Barbara C. Frankland KBA # 14198
Gunderson, Sharp & Walke, L.L.P.
4121 W. 83rd St., Ste. 256
Prairie Village, KS 66208
(913) 901-0505
(913) 901-0419 fax

12

# EXHIBIT D

IN THE DISTRICT COURT OF SEWARD COUNTY, KANSAS

MARVIN D. CHANCE, JR.
                                                    CASE NO. 05 CV 97
                    PLAINTIFF              DIVISION _____
                                                    K.S.A. CHAPTER 60
            VS
                                                    AHY
                                          TO SHERIFF
                                                    7-7-05
    INTEL CORPORATION          ORIGINAL   _____
                    DEFENDANT              COURT CLERK

                    SUMMONS              BY    DC    _____

**TO THE ABOVE-NAMED DEFENDANT:**

        You are hereby notified that an action has been commenced against you in this court. You are
required to file your answer to the petition with the court and to serve a copy upon the plaintiffs attorney as
follows:

                    NAME:      Rex A. Sharp

                    ADDRESS:   Gunderson, Sharp & Walke, L.L.P.

                               4121 West 83rd Street, Suite 256

                               Prairie Village, KS 66208

within 30 days after service of summons upon you.

        If you fail to do so, judgment by default will be taken against you for the relief demanded in the
attached petition, which is incorporated herein by reference. Any related claim which you may have against
the plaintiff must be stated as a counterclaim in your answer, or you will thereafter be barred from making
such claim in any other action.

(SEAL)                                        Deputy
                                          Clerk of the District Court

DATED:    7-7-05              BY: Deborah Copland

+++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++
                    **RETURN OF SERVICE OF SUMMONS**
STATE OF _____ )
COUNTY OF _____ ) SS.
        I hereby certify that on the _____ day of _____, 20_____, I served the foregoing
summons, together with a copy of the petition _____
upon the defendant _____
by delivering to _____
at _____ at
_____ a.m./p.m. in the County of _____, State of _____.

_____    _____    _____
Signature                  Title             County & State
                    **OUT OF STATE CLERK'S CERTIFICATE**
Subscribed and sworn to before me this date, by above deputy, who I certify was at the date of such service
and now is _____ of _____ County in the State of _____ and is authorized to
service process in civil actions within said state and is an officer of the court of which I am the clerk. Witness
my hand and the seal of this Court.
(SEAL)
DATE: _____        _____
                                  **CLERK**

## IN THE DISTRICT COURT OF SEWARD COUNTY, KANSAS

MARVIN D. CHANCE, JR.

PLAINTIFF

CASE NO. 05 C V 97

DIVISION _____

K.S.A. CHAPTER 60

VS

INTEL CORPORATION

DEFENDANT

### SUMMONS

### TO THE ABOVE-NAMED DEFENDANT:

You are hereby notified that an action has been commenced against you in this court. You are required to file your answer to the petition with the court and to serve a copy upon the plaintiffs attorney as follows:

NAME: _____ Rex A. Sharp _____

ADDRESS: _____ Gunderson, Sharp & Walke, L.L.P. _____

_____ 4121 West 83rd Street, Suite 256 _____

_____ Prairie Village, KS 66208 _____

within 30 days after service of summons upon you.

If you fail to do so, judgment by default will be taken against you for the relief demanded in the attached petition, which is incorporated herein by reference. Any related claim which you may have against the plaintiff must be stated as a counterclaim in your answer, or you will thereafter be barred from making such claim in any other action.

(SEAL)

Deputy
Clerk of the District Court

DATED: __7-7-05__          BY: _Deborah Garland_

+++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++
### RETURN OF SERVICE OF SUMMONS
STATE OF _____ )
COUNTY OF _____ ) SS.

I hereby certify that on the _____ day of _____, 20 ____, I served the foregoing summons, together with a copy of the petition _____
upon the defendant _____
by delivering to _____
at _____ at
_____ a.m./p.m. in the County of _____, State of _____.

_____          _____          _____
Signature                 Title                    County & State
### OUT OF STATE CLERKS CERTIFICATE
Subscribed and sworn to before me this date, by above deputy, who I certify was at the date of such service and now is _____ of _____ County in the State of _____ and is authorized to service process in civil actions within said state and is an officer of the court of which I am the clerk. Witness my hand and the seal of this Court.
(SEAL)
DATE: _____          _____
                                 CLERK

```
*************************************************************************
*                          TRANSACTION REPORT                          *
*                                                    OCT-03-2005 MON 03:57 PM *
*                                                                       *
*    FOR:  SEWARD CO DISTRICT COURT      620 626 3302                   *
*──────────────────────────────────────────────────────────────────────*
*    RECEIVE                                                            *
*                                                                       *
*  DATE  START   SENDER          RX TIME   PAGES TYPE    .   NOTE       M# DP *
*──────────────────────────────────────────────────────────────────────*
*  OCT-03 03:47 PM 3162626226            9'50"    35  RECEIVE     OK     *
*                                                                       *
*************************************************************************
```